**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------ X

LIA TIEU,                                                    :

                                                :     Civil Action No.:

                 Plaintiff,                               :

                                                 :

            v.                                               :     **COMPLAINT**

                                                 :

NEW YORK CITY ECONOMIC                                       :
DEVELOPMENT CORPORATION,                                     :     <u>**Jury Trial Demanded**</u>
WINTHROP HOYT and RACHEL LOEB, in                            :
their individual and professional capacities,                :

                                                 :

                 Defendants.                             :
------------------------------------------------------------ X

        Plaintiff Lia Tieu ("Tieu" or "Plaintiff") by and through her counsel Wigdor LLP, hereby alleges against Defendants New York City Economic Development Corporation ("NYCEDC" or the "Organization"), Winthrop Hoyt and Rachel Loeb (together, "Defendants"), as follows:

<u>**PRELIMINARY STATEMENT**</u>

        1.      Tieu gave birth in August 2019 while on maternity leave and, after her maternity leave ended, went on medical leave to recover from a tumor on her pituitary gland and from post-partum depression and anxiety.  Tieu returned to work on May 4, 2020.  Throughout this ordeal, NYCEDC has made clear to her that it did not want to accommodate her for her high-risk pregnancy and disability, treated her differently than white, non-pregnant and male co-workers, and ultimately, retaliated against her for her protected complaints.

        2.      First, when Tieu asked for a reasonable accommodation as a result of a sudden hearing loss that she experienced while pregnant, NYCEDC resisted her request for a reasonable accommodation, summarily labeling Tieu as "unfit for work."

        3.      Later, when Tieu requested a maternity leave for the birth of her first child, her manager Hoyt initially refused to approve her maternity leave application.  He also refused to

accommodate her pregnancy, forcing her to be a witness at a deposition even though Tieu notified him that she was eight months pregnant and classified as high-risk, with the possibility of her water breaking at any minute. Rather than permit her to exercise her rights, Hoyt accused her of "shirking [her] responsibilities." Hoyt also later told Tieu that she should be "grateful" that her colleagues were "doing [her] a favor" by filling in for her while she was on leave.

4. Tieu protested to Hoyt that she was entitled to take maternity leave and should not be made to feel guilty about it. Hoyt retaliated immediately. The next day, he gave her an unwarranted negative performance review.

5. As a result, Tieu complained repeatedly about this discriminatory and retaliatory treatment, to no avail. Rather, Tieu was directed to start her maternity leave early for no justifiable reason. Moreover, NYCEDC managers and executives to whom Tieu complained immediately discounted her serious complaints, suggesting – falsely – that Tieu merely misheard Hoyt because of her hearing disability.

6. When NYCEDC purportedly investigated Tieu's complaint, the investigation resulted in few, if any, witnesses being interviewed and a superficial conclusion exonerating Hoyt, who was, at the same time, rewarded with a promotion.

7. The retaliatory conduct against Tieu, however, continued. She was given a minimal raise despite her excellent work and was provided fewer resources to perform her job going forward.

8. When Tieu returned to work, NYCEDC continued to retaliate against her by failing to transfer her to another unit as previously promised, diminishing her work responsibilities, forcing her to sign an agreement with restrictions for her work from home request (which was not required of other employees), treating her differently from her peers by

intensely scrutinizing her work and requiring her to report to a secondary manager and by giving her an unwarranted negative performance review, disqualifying her from a bonus.

9.      Tieu also complained about race discrimination.  As an Asian woman, Tieu observed that Hoyt treated her and other Asian women less well, including harshly criticizing and ultimately pushing out one of her Asian female colleagues.  Predictably, however, NYCEDC has also refused to take these complaints seriously.

10.     Defendants' actions violated the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2615(a)(2); Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"); the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 *et seq.* ("ADA"); the Civil Rights Act of 1866, 42 U.S.C. § 1981, *et seq.* ("Section 1981"); the New York State Human Rights Law ("Executive Law"), N.Y. Exec. Law § 290 *et seq.*; and the New York City Human Rights Law ("City Law"), N.Y.C. Admin. Code § 8-101 *et seq.*  Plaintiff seeks all available declaratory, injunctive and monetary relief.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as this action involves federal questions regarding the deprivation of Plaintiff's rights under the FMLA, Title VII, the ADA and Section 1981.  The Court has supplemental jurisdiction over Plaintiff's related claims arising under state law pursuant to 28 U.S.C. § 1367(a).

12.     Pursuant to 28 U.S.C. § 1391, venue is proper in this district because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## ADMINISTRATIVE PROCEDURES

13.     On June 3, 2020, Plaintiff filed a Charge of Discrimination with the Equal

Employment Opportunity Commission ("EEOC").  On January 13, 2021, the EEOC issued a

Notice of Right to Sue.[1]

14.     Pursuant to NYCHRL § 8-502, Plaintiff will serve a copy of this Complaint upon

the New York City Commission on Human Rights and the New York City Law Department,

Office of the Corporation Counsel, thereby satisfying the notice requirements of that section.

15.     Any and all other prerequisites to the filing of this suit have been met.

## PARTIES

16.     Tieu is a Vice President of Asset Management at NYCEDC.  She lives and works

in New York City.  At all relevant times, Plaintiff met the definition of "employee" and/or

"eligible employee" under all applicable statutes.

17.     NYCEDC is a domestic not-for-profit corporation with its principal place of

business located at One Liberty Plaza, New York, NY 10006.  At all relevant times, NYCEDC

met the definition of an "employer" and/or a "covered employer" under all relevant statutes.

18.     Hoyt is a Senior Vice President of Asset Management at NYCEDC.  He

supervised Tieu and participated in the unlawful conduct targeting Tieu.  At all relevant times,

Defendant Hoyt met the definition of an "employer" and/or a "covered employer" under all

relevant statutes.

---

[1]     On April 12, 2021, the Parties entered into a tolling agreement tolling all applicable
statutes of limitations until July 12, 2021.

19.     Loeb is President of NYCEDC.  She supervised Tieu and participated in the unlawful conduct targeting Tieu.  At all relevant times, Defendant Loeb met the definition of an "employer" and/or a "covered employer" under all relevant statutes.

## FACTUAL ALLEGATIONS

### I.     Background

20.     NYCEDC is a non-profit corporation whose stated mission is to grow economic opportunities in New York City, particularly through real estate development.  The agency operates independently from the City of New York and reports to the Deputy Mayor for Housing and Economic Development.  The members of its Board of Directors are appointed by the Mayor and the Borough Presidents.

21.     NYCEDC hired Tieu in July 2018 as a Vice President of Asset Management, initially reporting to Darryl Connelly.  In October 2018, Tieu began reporting to Hoyt, a Senior Vice President ("SVP").  However, Hoyt infrequently interacted with and rarely supervised Tieu (or any of his staff) regarding her work prior to her medical leave, and she spent the majority of her time working with Lauren Wolf, an SVP in the Real Estate Transactions team.

22.     From the beginning, Tieu worked hard and was successful in her role.  Wolf frequently spoke to Hoyt, and also emailed James Patchett, the former President of the Organization, and Rachel Loeb, NYCEDC's then Chief Operating Officer and now President, to praise Tieu and tell them about her good work.  Indeed, before Tieu requested any accommodations during her pregnancy, Tieu was unaware of any negative feedback about her performance at NYCEDC.

II.   **Tieu's Accommodations Request**

23.    In or around January 2019, Tieu notified Hoyt, Wolf and Patchett that she was pregnant.  Although her pregnancy was labeled high-risk, NYCEDC refused to accommodate her during this time and, to the contrary, became increasingly hostile toward her.

24.    In or around mid-to-late January 2019, when Tieu was approximately eight weeks pregnant, she began experiencing many side-effects of morning sickness, including difficulty sleeping and eating, which were exacerbated by the stress of the high-risk nature of Tieu's pregnancy.  As a result, Tieu asked Hoyt if she could work from home two days a week for just two weeks so that she could manage her morning sickness.  In response, Hoyt asked Matthew Kwatinetz, the former Executive Vice President ("EVP") of Asset Management and Hoyt's supervisor, who approved Tieu's accommodation request.

25.    However, when Tieu informed Rebecca Osborne, a former Assistant VP ("AVP") of NYCEDC Human Resources ("HR"), about the already-approved accommodation, Osborne refused to implement the plan, immediately claiming, "we don't have a formal work from home policy."

26.    In fact, Tieu had heard of other employees who worked from home on a long-term basis.  Moreover, Tieu would have been capable of performing the essential functions of her job with the already-approved accommodation without causing any undue hardship on the Organization.

27.    Having no choice, Tieu asked if she could arrive to work at 10:00 a.m. (instead of 9:00 a.m.) and leave the office a bit earlier so that she could work from home the rest of the day.  Approximately one week later, Osborne finally approved this lesser accommodation.

28.     Around early February 2019, Hoyt told Tieu that "it would behoove" her to tell Molly McCarthy, the former VP and Chief of Staff of Asset Management, that she was pregnant. There was, in fact, no reason for Tieu to tell McCarthy about her pregnancy at that early juncture. She was still in her first trimester and there was a considerable chance that she could miscarry given her high-risk pregnancy.

29.     Hoyt explained that Tieu should try to establish a "good relationship" with McCarthy and said it would help Tieu "develop trust" with McCarthy. He also explained that he was close with McCarthy and felt "beholden" to McCarthy for helping "get rid of" one of Tieu's Asian co-workers who had been discriminated against and ultimately resigned in October 2018. Unsettled, Tieu did not tell McCarthy about her pregnancy.

30.     On or about February 26, 2019, Tieu suffered a sudden sensorineural hearing loss in her left ear while approximately 12 weeks pregnant. As a result, her doctors advised her to work from home for the next two weeks, where Tieu could perform the essential functions of her job.

31.     On March 1, 2019, Tieu provided Osborne with a note from her doctor explaining the request. Tieu also spoke to Osborne and Patchett on the phone and cried as she detailed her hearing loss.

32.     Osborne reacted negatively, summarily denying the accommodation request. Even more remarkably, and without any inquiry, Osborne labeled Tieu "unfit for work" and directed Tieu not to return to work for two weeks.

33.     On March 4, 2019, Loeb called Tieu, and, while referring to Tieu's March 1, 2019 conversation with Osborne and Patchett, described Tieu as "hysterical."

34.     In fact, Tieu was able to work from home the entire time but was forced to take time off until she received a second note from her doctor two business days later.  Tieu then proceeded to work from home for the duration of the two-week accommodation.

35.     In late March 2019, Hoyt again fixated on Tieu's pregnancy.  He pressed Tieu to tell her co-workers that she was pregnant as a "courtesy" because they were probably wondering why she was not in the office following her short leave.  Again, Tieu was upset that Hoyt appeared to be directing her on how to disclose her pregnancy.

36.     In early May 2019, Tieu began to speak with HR about her request for maternity leave.  Tieu first met with Khary Hair, an AVP in HR, on May 7, 2019, to discuss NYCEDC's maternity leave policies.  That same day, pursuant to Hair's instructions, Tieu filled out and signed an NYCEDC form requesting leave from August 26, 2019 to December 15, 2019, or 16 weeks of job-protected maternity leave pursuant to NYCEDC policy.  Hair confirmed that, as an employee with at least one year of service, Tieu was eligible for 16 weeks of maternity leave.

37.     Hoyt, however, refused to approve the leave, telling Tieu – falsely – that she was "not eligible" and that her form was "wrong."  Hoyt stated that he had confirmed Tieu's denial of leave with Kwatinetz and McCarthy, neither of whom knew of Tieu's tenure, due date or leave eligibility.

38.     Hoyt was ultimately forced to approve the leave when Tieu confronted him with the written policy.  Hoyt later admitted that he had denied Tieu's request even though he "didn't know what the policy was."  Upon information and belief, Hoyt had neither looked at the policy nor spoken to Hair.

39.     Nonetheless, Hoyt went out of his way to show that he disapproved of Tieu exercising her right to take job-protected leave.  Hoyt accused Tieu of "shirking [her]

responsibilities" and expecting her co-workers to do her "favors" by taking over her work while she was out of the office.

40.     Indeed, Hoyt made it a point to force Tieu to perform tasks that could be detrimental to her health.  For example, in or around June 2019, NYCEDC had to provide a representative to be deposed in a personal injury lawsuit in which an NYCEDC tenant had been named as a defendant.

41.     NYCEDC initially asked Tieu to testify at the deposition as its corporate representative.  At the time, Tieu was approximately eight months into her high-risk pregnancy. Accordingly, she requested an accommodation.  Specifically, she sent an email to Richard Tom, an AVP and paralegal, stating that she was pregnant and that her "water could break at any time," potentially preventing her from appearing at the deposition on the scheduled date.  Tieu also had grave concerns that the stress of the deposition could aggravate the sudden hearing loss she had previously suffered, and was still recovering from, while being stuck at a location far from her home.  In response, Jill Braverman, NYCEDC's Assistant General Counsel, notified Hoyt that he "need[ed] to make [him]self available for this deposition."

42.     Hoyt became furious at Tieu.  Three days before the deposition, Hoyt lashed out at Tieu, accusing her of "shirking [her] responsibilities" and told her that she needed to "take ownership" of her work.  Hoyt then directed Tieu to appear for the deposition, in contravention of the advice of NYCEDC's lawyers.  Hoyt then emailed Braverman and Tom, stating that Tieu – not he – would have to appear at the deposition.

43.     Braverman and Tom were shocked and angry at Hoyt's decision.  Tom scrambled to request that the deposition be moved from Staten Island, where it was initially scheduled, to lower Manhattan so that Tieu would not need to take the ferry in order to travel there.

Ultimately, pursuant to Hoyt's instruction, Tieu was forced to attend the deposition in lower Manhattan.

44.     Thereafter, Hoyt continued to harass Tieu because of her pregnancy and accommodation request, which he viewed as an inconvenience to himself and her co-workers. For example, on July 24, 2019, Hoyt falsely reprimanded Tieu for "bossing around" a co-worker whom Tieu was attempting to inform about new projects before Tieu went on leave.  In fact, the co-worker was grateful for Tieu's help thanking Tieu for "setting me up for success."  Hoyt, however, believed that Tieu "should be grateful" that the co-worker would be taking on Tieu's work during the leave.  According to Hoyt, the co-worker was "doing [Tieu] a favor."

45.     Tieu protested Hoyt's discriminatory and retaliatory behavior, telling him that "no one is doing [her] a favor and [she] has a right to take maternity leave without feeling guilty."

46.     Tieu's protests only made things worse.  The next day, Hoyt gave Tieu a negative performance review.  While he rated Tieu a three out of five (meets expectations) overall, he falsely rated her a two (needs improvement) on her communication skills.  According to company policy, raises are awarded to employees based on their performance reviews.

47.     The review was much worse than Tieu had expected, given that she had not heard any concerns about her performance.

48.     Tieu again protested Hoyt's retaliatory actions.  She told Hoyt that she was surprised at the review as this was the first time that anyone had raised any concerns to her about her performance.  She also stated her belief that Hoyt was discriminating against her because of her pregnancy.

49.     Hoyt admitted that Tieu's pregnancy was a factor in his treatment of her.  He told Tieu that he had "debated whether to criticize [Tieu] because [she was] nine months pregnant

and about to go on leave."  Nevertheless, according to Hoyt, Tieu "needed to hear it."  He then threatened that he would continue to punish Tieu, saying he planned to start "keep[ing] a list" of her purported wrongdoings.  Upon information and belief, Hoyt did not keep such a list for any of Tieu's non-pregnant colleagues.

### III.   Tieu's Continued Protected Complaints of Discrimination

50.     Tieu reported Hoyt's discriminatory and retaliatory conduct to former President Patchett.  She explained her belief that Hoyt created a hostile work environment and had retaliated against her because of her impending maternity leave.

51.     Patchett was initially supportive.  Indeed, he did not disagree with Tieu's description of Hoyt as "lazy" and nodded his head up and down when Tieu explained her suspicions that Hoyt was angry that his work-load would increase with her leave and that, as a result, he "resent[ed] her."

52.     Patchett, however, did not take any remedial action.  He instead told Tieu that she had the option to file an informal complaint with NYCEDC before or after her maternity leave. He also suggested that Tieu – not Hoyt – give up her job, offering to transfer her to a different department.  While Tieu believed it was unfair that she transfer (not Hoyt who behaved unlawfully), she had little choice unless she wanted to remain his supervisee and suffer his abuse.

53.     Tieu also reported Hoyt's unlawful behavior to Hair and Rosa Vasquez, the SVP of HR.  Like Patchett, Hair and Vasquez suggested that Tieu was the problem and insisted that, as a solution to Hoyt's unlawful treatment of her, she go on medical leave immediately.  In fact, Tieu was able to perform the essential functions of her job through her estimated due date of August 29, 2019.

54.     On July 30, 2019, Tieu again raised complaints of discrimination to NYCEDC. Tieu told Loeb, then Chief Operating Officer, that Hoyt was discriminating against her for her pregnancy and upcoming maternity leave by, among other things, giving her a poor review.  Tieu also explained that she was the second Asian female that Hoyt targeted.

55.     Loeb summarily dismissed Tieu's concerns without any investigation, in contravention of NYCEDC's policies, which require "a prompt and thorough investigation" that is reasonable and appropriate for the review and resolution of the complaint.  Loeb "c[ouldn't] believe" that Hoyt would "say those things," and interrogated Tieu as to whether she knew when Defendant Hoyt wrote the review, saying that it could have been "a month ago."

56.     To make matters worse, Loeb attacked Tieu for her disability.  Referring to the hearing loss that required Tieu to seek an accommodation, Loeb questioned whether Tieu had "heard [Hoyt] correctly," saying that Tieu had "had problems with [her] ear in March."  Like Hoyt, Loeb suggested Tieu should be grateful to NYCEDC, emphasizing that NYCEDC had gone to great lengths to "accommodate" Tieu for her hearing loss.  In fact, NYCEDC had not properly accommodated Tieu at all; rather, as explained above, it labeled Tieu "unfit for work" and sent her home instead of permitting her to telecommute.  Tieu protested, asking Loeb how declaring her "unfit for work" was a proper accommodation.  True to form, Loeb brushed off Tieu's serious concerns, claiming that the term "unfit for work" was "an outdated Australian term" that "meant nothing."

57.     Tieu also attempted to raise concerns that Hoyt had behaved improperly with respect to a transaction the two worked on.  Loeb responded by attacking Tieu, asking if Tieu had "communicated" properly, another reference to Tieu's hearing loss.

58.     The next day, July 31, 2019, Tieu met with Patchett to report Loeb's hostility. Tieu told Patchett that she planned to file a formal complaint.

59.     On August 1, 2019, Tieu filed a complaint in a meeting with Vasquez and Erica Edwards-O'Neal, NYCEDC's former Equal Employment Opportunity Officer and SVP of Diversity, Equity and Inclusion.

60.     Unfortunately, NYCEDC made clear that it did not plan to take Tieu's concerns seriously.  Vasquez questioned whether Tieu was overreacting to Hoyt's criticism, saying "a three [that she received from Hoyt] is good" and that there was "a difference between poor management and discrimination."  Tieu responded by showing Vasquez various emails and documents substantiating her complaint.  Vasquez claimed that NYCEDC would conduct a thorough investigation, provide Tieu with a detailed report containing witness interviews and would contact Tieu (while she was on maternity leave) if she had any questions.

61.      On August 2, 2019, Tieu responded in writing to the negative performance review Defendant Hoyt had given her and once again protested Hoyt's discrimination, stating that Hoyt had exhibited "discriminatory animus" toward her over the past four months "because of her impending pregnancy leave."

## IV.   NYCEDC Continues to Discriminate and Retaliate Against Tieu While She Is on Maternity Leave

62.     Although Tieu was able to continue working in early August, HR had made clear to her that the only way to escape Defendant Hoyt's unlawful conduct was to take her leave early.

63.     Hair told Tieu, "I can see you're stressed out about it. You can take medical leave. We have a salary continuation policy that you can use before you give birth and start your

maternity leave. You can also use sick and vacation days." Hair explained that Tieu was eligible for ten days of salary continuation based on her length of service.

64.    Like Hair, Vasquez also tried to force Tieu to take an early leave despite her ability to continue working, telling Tieu, "you should take leave early. I can see you're stressed out about what happened. We don't want to take any liability if anything happened to you or the baby while you're still working."

65.    Loeb piled on, telling Tieu that there "is nothing wrong with taking leave early. Some women go on bedrest months before giving birth. Your work will still be here when you come back. I've been on maternity leave twice. I know how it works."

66.    Having no choice, on August 1, 2019, Tieu submitted a note to HR from her doctor explaining that her pregnancy was high-risk and requesting that she begin her leave on August 5, 2019. Tieu's last day of work before her leave was August 2, 2019.

67.    On August 15, 2019, while on leave, Tieu asked Hoyt whether she would be receiving a raise that year. Typically, raises are announced in mid-August.

68.    Hoyt did not respond. Instead, the next day, August 16, 2019, Vasquez explained that NYCEDC had instructed Hoyt not to communicate with Tieu because of "FMLA regulations" and that Tieu would not be hearing from him.

69.    Vasquez also informed Tieu that she would be receiving only a minimal raise that was significantly lower than what Tieu had expected given her strong work performance and the praise she had received.

70.    On October 2, 2019, Tieu emailed Vasquez to ask how her raise had been calculated. She also requested an update on the investigation NYCEDC was purportedly

conducting into her complaints of discrimination.  Vasquez refused to respond in writing, likely

not wanting to leave a paper trail of their conversation.

71.     Frustrated by the lack of a response, on October 14, 2019, Tieu sent an email to

Patchett asking for an update on the investigation, which she still had not received.  Patchett

responded on October 17, 2019, assuring Tieu that she would receive an update in writing.

## V.     Tieu's Request for Disability Leave

72.     In or around October 2019, Tieu was diagnosed with a pituitary tumor, which

required surgery.  The diagnosis, in concert with Tieu's recovery from a stressful high-risk

pregnancy and cesarean section, was devastating and led her to experience severe postpartum

anxiety and depression for which Tieu sought psychotherapeutic and psychiatric treatment.  As a

result of these medical conditions, Tieu was unable to return to work in late December 2019 as

planned.

73.     On November 4, 2019, Tieu wrote to Patchett and Hair asking for assistance

coordinating her medical leave.  Tieu explained that "I was recently diagnosed with a pituitary

tumor that [was] impinging on my optic nerve and that requires surgery in order to preserve my

vision [and that] [t]his latest development complicat[ed] my existing postpartum depression and

recovery."  Tieu further attached a note from her treating psychotherapist, explaining her health

conditions as well as her psychotherapist's recommendation that Tieu take "an extended leave of

24 weeks [until June 2020] from the pressure of work for post-operative healing and recovery."

74.     In the November 4, 2019 email, Tieu also asked that she not be required to engage

with Hoyt on her medical leave or other personal matters "because of [Hoyt's] hostility and

discriminatory animus toward [her] maternity leave."

75.     On November 23, 2019, Tieu submitted her disability leave forms to Aetna, the outside insurance company responsible for managing disability leave at NYCEDC.  On December 12, 2019, Tieu's therapist submitted forms substantiating her need for medical and disability leave.

76.     On December 4, 2019, Tieu underwent brain surgery and was discharged from the hospital on December 6, 2019.

77.     On December 17, 2019, Tieu had still not heard any confirmation from NYCEDC regarding her disability leave.  With her original return to work date of December 23, 2019, approaching, Tieu emailed Hair to ask about the status of her disability leave request.

78.     Once again, NYCEDC attempted to block Tieu from exercising her rights.  Hair stated that Tieu could not change her return-to-work date "until [she] receive[d] formal word from Aetna as to [her] status."  He then suggested that her job was at risk, saying, "[a]ccording to the [FMLA] your job protection ended on [October 25, 2019].  Your company provided Parental Leave is ending as of [December 20, 2019].  In order for us to continue holding your position on our books we must have some documentation to support the action."

79.     Hair's explanation that Tieu needed "documentation" in order to keep her job made no sense.  Tieu initially emailed Patchett and Hair regarding her disability leave request almost two months prior and had submitted the required forms to Aetna as instructed.  Accordingly, Tieu responded to Hair on December 18, 2019, copying Patchett, explaining that she had already submitted the documentation required for an "ADA accommodation."

80.     Fearful of losing her job, Tieu also explained that she would return to work on her scheduled return date of December 23, 2019 "against [her] medical provider's orders and despite [her] ongoing physical, mental and emotional recovery from [her] recent brain surgery and

postpartum depression and anxiety."  However, Tieu stated, she feared that doing so would "curtail [her] recovery process" and that she would not "hesitate to pursue legal action," should she suffer physical harm as a result of NYCEDC's decision to deny her request for a reasonable accommodation.

81.     The next day, December 19, 2019, Tieu sent Hair a letter from her physician recommending an extension of her leave to March 4, 2020, at which point her physician would conduct a follow up evaluation to determine whether Tieu could safely return to work.  Tieu wrote in the cover email to Hair and Patchett that she "hope[d] that this letter, along with the Nov. 4, 2019 letter from [her] therapist (who recommends an extension of [her] leave to June 15, 2020), underscores and helps NYCEDC understand the gravity of [her] medical condition and the necessity of extending [her] leave."  Tieu explained that "[g]iven that [her] medical care professionals both recommend[ed] extending [her] leave but differ[ed] on the return date, a provisional extension of [her] leave to at least March 4, 2020 [was] warranted."

82.     On December 20, 2019, the Friday before Tieu was scheduled to return to work, Hair finally granted her accommodation request, writing that HR was "accepting [her] letter as a basis to provide [her] with an unpaid leave of absence" through March 4, 2020.

## VI.   NYCEDC Summarily Dismisses Tieu's Discrimination Complaints and Continues Hostility Against Her

83.     On November 4, 2019, as she continued to struggle with NYCEDC's attempts to deny her accommodation request, Tieu asked Patchett for an update as to the status of the investigation into her discrimination and retaliation complaints.  Tieu had not heard from anyone

about the status of the investigation since Patchett assured her that she would be receiving a response nearly three weeks earlier.

84.     Three days later, Tieu received the results of NYCEDC's purported investigation. The superficial conclusion was less than half a page long and denied any wrongdoing on the part of NYCEDC, stating merely that Tieu's claims had been "unsubstantiated."

85.     Upon information and belief, HR took very few steps to properly investigate Tieu's complaint.  For example, Tieu provided HR with a list of eight witnesses with personal knowledge of her discrimination complaints.  Upon information and belief, none of them were interviewed.

86.     Moreover, NYCEDC took no action to remediate Tieu's concerns about discrimination and retaliation, nor did it take corrective actions against Hoyt.  To the contrary, Tieu learned that on November 5, 2019, two days before she received the results of NYCEDC's purported investigation, NYCEDC had promoted Hoyt to the role of Co-Head of Portfolio Management.

87.     Tieu was frustrated that NYCEDC was continuing to discriminate and retaliate against her by brushing off her complaints while exonerating and elevating Hoyt; she repeatedly followed up with the investigators, to no avail.

88.     On November 16, 2019, Tieu emailed the investigators and asked multiple questions about the investigation process.  Tieu also repeated her request for a "new and fair review" from another manager who truly knew her work and to be transferred to a new department "in order to be removed from the hostile work environment."

89.     The investigators refused to acknowledge Tieu's concerns.  On November 20, 2019, the investigators replied and stated that they had "no further comment" on Tieu's

complaints.  Tieu responded on November 22, 2019, that NYCEDC was legally obligated to look

into her complaints of discrimination and that, based on NYCEDC's handling of her complaint,

it was "evident that [her] discrimination complaint against [] Hoyt was not taken seriously nor

properly investigated."  Accordingly, Tieu wrote that she would be filing discrimination

complaints with the appropriate regulatory agencies.

90.     After declaring that Tieu's claims were "unsubstantiated" and following her

request for a reasonable accommodation, NYCEDC openly retaliated against her by depriving

Tieu of opportunities given to her co-workers.

91.     For example, on December 16, 2019, less than two months after dismissing Tieu's

discrimination complaints and less than two weeks after she was discharged from the hospital

following her brain surgery, NYCEDC distributed a new organizational chart of the Asset

Management department in response to the reorganization that was announced in late September

2019.  According to the new organizational chart, Tieu's co-worker who had only recently been

hired to the VP position and who already had two employees to supervise, would be given a third

employee to supervise.  NYCEDC had assigned no employees to Tieu, even though she had

managed an employee in the past and her job responsibilities included managing employees.

92.     NYCEDC also ignored Tieu's questions regarding issues with her benefits.  On

January 16, 2020, Tieu emailed Hair regarding a discrepancy with her Flexible Spending

Account (FSA).  A week later, having not heard back from Hair, Tieu wrote again to follow up.

Tieu has not received any response.

**VII.**   **Tieu Returns to Work and Faces Continued Discrimination and Retaliation**

93.     On May 4, 2020, Tieu returned to work with a reasonable accommodation to work remotely only three days a week for the following four weeks.  On the same day, Osborne asked Tieu to sign a Flexible Work Agreement ("Agreement").

94.     On May 7, 2020, Tieu followed up with Osborne about the transfer promised to her by Patchett on July 25, 2019.  Osborne responded by stating that NYCEDC would not be providing her with her promised transfer because "EDC is currently in the midst of a hiring freeze and positions across the organization are not being filled due to the current fiscal situation brought about by our COVID response efforts."  The hiring freeze purportedly began around mid-March 2020.

95.     Tieu also made a transfer request of Loeb who, like others, refused to entertain the idea without providing justification.

96.     In fact, on March 30, 2020, NYCEDC brought in Andy Padian, VP, to begin a new job in Tieu's department.  And on April 21, 2020, NYCEDC brought in Juan Galvan, Senior Associate, to start a new job in Asset Management.  In addition, up until mid-to-late May 2020, Loeb was in the process of requesting an exception to the hiring freeze in order to hire an intern, Alyana Roxas, to start as a full-time employee.

97.     Tieu also wrote to Osborne about the Agreement stating, "I believe that the denial of my transfer, which James Patchett promised upon my return from leave, is retaliatory, and has no bearing on any fiscal or COVID-19 situation.  Nonetheless, I will work on my newly allocated portfolio in Asset Management."  Osborne's response ignored Tieu's complaint of retaliation.

98.     Tieu has faced multiple incidents of retaliation since returning to work.  For example, she has been treated as if she were a new hire, despite her year-long tenure at NYCEDC prior to her leave.  She has also been forced to go through trainings and orientations that she has already attended as an employee of NYCEDC.

99.     Tieu had almost all of her projects taken away and re-allocated to other employees.  In return, Tieu was given three new projects that were short-term or temporary and required very little work.

100.    Tieu's reporting structure has been changed, at least in part by Loeb, to require her to report into both Defendant Hoyt and Julie Stein, SVP and Co-Head of Portfolio Management.  Tieu is also required to have a two-on-one weekly meeting with both Defendant Hoyt and Stein, which is not required of any other person in her department.

101.    On June 3, 2020, Plaintiff filed a Charge of Discrimination with the EEOC and provided the same to counsel for Defendants.

102.    Since filing her Charge of Discrimination, Tieu has been continually met with heightened scrutiny in her daily work from Defendant Hoyt and Stein, despite their lack of actual supervision of Tieu, and constant pushback from NYCEDC regarding her further accommodation requests and accrual of paid leave.  During this period, Tieu struggled to manage her second high-risk pregnancy.

103.    For example, HR continuously ignores Tieu's for significant periods of time, revises Tieu's timesheets to reduce her earned leave and salary, and alters the terms of Tieu's work from home accommodation, labeling them as "mistakes."

104.    On February 1, 2021, Tieu received another unwarranted negative performance review with an overall score of 2.67 (improvement needed).  The performance review was

retaliatory, given that Hoyt had minimal interaction with Tieu during the applicable review period.  Contrary to Hoyt's unqualified assessment, Wolf, who supervised Tieu on a daily basis, praised Tieu, stating that "she has always been great, but I think this year she has really shone."

105.    Hoyt admitted that Loeb provided him feedback for the negative review.

106.    On February 12, 2021, Patchett announced that there would be a "one time bonus" for employees who received a rating of three or above on their performance reviews.

107.    On February 24, 2021, Vasquez informed Tieu that, as a result of her negative performance review, Tieu would not be eligible for a bonus.

## VIII.   Race and Sex Discrimination

108.    Although, as described above, NYCEDC punished Tieu for her disability, pregnancy, and leave and accommodation requests, it has protected and even rewarded her less competent white and male co-workers who have not complained about discrimination or sought accommodations.

109.    For example, Darryl Connelly, an SVP and Tieu's first manager at NYCEDC, has been able to keep his job despite significant performance issues.  From the time Tieu first began reporting to Connelly in July 2018, he was uninvolved, passive aggressive, negative and demoralizing.  Connelly's treatment of Tieu became so intolerable that, in September 2018, Tieu asked Kwatinetz, to whom Connelly reported, for a transfer out of Connelly's group.  Kwatinetz, with the approval of Patchett, granted her request to transfer in October 2018.  Kwatinetz told her that he was approving her transfer because he did not want her to leave NYCEDC.  Kwatinetz also confided in her that he had told Connelly "many times to work on his management skills" and had placed Connelly on a performance improvement plan ("PIP") on "at least three" separate occasions.  The next month, another Asian woman reporting to Connelly, requested and was

granted permission to transfer out of Connelly's group.  Since November 2018, despite these problems, and contrary to its treatment of Tieu, NYCEDC has not tried to force Connelly out of his job.

110.    Unsurprisingly, given this culture of discrimination, Tieu is not the only Asian woman at NYCEDC whom Defendant Hoyt has mistreated and harassed.

111.    Another NYCEDC employee, a Korean woman and a former Senior Associate at NYCEDC, began reporting to Defendant Hoyt when he joined as a VP in April 2018.  At the time Defendant Hoyt joined, this employee was generally regarded as very capable and was trusted with managing her own projects.  As with Tieu's employment, Defendant Hoyt was not involved with this employee's day-to-day work and seemed not to know much about her projects.  Despite his lack of knowledge, Defendant Hoyt would regularly interfere and insist that this employee make changes to her work that made no sense.

112.    When this employee resisted making changes that would diminish the quality of her work, Defendant Hoyt became enraged that this employee, an Asian woman, would disagree with him.  Defendant Hoyt went on a campaign to discredit this employee, regularly referring to her as "difficult" and "combative."  He also complained about her to Kwatinetz and McCarthy, wrote a negative performance review about her, and placed her on a PIP.  Believing that she was being targeted because of her race and gender, this employee refused to sign the PIP as requested.  Ultimately, this employee resigned as a result of Defendant Hoyt's unfair treatment in October 2018.

113.    A third Asian employee, a Korean woman who reported to Connelly, had similar experiences as those noted above.  This employee complained to Human Resources in writing about the terrible treatment she endured at the hands of Connelly and her experiences with the

Asset Management Group.  This employee also spoke with Yolande Schuler, former Executive Vice President of Asset Management, who told her that NYCEDC was "taking a closer look" at Connelly.  Additionally, in 2019, this employee was verbally berated by Hoyt when she remarked on a business matter in the workplace.  Ultimately, and not surprisingly, no corrective actions were taken, and this employee resigned in May 2021.

114.    Finally, a fourth Asian employee, a Chinese woman and Assistant Vice President has made similar complaints of mistreatment at NYCEDC.  This employee took the AVP role with the promise of being promoted to Vice President.  When she was passed up for a promotion, she made a complaint.  The following day, NYCEDC posted a job position in order to replace her.  This employee then made a further complaint to the Head of Human Resources at the time, Patti Lucas, who attempted to intervene on her behalf.  Ultimately, she was unsuccessful, and this employee was not given a promotion.  This employee has told Ms. Tieu that she believes she was also a victim of discrimination.  She resigned in June 2019.

**FIRST CAUSE OF ACTION**
**(Unlawful Interference and Retaliation in Violation of the FMLA)**
*Against All Defendants*

115.    Plaintiff repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs, as though fully set forth herein.

116.    By the actions described above, among others, Defendants violated the FMLA.

117.    Defendants' unlawful conduct was willful.

118.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, monetary and other harm.

## SECOND CAUSE OF ACTION
### (Discrimination in Violation of Title VII)
### *Against Defendant NYCEDC*

119.    Plaintiff repeats, reiterates and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

120.    By the actions described above, Defendant NYCEDC discriminated against Plaintiff on the basis of her sex, race and/or pregnancy in violation of Title VII.

121.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm.

122.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered, and continues to suffer, injury, pain, ailments and conditions, as well as mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and other emotional pain and suffering.

123.    Defendant's unlawful and discriminatory actions constitute malicious, willful and wanton violations of Title VII.

## THIRD CAUSE OF ACTION
### (Retaliation in Violation of Title VII)
### *Against Defendant NYCEDC*

124.    Plaintiff repeats, reiterates and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

125.    By the actions described above, among others, Defendant NYCEDC retaliated against Plaintiff in violation of Title VII.

126.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has

suffered, and continues to suffer, monetary and/or other economic harm.

127.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has

suffered, and continues to suffer, injury, pain, ailments and conditions, as well as mental anguish

and emotional distress, including, but not limited to, depression, humiliation, embarrassment,

stress and anxiety, loss of self-esteem and self-confidence, and other emotional pain and

suffering.

128.    Defendant's unlawful and retaliatory actions constitute malicious, willful and

wanton violations of Title VII.

## FOURTH CAUSE OF ACTION
### (Discrimination in Violation of ADA)
### *Against Defendant NYCEDC*

129.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each

of the preceding paragraphs as if fully set forth herein.

130.    Defendant NYCEDC discriminated against Plaintiff on the basis of her disability

and/or perceived disability in violation of ADA.

131.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has

suffered, and continues to suffer, monetary and/or other economic harm.

132.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has

suffered, and continues to suffer, injury, pain, ailments and conditions, as well as mental anguish

and emotional distress, including, but not limited to, depression, humiliation, embarrassment,

stress and anxiety, loss of self-esteem and self-confidence, and other emotional pain and

suffering.

133.    Defendant NYCEDC's unlawful and discriminatory actions constitute malicious,

willful and wanton violations of the ADA.

## FIFTH CAUSE OF ACTION
### (Retaliation in Violation of ADA)
### *Against Defendant NYCEDC*

134.   Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

135.   Defendant NYCEDC retaliated against Plaintiff for engaging in protected activities in violation of the ADA.

136.   As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm.

137.   As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered, and continues to suffer, injury, pain, ailments and conditions, as well as mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and other emotional pain and suffering.

138.   Defendant NYCEDC's unlawful and retaliatory actions constitute malicious, willful and wanton violations of the ADA.

## SIXTH CAUSE OF ACTION
### (Discrimination in Violation of the Executive Law)
### *Against All Defendants*

139.   Plaintiff repeats, reiterates and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

140.   By the actions described above, among others, Defendants discriminated against Plaintiff on the basis of her gender, familial status, pregnancy and race in violation of the Executive Law.

141.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has

suffered, and continues to suffer monetary and/or other economic harm.

142.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has

suffered, and continues to suffer, injury, pain, ailments and conditions, as well as mental anguish

and emotional distress, including, but not limited to, depression, humiliation, embarrassment,

stress and anxiety, loss of self-esteem and self-confidence, and other emotional pain and

suffering.

143.     Defendants' unlawful actions constitute malicious, willful and wanton violations

of the Executive Law.

**SEVENTH CAUSE OF ACTION**
**(Retaliation in Violation of the Executive Law)**
***Against All Defendants***

144.     Plaintiff repeats, reiterates and re-alleges each and every allegation in the

preceding paragraphs, as though fully set forth herein.

145.     By the actions described above, among others, Defendants retaliated against

Plaintiff in violation of the Executive Law.

146.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has

suffered, and continues to suffer, monetary and/or other economic harm.

147.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has

suffered, and continues to suffer, injury, pain, ailments and conditions, as well as mental anguish

and emotional distress, including, but not limited to, depression, humiliation, embarrassment,

stress and anxiety, loss of self-esteem and self-confidence, and other emotional pain and

suffering.

148.     Defendants' unlawful actions constitute malicious, willful and wanton violations of the Executive Law.

### EIGHTH CAUSE OF ACTION
#### (Discrimination in Violation of the City Law)
#### *Against All Defendants*

149.     Plaintiff repeats, reiterates and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

150.     By the actions described above, among others, Defendants discriminated against Plaintiff on the basis of her gender, familial status, pregnancy and race in violation of the City Law.

151.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm.

152.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, injury, pain, ailments and conditions, as well as mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and other emotional pain and suffering.

153.     Defendants' unlawful actions constitute malicious, willful and wanton violations of the City Law.

### NINTH CAUSE OF ACTION
#### (Retaliation in Violation of the City Law)
#### *Against All Defendants*

154.     Plaintiff repeats, reiterates and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

155.    By the actions described above, among others, Defendants retaliated against Plaintiff in violation of the City Law.

156.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm.

157.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, injury, pain, ailments and conditions, as well as mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and other emotional pain and suffering.

158.    Defendants' unlawful and retaliatory actions constitute malicious, willful and wanton violations of the City Law.

## TENTH CAUSE OF ACTION
### (Discrimination in Violation of Section 1981)
### *Against All Defendants*

159.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

160.    By the acts described above, Defendant NYCEDC discriminated against Plaintiff based on her race in violation of Section 1981.

161.    Plaintiff has suffered and will continue to suffer economic and compensatory damages as a result of Defendant's unlawful conduct unless and until this Court grants relief.

162.    Defendant's conduct was willful and/or showed reckless disregard for Plaintiff's statutorily protected rights.

### ELEVENTH CAUSE OF ACTION
### (Retaliation in Violation of Section 1981)
### *Against All Defendants*

144.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

145.    By the acts described above, Defendant NYCEDC retaliated against Plaintiff for engaging in protected activity under Section 1981.

146.    Plaintiff has suffered and will continue to suffer economic and compensatory damages as a result of Defendant's willful and unlawful conduct unless and until this Court grants relief.

147.    Defendant's conduct was willful and/or showed reckless disregard for Plaintiff's statutorily protected rights.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendants, through the following relief:

A.    A declaratory judgment that the actions of Defendants complained of herein violate the laws of the United States, the State of New York and City of New York;

B.    An injunction and order permanently restraining Defendants from engaging in such unlawful conduct;

C.    An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages, including but not limited to past and future lost earnings;

D.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for harm to his professional and personal reputations and loss of career fulfillment;

E.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including but not limited to, emotional pain and suffering and emotional distress;

F.      An award of punitive damages in an amount to be determined at trial;

G.      An award of liquidated damages in an amount to be determined at trial;

H.      An award of attorneys' fees and costs that Plaintiff has incurred in this action to the fullest extent permitted by law; and

I.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: July 12, 2021
New York, New York

Respectfully submitted,

**WIGDOR LLP**

By:
        Valdi Licul
        Lindsay M. Goldbrum

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
vlicul@wigdorlaw.com
lgoldbrum@wigdorlaw.com

*Attorneys for Plaintiff*