UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------- X

LIA TIEU,                                                    Civil Case No.: 1:21-CV-05951-AT

                              Plaintiff,

              v.

NEW YORK CITY ECONOMIC DEVELOPMENT
CORPORATION, WINTHROP HOYT, and
RACHEL LOEB, in their individual and professional
capacities,

                              Defendants.

---------------------------------------------------------------- X


## **DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**


**GORDON & REES LLP**
One Battery Park, 28th Floor
New York, New York
Telephone: (212) 269-5500
Facsimile: (212) 269-5505

*Attorneys for Defendants*

## <u>TABLE OF CONTENTS</u>

Page(s)

PRELIMINARY STATEMENT ................................................................................... 1

SUMMARY OF FACTS ............................................................................................... 2

ARGUMENT ............................................................................................................... 14

I.      SUMMARY JUDGMENT STANDARD ......................................................... 14

II.     TIEU'S FMLA INTERFERENCE AND RETALIATION CLAIMS (FIRST
        CAUSE OF ACTION) FAIL AS A MATTER OF LAW. ................................. 16

        A.      Tieu's FMLA Interference Claim Fails Because She Was Never Denied
                FMLA Leave. ........................................................................................16

        B.      Tieu's FMLA Retaliation Claim Fails Because She Cannot Establish a
                Prima Facie Case of Retaliation, Let Alone Overcome Defendants'
                Legitimate Non-Retaliatory Justifications for the "Communications"
                Rating in Her July 2019 Performance Review. ....................................17

III.    TIEU'S GENDER, RACE, AND PREGNANCY DISCRIMINATION CLAIMS
        UNDER TITLE VII (SECOND CAUSE OF ACTION) FAIL AS A MATTER OF
        LAW. ................................................................................................................ 20

        A.      Legal Standard Applicable to Discrimination Claims under Title VII. ................21

        B.      Tieu's Gender, Race, and Pregnancy Discrimination Claims under Title
                VII Fail Because She Cannot Establish Her 2019 Performance Review –
                or Any of the Myriad Other Actions about Which She Complains – Were
                Motivated by Discriminatory Animus. ..................................................21

IV.     TIEU'S DISABILITY DISCRIMINATION CLAIM UNDER THE ADA
        (FOURTH CAUSE OF ACTION) FAILS AS A MATTER OF LAW. .......................... 24

        A.      Legal Standard Applicable to Discrimination Claims under the ADA. ................24

        B.      Tieu Cannot Establish Her Prima Facie Case for Discrimination under the
                ADA Because She was Never Denied Any Reasonable Accommodation. ...........25

V.      TIEU'S RACE DISCRIMINATION CLAIM UNDER SECTION 1981 (TENTH
        CAUSE OF ACTION) FAILS AS A MATTER OF LAW. ............................................. 27

        A.      Legal Standard Applicable to Discrimination Claims under Section 1981. ..........27

        B.      Tieu Race Discrimination Claim under Section 1981 Fails because She
                Cannot Establish Race Discrimination Was the But-For Cause of Her 2019
                Performance Review – or Any of the Myriad Other Actions about Which
                She Complains. ......................................................................................28

VI.     TIEU'S RETALIATION CLAIMS UNDER TITLE VII, THE ADA, AND
        SECTION 1981 (THIRD, FIFTH, AND ELEVENTH CAUSES OF ACTION)
        FAIL AS A MATTER OF LAW. ..................................................................... 29

A.      Legal Standard Applicable to Retaliation Claims under Title VII, the ADA, and Section 1981. .......................................................................29

B.      Tieu's Retaliation Claims under Title VII, the ADA, and Section 1981 Fail because She Cannot Establish Retaliation Was the But-For Cause of Any of the Actions She Claims to be Retaliatory. ..........................................30

1.      Tieu's Allegation that She Had No Associate to Supervise. ................... 30

2.      Tieu's Allegation That Her Workload Was Diminished. ........................ 31

3.      Tieu's Allegation that HR Ignored Her Emails. ...................................... 32

4.      Tieu's Allegation that EDC Refused to Transfer Her. ............................. 32

5.      Tieu's Allegation that She Reported to Stein and Hoyt, Was Subjected to "Excessive Scrutiny", and Had Two-On-One Weekly Check-In Meetings. ..................................................................................... 33

6.      Tieu's 2020 Performance Review and Bonus. .......................................... 34

VII.    THE COURT SHOULD DECLINE TO EXCERCISE SUPPLEMENTAL JURISDICTION OVER TIEU'S CLAIMS UNDER THE NYSHRL AND NYCHRL. ............................................................................................................ 34

CONCLUSION .............................................................................................................. 35

## <u>TABLE OF AUTHORITIES</u>

Page(s)

Cases

*Abdu-Brisson v. Delta Air Lines, Inc.*,
  239 F.3d 456 (2d Cir. 2001) ........................................................................................ 14
*Altman v. N.Y. City Dep't of Educ.*,
  No. 06-CV-6319 (HB), 2007 WL 1290599 (S.D.N.Y., May 1, 2007) ................................... 23
*Anderson v. New Orleans Jazz & Heritage Festival & Found., Inc.*,
  464 F. Supp. 2d 562 (E.D. La. 2006) ........................................................................... 17
*Aslanidis v. United States Lines, Inc.*,
  7 F.3d 1067 (2d Cir. 1993) .......................................................................................... 15
*Bacchus v. N.Y.C. Dep't of Educ.*,
  137 F. Supp. 3d 214 (E.D.N.Y. 2014) ............................................................................ 30
*Berger v. New York City Police Dep't*,
  304 F. Supp. 3d 360 (S.D.N.Y. 2018) ........................................................................... 25
*Brockman v. Snow*,
  217 F. App'x 201 (4th Cir. 2007) ................................................................................. 26
*Burlington N. & Santa Fe Ry. Co. v. White*,
  548 U.S. 53 (2006) .................................................................................................... 22
*Carmody v. Vill. of Rockville Ctr.*,
  661 F. Supp. 2d 299 (E.D.N.Y. 2009) ........................................................................... 21
*Celotex v. Catrett*,
  477 U.S. 317 (1986) ................................................................................................... 14
*Comcast Corp. v. National Association of African American-Owned Media*,
  140 S.Ct. 1009 (2020) ............................................................................................ 27, 28
*Coppola v. Bear Stearns & Co.*,
  499 F.3d 144 (2d Cir. 2007) ........................................................................................ 15
*Dawson v. Bumble & Bumble*,
  398 F.3d 211 (2d Cir. 2005) ........................................................................................ 21
*Dodd v. City Univ. of New York*,
  489 F. Supp. 3d 219 (S.D.N.Y. 2020) ....................................................................... 18, 32
*E.E.O.C. v. Bloomberg L.P.*,
  967 F. Supp. 2d 816 (S.D.N.Y. 2013) ........................................................................... 34
*Ebel v. G/O Media, Inc.*,
  No. 20 CIV. 7483 (PAE), 2022 WL 2359245 (S.D.N.Y. June 30, 2022) ............................... 22
*Fairbrother v. Morrison*,
  412 F.3d 39 (2d Cir. 2005) .......................................................................................... 22
*Feingold v. New York*,
  366 F.3d 138 ............................................................................................................. 14
*Fitzgerald v. We Co.*,
  No. 20 CIV. 5260 (AT), 2022 WL 952963 (S.D.N.Y. Mar. 30, 2022) ......................... 16, 20, 34
*Georges v. Peters*,
  581 F. App'x 80 (2d Cir. 2014) ................................................................................... 30
*Grady v. Affiliated Cent., Inc.*,
  130 F.3d 553 (2d Cir. 1997) ........................................................................................ 23

*Graziadio v. Culinary Inst. of Am.*,
   817 F.3d 415 (2d Cir. 2016) ................................................................................... 16

*Greenberg v. State Univ. Hosp. - Downstate Med. Ctr.*,
   838 F. App'x 603 (2d Cir. 2020) ................................................................. 16, 17, 18

*Heiden v. New York City Health & Hosps. Corp.*,
   No. 20-CV-10288 (LJL), 2023 WL 171888 (S.D.N.Y. Jan. 11, 2023) .................... 30

*Hicks v. Baines*,
   593 F.3d 159 (2d Cir. 2010) ................................................................................... 29

*James v. New York Racing Ass'n*,
   233 F.3d 149 (2d Cir. 2000) ................................................................................... 23

*Jeffreys v. City of New York*,
   426 F.3d 549 (2d Cir. 2005) ............................................................................. 15, 16

*Knight v. U.S. Fire Ins. Co.*,
   804 F.2d 9 (2d Cir. 1986) ....................................................................................... 15

*Levitant v. City of N.Y. Hum. Res. Admin.*,
   558 F. App'x 26 (2d Cir. 2014) .............................................................................. 33

*Littlejohn v. City of New York*,
   795 F.3d 297, 312 (2d Cir. 2015) ..................................................................... 27, 29

*Lore v. City of Syracuse*,
   670 F.3d 127 (2d Cir. 2012) ................................................................................... 29

*Lu v. Chase Inv. Servs. Corp.*,
   412 F. App'x 413 (2d Cir. 2011) ............................................................................ 14

*Mathirampuzha v. Potter*,
   548 F.3d 70 (2d Cir. 2008) ..................................................................................... 22

*Matias v. Montefiore Med. Ctr.*,
   No. 20-CV-2849 (VEC), 2022 WL 4448585 (S.D.N.Y. Sept. 23, 2022) ............... 17

*McDonnell Douglas Corp. v. Green*,
   411 U.S. 792 (1973) ............................................................................................... 21

*McMillan v. City of New York*,
   711 F.3d 120 (2d Cir. 2013) ............................................................................. 24, 25

*Nicastro v. N.Y.C. Dep't of Design & Constr.*,
   125 F. App'x 357 (2d Cir. 2005) ............................................................................ 19

*Nikolakopoulos v. Macy's Inc.*,
   No. 20 CIV. 1641 (KPF), 2022 WL 3903595 (S.D.N.Y. Aug. 30, 2022) ............... 18

*Noll v. Int'l Bus. Machines Corp.*,
   787 F.3d 89 (2d Cir. 2015) ..................................................................................... 26

*Onibokun v. Chandler*,
   749 F. App'x 65 (2d Cir. 2019) .............................................................................. 35

*Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley
   Inv. Mgmt. Inc.*,
   712 F.3d 705 (2d Cir. 2013) ................................................................................... 35

*Peters v. Mount Sinai Hosp.*,
   No. 08 Civ. 7250 (CM), 2010 WL 1372686 (S.D.N.Y. March 30, 2010) .............. 24

*Porter v. Potter*,
   366 F. App'x 195 (2d Cir. 2010) ............................................................................ 19

*Postell v. Fallsburg Library*, 20-cv-3991 (NSR),

2022 WL 1092857 (S.D.N.Y. Apr. 8, 2022) ......................................................................... 28

*Powell v. Nat'l Bd. of Med. Exam'rs*,
364 F.3d 79 (2d Cir. 2004) ................................................................................................. 15

*Reeves v. Sanderson Plumbing Prods., Inc.*,
530 U.S. 133 (2000) ............................................................................................................ 21

*Rios v. Dep't of Educ.*,
351 F. App'x 503 (2d Cir. 2009) ........................................................................................ 29

*Rivera v. Rochester Genesee Reg'l Transp. Auth.*,
743 F.3d 11 (2d Cir.2014) ................................................................................................... 16

*Rojas v. Roman Catholic Diocese of Rochester*,
660 F.3d 98 (2d Cir. 2011) ................................................................................................. 15

*Sanders v. New York City Human Res. Admin.*,
361 F.3d 749 (2d Cir. 2004) ............................................................................................... 22

*Sears-Barnett v. Syracuse Cmty. Health Ctr., Inc.*,
No. 16 Civ. 426 (DNH), 2021 WL 1202206 (N.D.N.Y. Mar. 31, 2021) ......................... 30

*Toombs v. New York City Hous. Auth.*,
830 F. App'x 665 (2d Cir. 2020) ........................................................................................ 30

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*,
570 U.S. 338 (2013) ............................................................................................................ 29

*Vill. Of Freeport v. Barrella*,
814 F.3d 594 (2d Cir. 2016) ............................................................................................... 27

*Vogel v. CA, Inc.*,
662 F. App'x 72 (2d Cir. 2016) .......................................................................................... 21

*Weinstock v. Columbia Univ.*,
224 F.3d 33 (2d Cir. 2000) ................................................................................................. 14

*Woolf v. Bloomberg L.P.*,
No. 16-CV-6953 (PKC), 2019 WL 1046656 (S.D.N.Y. Mar. 5, 2019) ............................ 20

*Zann Kwan v. Andalex Grp. LLC*,
737 F.3d 834 (2d Cir. 2013) ............................................................................................... 19

## Rules

Fed. R. Civ. P. 56(a) ................................................................................................................. 15

## PRELIMINARY STATEMENT

Plaintiff Lia Tieu ("Tieu") is a current employee of defendant New York City Economic Development Corporation ("EDC") who has been given countless accommodations and leaves related to her pregnancies and medical conditions. The genesis of Tieu's dispute with the Company is her subjective disagreement with the content of her performance reviews. No one likes to be criticized, but this appears to be particularly true of Tieu. Rather than accept constructive criticisms given to her – specifically, regarding her communications – Tieu lashed out, refusing to accept same, and denouncing the reviews as discriminatory and retaliatory.  However, the criticism was not pulled from thin air and certainly was not motivated by any desire to discriminate or retaliate against her.

Tieu also demanded a transfer to a different department without actually applying for any position.  Evidently, she expected EDC to simply shift her to a new supervisor rather than improve her performance. EDC thoroughly investigated Plaintiff's complaints about her reviews, but determined that there was simply no evidence to substantiate them. Tieu points to subsequent trivial, insubstantial incidents occurring long after her initial complaint as purported retaliation.

Tieu cannot establish that she suffered any adverse action under circumstances giving rise to an inference of discrimination or retaliation, and even if she somehow could, she cannot overcome the insurmountable obstacle of demonstrating that Defendants' legitimate non-discriminatory and non-retaliatory reasons for their actions were merely pretextual. Nor can she demonstrate that she was denied any reasonable accommodations. Accordingly, Defendants are entitled to summary judgment on each of her claims.

## SUMMARY OF FACTS[1]

### Defendant Hoyt Assists Tieu in Obtaining Employment with EDC

Defendant EDC is a non-profit organization responsible for managing and developing City-owned real estate assets. (SOF ¶ 1).[2] Defendant Rachel Loeb ("Loeb") previously served as EDC's Chief Operating Officer ("COO") from September 2018 until March 2021, at which time she was appointed as acting President and CEO. (SOF ¶ 1). In Spring 2018, defendant Winthrop Hoyt ("Hoyt") joined EDC as a Vice President ("VP") in its Asset Management Revenue department ("AMR"). (SOF ¶ 5). In July 2018, EDC hired Tieu, also as a VP in AMR, and she remains employed in that position. (SOF ¶ 3). Before joining EDC, Tieu and Hoyt had been colleagues at another company. (SOF ¶ 7). In May 2018, at Tieu's invitation, Hoyt met Tieu for coffee, during which Tieu told Hoyt that she was actively looking for a job and trying to have children. (SOF ¶ 8-9). Thereafter, Hoyt assisted Tieu in applying to EDC and recommended Tieu as a candidate to Matt Kwatinetz ("Kwatinetz"), then-Executive Vice President of AMR. (SOF ¶¶ 10-11).

### Upon Hire, Tieu's Initial Supervisor Observes that Tieu's Communication Needs Improvement, and Tieu Requests to Report to Hoyt Instead.

At the start of her employment, Tieu reported to Darryl Connelly ("Connelly"), a Senior

---

[1] Rule III.D of Judge Torres' Individual Practices states: "A memorandum of law shall <u>not</u> incorporate by references any accompanying declarations or affidavits. Instead, the memorandum of law shall contain a fact section that sets forth all facts relevant to the motion and, for each factual statement, provides one or more citations to declarations, affidavits, or other evidence in the records. <u>In the case of summary judgment motions, factual statements must be supported by citations to both the record evidence and the Rule 56.1 statement</u>, if contained therein." Accordingly, Defendants interpret the Court's requirement for memoranda of law to contain a fact section to apply to all motions except motions for summary judgment. Defendants, thus, respectfully refer the Court to Defendants' Local Rule 56.1 Statement of Undisputed Facts, dated March 13, 2023 ("SOF"), and the evidence cited to therein, for a full statement of material facts, but provide the following condensed factual statement for the Court's ease of reference.

[2] "Ex." refers to the exhibits annexed to the declaration of Kuuku Minnah-Donkoh dated March 13, 2023.

Vice President ("SVP") in AMR who had interviewed and hired Tieu. (SOF ¶¶ 15-16). Tieu's responsibilities included maintaining good working relationships with internal and external project stakeholders. (SOF ¶ 19). In October 2018, Connelly drafted a performance improvement plan ("PIP") for Tieu in which he noted her inappropriate tone and argumentative communication style, and commenting, *inter alia*, "How things are said and tone is just as important as what you say." (SOF ¶¶ 21-26). Ultimately, Connelly did not deliver the PIP to Tieu because in October or November 2018, Tieu began reporting to Hoyt. (SOF ¶¶ 31-32). Indeed, Tieu asked to move to Hoyt's team, and Hoyt welcomed the idea of Tieu on his team. (SOF ¶¶ 27-30).

**While Reporting to Hoyt, Tieu Continues to Exhibit Communication Issues.**

As Tieu's supervisor, Hoyt had weekly check-in meetings with Tieu and remained in daily contact about her projects. (SOF ¶ 33-35). Shortly after she moved to Hoyt's team, Hoyt observed Tieu had communication issues; for example, when Hoyt proposed Tieu create a work plan to redistribute some of her workload to other members of Hoyt's team, including assets that moved over with Tieu from Connelly's team, Tieu ignored this proposed solution, and instead: disparaged her colleagues as "lazy asses" and "motherfuckers"; accused coworkers of "fucking with" them and purposely giving her "shitty assets"; threatened to quit; and mused that she was "tempted" to try to get her colleagues fired ("I'm so tempted to go to [EDC's President][.] He'll fire both of them on the spot today"). (SOF ¶¶ 38-42).

During a December 2018 meeting with representatives of Columbia University ("Columbia"), a tenant under an EDC-managed lease,  Hoyt and Kwatinetz observed that Tieu took an aggressive tone and threatened to default Columbia for failing to report parking income. (SOF ¶ 43). Kwatinetz attempted to intervene to tone down Tieu's message, but believed that Tieu's approach had derailed the meeting. (SOF ¶ 45). After the meeting, a Columbia

representative asked Kwatinetz to remove Tieu from the project. (SOF ¶ 47).

In February 2019, Hoyt prepared a 90-day review for Tieu, in which he identified areas for improvement (including "her communication with her colleagues"), areas where Tieu excelled, and goals. (SOF ¶¶ 50-51). Hoyt noted that Tieu should develop a "solution-oriented mindset" because of her "tendency to expect the worst outcome in a given situation can distract her from the work at hand", citing, as an example, Tieu's frustration about receiving new assets and her failure to create a work plan as he requested. (SOF ¶ 51). Hoyt noted that Tieu should "work to create relationships with her tenants to help devise mutually satisfactory outcomes instead of going immediately to the strongest power move", in reference to the Columbia incident (SOF ¶ 52).

In March 2019, Naima Cochrane ("Cochrane"), an independent contractor for the Audubon Ballroom (one of Tieu's assets), emailed Kwatinetz, complaining that Tieu's tone was "increasingly dismissive." (SOF ¶¶ 59-61). Kwatinetz forwarded the email to Hoyt, who offered to take over the communications with Cochrane. (SOF ¶ 62). The next day, Kwatinetz emailed Hoyt that City Hall "has now requested a meeting to discuss [Cochrane], I'm assuming due to [Tieu]", that he had received the same complaint from Columbia, who asked to remove Tieu from their project, and that they needed to "deal with this formally". (SOF ¶ 63). A few days later, when Tieu suggested that EDC void Cochrane's contract, Kwatinetz told Tieu, "[W]e won't be voiding the contract. . . Let's tone down the language please." (SOF ¶¶ 64-66).[3]

**Tieu Becomes Pregnant and Is Granted Reasonable Accommodations.**

In January 2019, Tieu informed Hoyt she was pregnant. (SOF ¶ 67). On multiple occasions,

---

[3] Cochrane had complained directly to Tieu on March 11, 2019, about Tieu's "scolding/dismissive tone" in emails and suggested, "maybe our communication would be better via phone moving forward." (SOF ¶¶ 55-56). Tieu ignored Cochrane's suggestion. (SOF ¶ 57). On March 18, 2019, Cochrane again complained to Tieu that the way Tieu spoke to her "is not ok." (SOF ¶ 58).

Tieu notified Hoyt of pregnancy-related complications and medical conditions that would impact her attendance at work. On each occasion, Hoyt was understanding and sympathetic. (SOF ¶ 76).

At Tieu's request, Hoyt disclosed Tieu's pregnancy to Kwatinetz in connection with her request to work from home 2 days per week for 2 weeks due to morning sickness.[4] (SOF ¶ 68). Hoyt did not have any objection to Tieu's request; however, Tieu did not submit a doctor's note recommending she work remotely, and at that time, EDC did not have a formal policy permitting remote work. (SOF ¶¶ 70-71). Instead, EDC maintained a "flexible work time arrangement" policy whereby employees could enter into a temporary flexible work arrangement when needing to work outside of EDC's normal 9-5 office hours and from locations other than the office. (SOF ¶ 73). Accordingly, Tieu alternatively requested permission to arrive to work 1 hour late and leave work 2 hours early every day for one month, by completing a Flexible Work Arrangement agreement ("FWA"). (SOF ¶ 74). Human Resources granted Tieu's alternative request. (SOF ¶ 75).

On March 1, 2019, Tieu submitted a doctor's note to Rebecca Osborne ("Osborne"), AMR's HR Business Partner, directing EDC to "excuse [Tieu] from work for the next 2 weeks" due to sudden hearing loss, treatment side effects, and stress; the note did *not* state that Tieu could work remotely for those 2 weeks. (SOF ¶¶ 81-82). When Tieu informed Osborne that she wanted to work from home, Osborne explained that the doctor's note advised that Tieu should not be working due to her medical condition, and that EDC was required to follow the doctor's instructions. (SOF ¶¶ 84-86, 90-91). Osborne advised Tieu that if her doctor provided a note with a different accommodation, *i.e.,* working from home, EDC would accommodate that request. (SOF

---

[4] Hoyt suggested that Tieu tell her colleagues in case they were worried about her due to her frequent absences, and that Tieu could tell Molly McCarthy ("McCarthy"), then-Chief of Staff in AMR, about her pregnancy because McCarthy could help Tieu navigate EDC's bureaucracy. (SOF ¶¶ 77-78). Hoyt had previously encouraged Tieu to discuss work issues with McCarthy, describing McCarthy as a good "sounding board and ally." (SOF ¶ 79).

¶ 92). When Tieu complained that Osborne had called her "unfit for work", Osborne clarified that the phrase referred to a doctor's clearance for duties, not that Tieu was not "fit to work" because of her pregnancy and hearing loss. (SOF ¶¶ 93-98). Tieu complained to James Patchett ("Patchett"), EDC's then-President, about the disagreement over the doctor's note. (SOF ¶ 87). At Patchett's request, Loeb also spoke with Tieu about her request, advising Tieu that EDC could not violate the doctor's directives and reiterating that EDC would grant a remote-work accommodation if she obtained a doctor's note to that effect. (SOF ¶ 88). On March 5, 2019, Tieu submitted a second doctor's note, advising that Tieu was able to return to work with the restriction of working remotely through March 15, 2019. (SOF ¶ 99). EDC granted the remote-work accommodation, and credited back the 2 paid time off ("PTO") days that Tieu had used. (SOF ¶¶ 100-101).

**Tieu's 2019 FMLA Leave Request Is Granted for Parental Leave.**

On May 7, 2019, Tieu presented a parental leave form to Hoyt for signature, stating that Tieu would be taking FMLA and parental leave for 16 weeks from August 26, 2019 to December 15, 2019.[5] (SOF ¶ 111). Hoyt sought guidance from McCarthy, as AMR's then-Chief of Staff, about whether the amount of leave on Tieu's form was correct.[6] (SOF ¶ 112). Initially, McCarthy mistakenly calculated Tieu's years of service as of May 2019 (when the request was submitted), as opposed to when Tieu's parental leave would begin, and told Hoyt to hold off on signing the form because the amount of leave was more than EDC's policy provided. (SOF ¶ 113). A few days later, McCarthy informed Hoyt that the amount of leave was correct, and Hoyt signed the form on May 13, 2019 -- less than a week after receiving the form. (SOF ¶¶ 114-115).

---

[5] EDC's parental leave form includes a signature block for the manager to acknowledge understanding that the employee will be on leave for a specified period of time; the manager's signature is not required for "approval" of the parental leave, because at EDC, a manager does not have authority to approve or deny leave. (SOF ¶ 105-107).
[6] Pursuant to EDC's parental leave policy, employees with less than 1 year of service are entitled to 12 weeks, and employees with 1-3 years of service are entitled to 16 weeks. (SOF ¶ 108).

**The July 2019 Deposition**

In June 2019, EDC's Legal department ("EDC Legal") selected Tieu to serve as the witness for a deposition on July 12, 2019, in a lawsuit concerning one of Tieu's assets. (SOF ¶¶ 119-120, 124-125). For weeks, Tieu repeatedly expressed her belief that another employee would serve as a better witness, but did not raise the purported issue of her pregnancy until June 20, 2019, when Tieu falsely told EDC Legal that she might not be available on July 12 (the deposition date) because "I am 8 months pregnant and my water could break at any moment," while assuring EDC Legal, "I am happy to do it but the timing is uncertain." (SOF ¶¶ 121-123, 126-128, 132). However, Tieu's parental leave was scheduled to begin 6 weeks after the deposition, on August 26, 2019. (SOF ¶ 130; Ex. JJ, at DEF000007). After Hoyt agreed to be available in the event Tieu's water broke, Tieu emailed Hoyt, offering, "If I'm around on July 12, then I can be the witness." (SOF ¶¶ 133-135). Ultimately, on July 12, 2019, Tieu sat for the deposition, which lasted under 40 minutes. (SOF ¶ 142). Tieu never requested to be excused from attending the deposition as a pregnancy accommodation. (SOF ¶ 139). Nevertheless, EDC Legal did accommodate Tieu by moving the deposition from Staten Island to Manhattan so Tieu would not need to take the ferry. (SOF ¶ 141).[7]

**Hoyt Prepares Tieu's July 2019 Performance Review.**

In June or early July 2019, Hoyt began preparing Tieu's 2019 performance review, in which he rated Tieu a "4" in "Results", a "3" in "Teamwork", and a "2" in Communications", with an overall rating of "3" out of "5". (SOF ¶¶ 148, 160, 163, 182). Hoyt rated Tieu a "2" in "Communications" because he had observed communications issues, including the complaints from Columbia and Cochrane and her resistance to taking on additional assets. (SOF ¶¶ 155-159). Hoyt also incorporated positive feedback he received into the review, including from Lauren Wolf

---

[7] Three weeks later, Tieu took a ferry to EDC's voluntary summer party in Brooklyn. (SOF ¶ 144).

("Wolf"). (SOF ¶ 157).

**Alleged Comment by Hoyt Regarding Sabrina Lippman Doing Tieu a "Favor"**

On July 23, 2019, in response to a request from EDC's risk manager that Tieu address insurance issues with one of her assets, Tieu emailed a group of recipients, including Hoyt and Sabrina Lippman ("Lippman"), another VP in AMR, stating, "What is [EDC's risk manager] talking about? . . . I will let Sabrina handle this." (SOF ¶¶ 173-174). Hoyt considered it inappropriate for Tieu to delegate her work to Lippman when there was no reason to have Lippman do it and Tieu simply appeared frustrated with the assignment. (SOF ¶ 175). Lippman also indicated that Tieu's e-mail had bothered her and that she wanted Hoyt to address it with Tieu. (SOF ¶ 176). Hoyt told Tieu that directing Lippman to handle scopes of Tieu's work was the equivalent of asking Lippman for a favor because it was Tieu's responsibility to handle her own assignments prior to her parental leave. (SOF ¶¶ 177-179).

**After Receiving the Review, Tieu Complains and Requests to Begin Leave Early.**

On July 25, 2019, Hoyt delivered Tieu's performance review. (SOF ¶ 182). Subsequently, during a meeting with HR to finalize her parental leave paperwork, Tieu complained that she believed Hoyt was treating her differently because of her pregnancy. (SOF ¶¶ 183-185). Tieu also stated she was concerned about her baby's health and did "not want to be here." (SOF ¶ 186). EDC explained that if she were concerned for her baby's health, she could go out on FMLA leave early if she provided a doctor's note. (SOF ¶¶ 187, 189).[8] During a phone call with Loeb, Tieu expressed concern about the potential impact on her projects if she went on leave early. Loeb assured Tieu she need not worry about her projects if she went on leave early because it was customary for colleagues to pick up and divide the work she would otherwise have been doing. (SOF ¶ 190). On

---

[8] Initially, Tieu did not want to go on leave early because she did not want to use up her parental leave, until Hair explained that Tieu could receive salary continuation. (SOF ¶ 188).

August 1, 2019, Tieu requested to go on medical leave prior to parental leave, submitting a doctor's note stating her pregnancy was high-risk and recommending she go on leave beginning August 5, 2019, and EDC approved Tieu's request. (SOF ¶¶ 191-192). On August 16, 2019, Tieu was notified that she had received an annual salary raise from $115,000 to $118,450. (SOF ¶¶ 17, 193).

**EDC Investigates Tieu's 2019 Complaint.**

On August 1, 2019, EDC's then-Equal Employment Opportunity ("EEO") Officer, Erica Edwards-O'Neal ("O'Neal") and Vasquez initiated an investigation into Tieu's complaint against Hoyt by conducting an interview with Tieu. (SOF ¶ 198). During the interview, Tieu complained that Hoyt discriminated against her by giving her a poor review because of her pregnancy, parental leave, and race. (SOF ¶ 199). Edwards-O'Neal and Vasquez also interviewed Hoyt and Kwatinetz, reviewed documents provided by Tieu and by other sources relating to the incidents described in Tieu's review, and reviewed hiring and promotion records to investigate Tieu's allegations that women were not promoted under Kwatinetz and that he had pushed out other Asian women on the team. (SOF ¶¶ 202-204). O'Neal concluded that Tieu's complaint could not be substantiated, and prepared a confidential report summarizing the investigation and findings. (SOF ¶¶ 205-206).

**While on Parental Leave, Tieu Is Granted Additional Leave for Medical Reasons.**

On November 4, 2019, while on parental leave, Tieu requested additional leave for a tumor diagnosis, along with a note from her therapist (but not her physician) recommending additional leave. (SOF ¶ 216). Two days later, Khary Hair ("Hair"), an Assistant VP in EDC's HR department, provided Tieu with the disability carrier's certification forms and advised Tieu that both doctors recommending leave should "complete the forms and submit *to me* as soon as possible" (emphasis added). (SOF ¶¶ 217-218). Hair also alerted the benefits provider of Tieu's impending request and responded to several emails from Tieu about the forms. (SOF ¶¶ 222-223).

However, Tieu refused to provide the forms to Hair as required. (SOF ¶¶ 224-226). On December 17, 2019, Tieu requested to extend her return to work indefinitely. (SOF ¶¶ 227-228). The next day, Hair reminded Tieu that to continue holding her position after her leave ended, EDC needed "documentation to support the action", *i.e.,* forms certifying Tieu's leave as medically necessary. (SOF ¶¶ 229-231). On December 19, 2019, Tieu submitted a note from her neurosurgeon, recommending leave until March 4, 2020. (SOF ¶ 234). EDC accepted the doctor's note as a basis for approving Tieu's leave, despite not yet receiving Aetna's approval of Tieu's leave and never receiving the forms from Tieu. (SOF ¶ 236). On March 2, 2020, Tieu submitted a request for extension of her medical leave until April 30, 2020, which EDC also approved. (SOF ¶¶ 237-238).

**Tieu Is Granted Additional Accommodations and a Second Parental Leave.**

On April 28, 2020, Tieu submitted a doctor's certification clearing her to return to work on May 4, 2020, with the temporary restriction of working a reduced schedule (3 days per week) until May 29, 2020, and EDC granted Tieu's requested accommodation and gave Tieu her preferred schedule. (SOF ¶¶ 239-240).[9] Subsequently, EDC granted Tieu's request to extend her part-time schedule until August 31, 2020, based upon her doctor's recommendation while undergoing IVF treatment. (SOF ¶¶ 246-247). In August 2020, Tieu notified HR that she was pregnant and requested an exemption from EDC's impending return-to-office mandate as well as an extension of her part-time accommodation until her due date, March 30, 2021; once again, Tieu's accommodation requests were granted (SOF ¶¶ 248-255). On October 22, 2020, Tieu submitted a form to Hair requesting parental leave from March 23 to July 13, 2021. (SOF ¶¶ 256-257).

---

[9] Tieu's doctor's certification also stated that Tieu should work remotely; however, EDC's offices were still closed due to COVID-19. (SOF ¶ 242).

**Alleged Retaliation**

### A.    Tieu's Allegation that She Had No Associate to Supervise

When Tieu returned from leave in May 2020, she did not have any direct reports assigned to her; however, Tieu had not had a direct report since joining Hoyt's group in 2018. (SOF ¶ 258). Moreover, Tieu was only working a 3-day workweek, and was serving in a support role herself for her larger projects (*viz.,* the Wheel and Lighthouse Point). (SOF ¶ 260). Notably, two other VPs in Hoyt's group, Patrick Conway and Andy Padian, also did not have direct reports. (SOF ¶ 259).

### B.    Tieu's Allegation That Her Workload Was Diminished

Upon her return from leave, several of Tieu's assets were assigned back to her, including the Wheel, Lighthouse Museum, and Lighthouse Point, and Tieu was also given new assignments, including the Vacant Land portfolio and projects on Julie Stein's ("Stein") team, who was an SVP in Asset Management. (SOF ¶ 261). Tieu was not reassigned all of her former assets because upon her return in May 2020, Tieu was scheduled to work only 3 days per week; indeed, even with fewer projects, she contends she was working beyond her 3-day schedule: "I was actually working more like five days a week, I was working on my days off." (SOF ¶ 262).

### C.    Tieu's Allegation that HR Ignored Her Emails

Hair and other HR staff habitually responded to Tieu's emails within 1-2 business days, unless HR needed to research the answers to Tieu's questions, although on one occasion, in September 2020, Hair initially failed to respond to an email from Tieu until 3 weeks later, after Tieu sent a follow-up email. (SOF ¶ 264). On a daily basis, Hair receives emails from EDC employees with questions that require further research before he can provide an answer. (SOF ¶ 266). Generally, Hair's email inbox contains approximately 50 to 100 emails each day that require a response, and occasionally, Hair accidentally misses an email. (SOF ¶¶ 265, 267).

### D.   Tieu's Allegation that EDC Refused to Transfer Her

Prior to her parental leave, Tieu told Patchett she wanted to transfer to the Real Estate Transaction Services department ("RETS"), and expressed concerns about her health and her baby's health.[10] (SOF ¶ 268). In an effort to calm Tieu down, Patchett reassured Tieu that they could address her position when she returned from leave. (SOF ¶ 268). EDC's Internal Transfer Policy requires an employee desiring to transfer to a different department to complete an application and submit an updated resume to HR for a specific vacant position listed on EDC's website. (SOF ¶¶ 270-272). On May 7, 2020, Tieu asked Osborne about transferring to RETS without identifying an open position or submitting an application. (SOF ¶ 273). Osborne informed Tieu that EDC was unable to accommodate her transfer request since positions across the organization were not being filled due to COVID-19 and the resulting fiscal impact. (SOF ¶ 273).

### E.   Tieu's Allegation that She Reported to Both Hoyt and Stein and Had 2-on-1 Weekly Check-In Meetings

While Tieu was on parental leave, EDC's Asset Management division underwent a reorganization, under which Hoyt and Julie Stein were promoted to Co-Heads of the new Portfolio Management department. (SOF ¶ 215). Upon her return from leave in May 2020, Tieu continued reporting to Hoyt as her direct supervisor, but also reported directly to Stein regarding Tieu's projects in Stein's portfolio. (SOF ¶ 274). Hoyt and Stein held weekly check-in meetings with Tieu to obtain status updates on Tieu's projects and to provide Tieu supervisory support and strategic direction. (SOF ¶ 279). Stein and Hoyt held weekly check-ins with each of their other direct reports. (SOF ¶ 277). Stein and Hoyt held their weekly check-in meeting together with Tieu for

---

[10] RETS is responsible for executing real estate transactions (both sales and leases) on behalf of EDC or city agencies. For a lease transaction, once the transaction is complete, the lease transfers to the Asset Management department to manage the asset as part of EDC's portfolio. (SOF ¶ 14).

efficiency purposes and so Stein could act as an additional objective observer. (SOF ¶ 275).[11]

**Upon Return from Leave, Tieu Exhibits Communications Issues.**

In addition to their weekly check-in meetings, Hoyt also interacted with Tieu about her projects by email. (SOF ¶ 283). During these email interactions, Hoyt often received pushback from Tieu. For example: on June 9, 2020, Tieu falsely accused Hoyt of scheduling office hours with Patchett without her knowledge and trying to have her work outside of her part-time schedule; on June 16, 2020, Tieu refused Hoyt's directions to consolidate presentations for a meeting, stating, "I will give you the individual presentations and you may do as you have envisioned for the meeting"; and on November 23, 2020, when Hoyt asked Tieu to handle a work issue, Tieu advised that she had arranged with Wolf (not her supervisor) to take the day off, and accused Hoyt of "requir[ing] me to work today". (SOF ¶¶ 284-288).

**Tieu's Complaint about Her 2020 Performance Review**

Due to the COVID-19 pandemic, EDC employees received an off-cycle 2020 performance review in February 2021. (SOF ¶ 289). Employees who received a score of "3" or higher on their 2020 performance review were eligible for a one-time bonus between $1,200.00 and $1,500.00. (SOF ¶¶ 322-323). For Tieu's 2020 performance review, Hoyt solicited, and received, written feedback regarding Tieu's performance from Wolf, Stein, Loeb, and Emily DeVito ("DeVito") an SVP in Asset Management. (SOF ¶ 290). Tieu received an overall rating of 2.67. (SOF ¶ 296). Hoyt rated Tieu a "2" for "Communications" based upon, *inter alia*, DeVito's observations that Tieu could be "short" and "snippy", and Hoyt and Stein's observations that: during check-ins, Tieu was unable to engage in strategic discussions about her assets; Tieu was resistant when Hoyt tried to assign her work; and when asked strategy questions, Tieu became extremely defensive and gave

---

[11] Stein and Hoyt also sometimes held two-on-one check-ins together with Justin Poulsen, who reported mostly to Stein but who also reported to Hoyt on one project. (SOF ¶ 278).

curt answers (SOF ¶¶ 297-308). Hoyt rated Tieu a "3" for "Teamwork" and "Results", and incorporated positive feedback from Wolf and DeVito. (SOF ¶¶ 309-318).

On February 18, 2021, Tieu complained to Vasquez that she had received a retaliatory performance review, and simultaneously submitted a doctor's note recommending that she begin her leave that day due to the high-risk nature of her pregnancy. (SOF ¶ 325).

**During Tieu's Parental Leave, EDC Investigates Tieu's Complaint About Her 2020 Review.**

EDC's then-EEO Officer, Mirna Santiago ("Santiago"), conducted an investigation into Tieu's complaint by reviewing Tieu's performance review, Tieu's 5-page "rebuttal", and the performance reviews of Hoyt's other direct reports, as well as interviewing Hoyt, Wolf, Stein, and DeVito (both Stein and DeVito reported experiencing communications issues with Tieu). (SOF ¶¶ 330-331). Santiago prepared an investigative report of her findings, along with her determination that the complaint could not be substantiated, and notified Tieu of the outcome on June 17, 2021. (SOF ¶¶ 332-333). Tieu returned from parental leave on July 12, 2021.

**ARGUMENT**

## I.    SUMMARY JUDGMENT STANDARD

The purpose of summary judgment is to isolate and terminate claims that are factually unsupported so as to avoid costly and unnecessary trials. *Celotex v. Catrett*, 477 U.S. 317, 322 (1986). "'[T]he salutary purposes of summary judgment – avoiding protracted, expensive and harassing trials – apply no less to discrimination cases than to other areas of litigation.'" *Lu v. Chase Inv. Servs. Corp.*, 412 F. App'x 413, 415 (2d Cir. 2011) (summ. order) (quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000)). Indeed, "[i]t is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." *Feingold v. New York*, 366 F.3d 138, 149 (2d. Cir. 2004 (quoting *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001)).

14

Summary judgment must be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In this context, a particular fact will be deemed "material" only if its existence or non-existence would "'affect the outcome of the suit under governing law . . . .'" *Coppola v. Bear Stearns & Co.*, 499 F.3d 144, 148 (2d Cir. 2007) (citation omitted).  Likewise, an issue will only be considered "genuine" if the evidence "is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Thus, as the Second Circuit Court of Appeals has repeatedly noted, summary judgment "is appropriate when, after discovery, the party -- here Plaintiff -- against whom summary judgment is sought, has not shown that evidence of an essential element of her case -- one on which she has the burden of proof -- exists." *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 84 (2d Cir. 2004) (citation omitted).

In order to withstand a motion for summary judgment, the plaintiff must "demonstrate more than some metaphysical doubt as to the material facts," and come forward with specific and admissible evidence showing a genuine issue for trial on each element of her claim.  *Aslanidis v. United States Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993).  "[M]ere speculation or conjecture as to the true nature of the facts" will not overcome a motion for summary judgment.  *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986).  Moreover:

> While it is undoubtedly the duty of [ ] courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on [her] own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether the jury could reasonably find for the plaintiff, and thus whether there are any genuine issues of material fact, without making some assessment of the plaintiff's account.

*Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (citation omitted); *see also Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 105 (2d Cir. 2011) (district court entitled to assess the plaintiff's factual assertions where plaintiff only submitted an affidavit and her

deposition testimony in opposition to the summary judgment motion, whereas the defendant submitted documentary evidence that contradicted the plaintiff's assertions); *accord Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 22 (2d Cir.2014) (stating that summary judgment in *Jeffreys* and *Rojas* was appropriate because plaintiffs in those cases relied entirely on their own testimony, which were inconsistent and contradicted by evidence in the record).

## II.    TIEU'S FMLA INTERFERENCE AND RETALIATION CLAIMS (FIRST CAUSE OF ACTION) FAIL AS A MATTER OF LAW.

### A.    Tieu's FMLA Interference Claim Fails Because She Was Never Denied FMLA Leave.

An employer "violates the FMLA's interference clause where it has denied or otherwise interfered with a benefit to which [an eligible employee] was entitled under the FMLA." *Fitzgerald v. We Co.*, No. 20 CIV. 5260 (AT), 2022 WL 952963, at *8 (S.D.N.Y. Mar. 30, 2022) (quoting *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 424 (2d Cir. 2016). To succeed on an FMLA interference claim, "a plaintiff must establish: 1) that she is an eligible employee under the FMLA; 2) that the defendant is an employer as defined by the FMLA; 3) that she was entitled to take leave under the FMLA; 4) that she gave notice to the defendant of her intention to take leave; and 5) that she was denied benefits to which she was entitled under the FMLA." *Graziadio*, 817 F.3d 415, at 424. Tieu's FMLA interference claim fails because it is undisputed that Tieu was granted the full amount of FMLA leave that she requested in 2019 and 2021. *See Greenberg v. State Univ. Hosp. - Downstate Med. Ctr.*, 838 F. App'x 603, 605 (2d Cir. 2020) (affirming district court's holding that the plaintiff "failed to establish a *prima facie* case of interference by not adducing evidence sufficient for a reasonable factfinder to conclude that he was denied a benefit to which he was entitled"). Nor has Tieu demonstrated that Defendants impeded her ability to exercise her FMLA rights. While Tieu contends that Hoyt initially did not sign her FMLA request form, there is no dispute that Hoyt *did* sign the form less than a week later, after he confirmed that EDC's policy

entitled Tieu to 16 weeks of parental leave. (SOF ¶¶ 114-115; Ex. C, Hoyt Dep. at 154:14-17, 155:2-10; Ex. D, Vasquez Dep. at 181:10-182:4; Ex. JJ, at DEF000007). *See Matias v. Montefiore Med. Ctr.*, No. 20-CV-2849 (VEC), 2022 WL 4448585, at *15 (S.D.N.Y. Sept. 23, 2022) (granting summary judgment on FMLA interference claim and holding that "even if Defendants delayed processing that leave request, plaintiff has not presented evidence that she was denied benefits to which she was entitled under the FMLA"). In any event, EDC does not require a manager's signature as a precondition to granting an employee FMLA leave.  (SOF ¶ 105-107; Ex. HH, Hair Dep. at 30:25-31:20, 32:14-33:22; Ex. D, Vasquez Dep. at 182:5-23, 182:19-23; Ex II, at PL000369). Thus, even if Hoyt had never signed Plaintiff's form, it would be immaterial so long as Plaintiff was granted the full amount of FMLA leave she requested in 2019 and 2021 – which she was. *See Anderson v. New Orleans Jazz & Heritage Festival & Found., Inc*., 464 F. Supp. 2d 562, 569 (E.D. La. 2006) (dismissing FMLA interference claim where employee was allowed to take leave even when her supervisor did not approve the forms).

Based on the foregoing, Tieu's FMLA interference claim fails as a matter of law.

**B.**  **Tieu's FMLA Retaliation Claim Fails Because She Cannot Establish a *Prima Facie* Case of Retaliation, Let Alone Overcome Defendants' Legitimate Non-Retaliatory Justifications for the "Communications" Rating in Her July 2019 Performance Review.**

FMLA retaliation claims are subject to the *McDonnell-Douglas* burden-shifting test, whereby a plaintiff has the initial burden to demonstrate a *prima facie* case by establishing that: "(1) she exercised rights protected under the FMLA; (2) she was qualified for [her] position; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Greenberg*, 838 F. App'x at 606. The fourth element, *i.e.*, a causal connection, may be established by either direct evidence of retaliatory animus, or circumstantial evidence "such as showing that the protected activity was

followed closely by [retaliatory] treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct." *Nikolakopoulos v. Macy's Inc.*, No. 20 CIV. 1641 (KPF), 2022 WL 3903595, at *15 (S.D.N.Y. Aug. 30, 2022). If the plaintiff establishes a *prima facie* case, the defendant need only "demonstrate a legitimate, [non-retaliatory] reason for its actions." *Greenberg*, 838 F. App'x at 606. "[T]he plaintiff must then show that [the] defendant's proffered explanation is pretextual … by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered reason … or by providing evidence such that a reasonable factfinder could conclude that the prohibited reason was a 'motivating factor' in the adverse employment action." *Id.*

Tieu claims Hoyt rated her a "2" for "Communications" in her July 2019 performance review to retaliate against her (i) for requesting FMLA leave on May 7, 2019, and (ii) for telling Hoyt on July 23, 2019, during their discussion about Tieu passing off work to Lippman, that Tieu had a right to take leave. For purposes of this motion only, Defendants do not contest the first three elements of Tieu's *prima facie* retaliation claim. Tieu's *prima facie* retaliation claim fails because she has not demonstrated the fourth element, *viz.*, evidence of any causal connection between her request for FMLA leave and the ratings she received in her 2019 performance review. *First*, the temporal relationship between Tieu's May 7, 2019 notice of intent to take leave and Hoyt's issuance of the 2019 performance review is too attenuated to establish a retaliatory inference, and she does not – because she cannot – point to any of Hoyt's direct reports who did not request FMLA leave who were treated more favorably. *See Dodd v. City Univ. of New York*, 489 F. Supp. 3d 219, 247 (S.D.N.Y. 2020) ("Generally, to show causation through temporal proximity alone, courts in this Circuit require no more than two months to have passed between a protected activity and an adverse action.").  Even if there were sufficient temporal proximity between Tieu's May 7,

2019 notice of intent to take leave and Hoyt's issuance of Tieu's 2019 performance review, it is well-settled that temporal proximity, alone, is insufficient to allow a retaliation claim to survive summary judgment.  *See, e.g., Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 847 (2d Cir. 2013) ("[t]emporal proximity alone is insufficient to defeat summary judgment at the pretext stage.").

Moreover, in October 2018 – almost seven (7) months before Tieu's May 2019 request to take FMLA leave – Connelly, who served as Tieu's supervisor immediately prior to Hoyt, prepared a draft performance improvement plan ("Draft PIP") for Tieu, in which Connelly raised issues with Tieu's communications. (SOF ¶¶ 21-31; Ex. N, Draft PIP).  "[W]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Nicastro v. N.Y.C. Dep't of Design & Constr.*, 125 F. App'x 357, 358 (2d Cir. 2005).

*Second*, assuming *arguendo* that Tieu's July 23, 2019 statements to Hoyt during their discussion about Tieu passing off work to Lippman – that Tieu had a right to take leave – constituted protected activity, Tieu cannot establish a causal connection between Tieu's July 23 statements and Hoyt's rating for Tieu's "Communication" in her 2019 performance review because Hoyt prepared the review before the July 23 conversation took place. (SOF ¶¶ 148, 160, 163; Ex. C, Hoyt Dep. at 165:6-17; Ex. QQ, at DEF 000176-178).  It is axiomatic that "[a]dverse employment actions … that begin[ ] prior to any protected activity on the plaintiff's part cannot give rise to an inference of retaliation." *Porter v. Potter*, 366 F. App'x 195, 197 (2d Cir. 2010).

Even if Tieu were capable of establishing a *prima facie* case for FMLA retaliation, which she cannot, Defendants have legitimate, non-retaliatory reasons for Tieu's "Communication" rating in her 2019 performance review. Specifically, EDC received complaints about Tieu's communication style from Columbia and Cochrane, and Hoyt also observed communication issues

with Tieu in Fall 2018 when she complained that her coworkers were "lazy asses" and "motherfuckers," and threatened to quit or have coworkers fired instead of approaching the problem with a solution-oriented mindset, as Hoyt noted in his 90-day review of Tieu in February 2019 – months prior to her May 2019 request for FMLA leave.[12]

Tieu has not, and cannot, demonstrate any weaknesses in these justifications. To the contrary, the undisputed evidence reveals that not only did EDC receive these complaints about Tieu's communication, Kwatinetz considered the complaints serious enough that he advised Hoyt to "deal with this formally" and counseled Tieu to "tone down the language". (SOF ¶¶ 21, 63-66; Ex. T, at DEF000112; Ex. U, at PL000025-26; Ex. L; Ex. N, at DC 001-004). *See Woolf v. Bloomberg L.P.*, No. 16-CV-6953 (PKC), 2019 WL 1046656, at *19 (S.D.N.Y. Mar. 5, 2019) (dismissing FMLA retaliation claim and finding that employee could not demonstrate the employer's criticism of the employee's performance was pretext where there was a "well-documented record of management's criticisms and concerns about [the employee's] performance" that "predate[d] [his] request for leave," and noting that "[w]hile [the employee] urges that the criticisms of his performance were inaccurate and unfair, the substance of the criticisms was consistent."); *Fitzgerald, supra*, 2022 WL 952963, at *10 (plaintiff's "subjective disagreement with [her supervisors'] assessment of her skills and expertise –even if that assessment was wrong– does not, without more, establish pretext.").

Based on the foregoing, Tieu's FMLA retaliation claim should be dismissed.

## III.   TIEU'S GENDER, RACE, AND PREGNANCY DISCRIMINATION CLAIMS UNDER TITLE VII (SECOND CAUSE OF ACTION) FAIL AS A MATTER OF LAW.

---

[12] (SOF ¶¶ 39-42, 47, 50-51, 58-62; Ex. Q, at DEF00003333; Ex. S, at DEF000331; Ex. T, at DEF000113; Ex. C, Hoyt Dep. at 210:2-19; Ex. R, at DEF000173; Ex. P at DEF000393-395, 000399-403).

**A.      Legal Standard Applicable to Discrimination Claims under Title VII.**

Discrimination claims under Title VII are analyzed under the *McDonnell Douglas* three-step burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Carmody v. Vill. of Rockville Ctr.,* 661 F. Supp. 2d 299, 324-25 (E.D.N.Y. 2009). The first step of the *McDonnell Dougla*s burden-shifting analysis requires the plaintiff to demonstrate a *prima facie* case of discrimination. *Carmody*, 661 F. Supp. 2d at 324-25.

To establish a *prima facie* case of discrimination, a plaintiff must show that: (1) she belongs to a protected group; (2) she was qualified for her position; (3) her employer took an adverse employment action against her; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination.  *Vogel v. CA, Inc.*, 662 F. App'x 72, 75 n.1 (2d Cir. 2016).  If the plaintiff establishes a *prima facie* case of unlawful discrimination, the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for the adverse employment action. *Dawson v. Bumble & Bumble*, 398 F.3d 211, 216 (2d Cir. 2005). This burden is "one of production, not persuasion." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). If the defendant meets its burden, the plaintiff must show by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. *Carmody*, 661 F. Supp. 2d at 324-25.

**B.      Tieu's Gender, Race, and Pregnancy Discrimination Claims under Title VII Fail Because She Cannot Establish Her 2019 Performance Review – or Any of the Myriad Other Actions about Which She Complains – Were Motivated by Discriminatory Animus.**

As an initial matter, for purposes of this motion only Defendants do not contest Tieu's ability to establish the first two elements of her *prima facie* case for gender, race, and pregnancy discrimination – that she is (or, in the case of her pregnancy, was) a member of a protected group, and she was qualified for her position.

With respect to the third element of Tieu's *prima facie* discrimination case, "[a]n adverse employment action is 'a materially adverse change in the terms and conditions of employment.'" *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008) (quoting *Sanders v. New York City Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004)).  To constitute a materially adverse change there must be:

> [A] change in working conditions . . . [that is] more disruptive than a mere inconvenience or an alteration of job responsibilities.  Examples of such a change include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation.

*Id.*

Here, the only employment action Tieu alleges that arguably constitutes an adverse employment action is her receipt of a "2" rating for "Communications" in her 2019 review.[13] (SOF ¶ 148; Ex. QQ, Tieu's 2019 Performance Review). However, Tieu cannot establish that she received a "2" rating for "Communications" on her 2019 performance review under circumstances giving rise to an inference of gender, race or pregnancy discrimination. *First*, Tieu cannot point to any employees outside of those protected classes who received better performance reviews after exhibiting similar communications issues. *See Ebel v. G/O Media, Inc.,* No. 20 CIV. 7483 (PAE), 2022 WL 2359245, at *21 (S.D.N.Y. June 30, 2022) (granting summary judgment where plaintiff failed to adduce evidence of a similarly situated comparator who was treated more favorably).

*Second*, Tieu cannot point to any comments by Defendants relating to her gender, race or

---

[13] Negative performance evaluations, without any accompanying consequences, are not adverse employment actions.  *See Fairbrother v. Morrison*, 412 F.3d 39, 56–57 (2d Cir. 2005) (surveying cases and concluding that a negative performance evaluation cannot be considered an adverse employment action without evidence that the evaluation "altered ... compensation, benefits, or job title"), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).  Here, Tieu alleges her 2019 performance review resulted in her receiving a minimal raise that was lower than she expected. *See* federal Complaint at ¶¶ 46, 67-69.

pregnancy, such that might give rise to an inference of gender, race or pregnancy discrimination. Indeed, Tieu testified during her deposition that she never heard Hoyt or Loeb ever make any derogatory comments about women, Asians or pregnant women. (SOF ¶ 337; Ex. F, Tieu Dep. at 279:16-280:11). *See Altman v. N.Y. City Dep't of Educ.*, No. 06-CV-6319 (HB), 2007 WL 1290599, \*5 (S.D.N.Y., May 1, 2007) (granting summary judgment on the plaintiff's discrimination claim because the plaintiff put forth no comments or actions by any of her supervisors relating to her protected class that might give rise to an inference of discrimination).

*Third*, Hoyt's demonstrated history of helping and treating Tieu well eviscerates any inference of discrimination. While aware of Tieu's race, gender, and efforts to become pregnant, Hoyt assisted Tieu in obtaining employment with EDC, consented to her request to move to his team, and subsequently, was accommodating and understanding of her time out of the office due to her pregnancy and medical issues.[14] *See Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997), ("[W]here the individual who made the decision identified by a plaintiff as an adverse employment action is the same person who previously promoted that employee, it is difficult to impute. . . a [discriminatory] motivation, to that individual."); *James v. New York Racing Ass'n*, 233 F.3d 149, 153 (2d Cir. 2000) (noting that it is "difficult to impute bias against plaintiff's protected class where the actor who made the adverse employment decision against plaintiff also made a recent favorable employment decision regarding plaintiff").

In sum, Tieu cannot point to *any* concrete evidence to support a finding that her 2019 performance review – or any of the myriad other actions she complains about – occurred under circumstances giving rise to an inference of gender, race or pregnancy discrimination. Rather,

---

[14] (SOF ¶¶ 9-11, 28-30, 76; Ex. C, Hoyt Dep. at 47:4-5, 117:24-118:7, 120:2-20, 123:14-124:20, 128:10-129:14, 147:12-149:7; Ex. J, at DEF 000103-000110; Ex. P, at DEF000412-422, 000427-438; Ex. Y, DEF000439-450, at DEF000447-000448; Ex. Z, at DEF000509-510, 000515-516).

Tieu's discriminations claims rely exclusively on a logical fallacy frequently employed by discrimination plaintiffs: she is a member of a protected class; she suffered an adverse action; therefore, she suffered an adverse action because she is a member of a protected class.  Such bald and wholly conclusory allegations repeatedly have been rejected by courts as entirely insufficient to plausibly allege, let alone establish, a claim of discrimination.  *See Peters v. Mount Sinai Hosp.*, No. 08 Civ. 7250 (CM), 2010 WL 1372686, at *11 (S.D.N.Y. March 30, 2010) ("This sort of *post hoc, ergo propter hoc* reasoning has been rejected as insufficient again and again in employment discrimination cases, by this court and by other district judges.").  Accordingly, summary judgment should be granted on Tieu's gender, race, and pregnancy discrimination claims under Title VII because Tieu cannot establish her *prima facie* case for gender, race, or pregnancy discrimination.

Even if Tieu were able to establish her *prima facie* case of discrimination under Title VII, summary judgment should be granted in EDC's favor nonetheless because, as discussed in Section II.B., *supra*, Defendants have provided legitimate, nondiscriminatory reasons as to why Tieu received a "2" for "Communications" in her 2019 performance review, and Tieu cannot show by a preponderance of the evidence that Defendants proffered reasons are pretextual.

## IV.  TIEU'S DISABILITY DISCRIMINATION CLAIM UNDER THE ADA (FOURTH CAUSE OF ACTION) FAILS AS A MATTER OF LAW.

### A.  Legal Standard Applicable to Discrimination Claims under the ADA.

Tieu alleges EDC refused to grant her accommodations in violation of the ADA. As with Title VII discrimination claims, discrimination claims under the ADA are also analyzed under the *McDonnell-Douglas* burden-shifting framework. *McMillan v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013).  To establish a *prima facie* discrimination case under the ADA, based on an employer's failure to accommodate a disability, a plaintiff must demonstrate that: (1) she was disabled under the meaning of the ADA; (2) the employer is covered by the statute and had notice

of her disability; (3) with reasonable accommodation, the plaintiff could perform the essential functions of the job at issue; and (4) the employer refused to make such accommodations. *Id*. at 125; *Berger v. New York City Police Dep't*, 304 F. Supp. 3d 360, 369 (S.D.N.Y. 2018).

**B.      Tieu Cannot Establish Her Prima Facie Case for Discrimination under the ADA Because She was Never Denied Any Reasonable Accommodation.**

For purposes of this motion only, Defendants do not contest Tieu's ability to establish the first three elements of her *prima facie* case. However, Tieu cannot establish the fourth element of her *prima facie* case because she was granted each and every reasonable accommodation she requested. Specifically, Tieu was granted the following accommodations: (i) in January 2019, Tieu was granted her request to start work one (1) hour late and leave work two (2) hours early, every day, for the period January 31 to March 1, 2019, to accommodate her morning sickness; (ii) Tieu was granted the ability to work remotely for two weeks in March 2019, upon submission of a doctor's note clarifying that she should work from home due to a sudden hearing loss; (iii) Tieu was granted an extension of her leave from December 15, 2019 (the date on which she was scheduled to return from parental leave) to May 4, 2020, for recovery from her pituitary surgery; and (iv) Tieu was granted a part-time schedule, and an exemption from EDC's return-to-work mandate, from May 2020 until February 2021, for her medical conditions and second pregnancy.[15]

Tieu does not dispute that these accommodations were granted. Rather, she futilely argues she was not permitted to work remotely in February 2019 to accommodate her pregnancy-related morning sickness. However, Tieu as a matter of law cannot demonstrate she was denied reasonable accommodations to cope with her pregnancy-related morning sickness because Tieu alternatively

---

[15] (SOF ¶¶ 74-75, 100-101, 236-240, 246-255; Ex. X, at PL000214; Ex. F, Tieu Dep. at 154:12-156:6, 158:22-159:5; Ex. GG, at DEF000005; Ex. HH, Hair Dep. at 75:7-77:4; Ex. GGG, at DEF00001623-1624; Ex. III, at DEF000044 & PL000068-69; Ex. JJJ, at DEF000060-61; Ex. KKK, at PL000086; Ex. MMM, at DEF000071-74; Ex. NNN, at PL000259; Ex. OOO, at DEF000093-97).

requested, and, as stated above, was granted, an accommodation to arrive to work late and leave early for the period January 31, 2019 to March 1, 2019. (SOF ¶¶ 74-75; Ex. F, Tieu Dep. at 131:9-133:2; Ex. W, at DEF000001; Ex. X, at PL000214). "Where an employer has already taken (or offered) measures to accommodate the disability, the employer is entitled to summary judgment if, on the undisputed record, the existing accommodation is "plainly reasonable." *Noll v. Int'l Bus. Machines Corp.,* 787 F.3d 89, 94 (2d Cir. 2015). A reasonable accommodation is not necessarily "a perfect accommodation or the very accommodation most strongly preferred by the employee," but rather, it merely "must be effective." *Id.* at 95. Here, the accommodation granted was indisputably effective, as Tieu arrived late and left work early and was able to continue performing her duties while at work. There is no evidence in the record that the accommodation EDC granted Tieu to cope with her pregnancy-related morning sickness was ineffective or had any negative impact on Tieu. *See id.* at 94 (affirming summary judgment where employer provided accommodations and employee failed to create genuine issue of fact that the accommodations were ineffective); *Brockman v. Snow*, 217 F. App'x 201, 205 (4th Cir. 2007) (finding that denial of pregnant employee's medically supported request to telecommute was not adverse employment action where option of part-time work was offered).

Likewise, Tieu's claim that EDC failed to provide her an accommodation to work remotely in March 2019 is doomed because: (i) the undisputed evidence reflects that Tieu initially submitted a doctor's note directing that she be "excused from work"; and (ii) after Tieu subsequently submitted a second doctor's note clarifying that she could work from home, EDC immediately granted the request to work from home, and credited Tieu the two (2) PTO days she had used.[16]

---

[16] (SOF ¶¶ 81-82, 99-101; Ex. F, Tieu Dep. at 111:19-23, 143:16-144:10, 154:12-156:6, 158:22-159:5; Ex. AA, at PL000989; Ex. CC, at PL000021; Ex. EE, at DEF000004; Ex. GG, at DEF000005).

Finally, Tieu has not demonstrated that EDC failed to accommodate her when she served as EDC's witness in a July 2019 deposition because Tieu has not put forth any evidence that she requested to be excused from the deposition as an accommodation for any pregnancy-related condition. Rather, Tieu only raised her pregnancy as a concern that she might not be available on the date of the deposition in the event she went into labor, commenting, "I am happy to do it but the timing is uncertain." (SOF ¶¶ 121-123, 126-128, 132; Ex. MM, at DEF000115-120).

Based on the foregoing, Tieu's disability discrimination claim under the ADA should be dismissed because she cannot establish EDC denied her reasonable accommodations.

## V.   TIEU'S RACE DISCRIMINATION CLAIM UNDER SECTION 1981 (TENTH CAUSE OF ACTION) FAILS AS A MATTER OF LAW.

### A.   Legal Standard Applicable to Discrimination Claims under Section 1981.

Section 1981 covers claims of race discrimination only. *See Vill. Of Freeport v. Barrella*, 814 F.3d 594, 606 (2d Cir. 2016). Race discrimination claims under Section 1981 are also subject to the *McDonnell Douglas* burden-shifting evidentiary framework, which is discussed in Section III.A., *supra*. *Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015). Unlike discriminations claims brought under Title VII, however, the United States Supreme Court has clarified that "to prevail [on a Section 1981 claim], a plaintiff must initially plead, and ultimately prove that, *but for* race, [she] would not have suffered the loss of a legally protected right." *Comcast Corp. v. National Association of African American-Owned Media*, 140 S.Ct. 1009, 1019 (2020) (emphasis added in italics). Accordingly, once a plaintiff establishes a *prima facie* case of discrimination under Section 1981, and the employer provides a legitimate non-discriminatory reason for the challenged adverse employment action, the plaintiff must establish that the adverse employment action would not have occurred but-for a discriminatory motive.

**B.    Tieu Race Discrimination Claim under Section 1981 Fails because She Cannot Establish Race Discrimination Was the But-For Cause of Her 2019 Performance Review – or Any of the Myriad Other Actions about Which She Complains.**

As an initial matter, nowhere in Tieu's federal Complaint does she allege race was the "but-for" cause of her 2019 performance review or any of the other actions about which she complains. *See*, *generally*, Tieu's federal Complaint.  Tieu's race discrimination claim under Section 1981, thus, should be dismissed on this ground alone. *Comcast Corp.*, 140 S.Ct. at 1019 ("to prevail [on a Section 1981 claim], a plaintiff *must initially plead*, and ultimately prove that, *but for* race, it would not have suffered the loss of a legally protected right.") (Emphasis added).

Moreover, in addition to her race discrimination claims, Tieu employs a kitchen sink approach by alleging she was discriminated against because of her gender, pregnancy, disability, and familial status – essentially, every protected category to which she belongs. *See, e.g.,* Complaint at ¶ 150. However, Tieu's claims of discrimination based on every protected class to which she belongs undercuts any claim that her race was the "but-for" cause of her 2019 performance review or any of the other actions about which she complains. *See Postell v. Fallsburg Library*, 20-cv-3991 (NSR), 2022 WL 1092857, at *9 (S.D.N.Y. Apr. 8, 2022) (finding that plaintiff's allegations that he was discriminated against because of his race, gender, or age precluded the Court from concluding that race was the but-for cause of the alleged unlawful conduct). Thus, the foregoing provides yet another independent basis for the Court to grant Defendants summary judgment on Tieu's Section 1981 discrimination claim.

Even if the Court were inclined not to rule on Tieu's Section 1981 discrimination claim based on the two independent grounds set forth above, Tieu's Section 1981 race discrimination claim should be dismissed nonetheless for the same reasons discussed in Section III.B., *supra*.  In sum, Tieu cannot establish her *prima facie* case of race discrimination, and even if she could, she

cannot demonstrate by a preponderance of the evidence that her race was the actual but-for cause

of her 2019 performance review or any other action about which she complains. Just as Tieu's

Title VII discrimination claims should not survive summary judgment, her race discrimination

claim under Section 1981 cannot overcome the heightened "but-for" causation standard required

to establish a claim under Section 1981.

**VI.    TIEU'S RETALIATION CLAIMS UNDER TITLE VII, THE ADA, AND SECTION 1981 (THIRD, FIFTH, AND ELEVENTH CAUSES OF ACTION) FAIL AS A MATTER OF LAW.**

**A.    Legal Standard Applicable to Retaliation Claims under Title VII, the ADA, and Section 1981.**

As with discrimination claims, retaliation claims under Title VII, the ADA, and Section

1981 are analyzed pursuant to Title VII principles and the *McDonnell-Dougla*s burden-shifting

evidentiary framework.  *See, e.g., Littlejohn v. City of New York*, 795 F.3d 297, 315 (2d Cir. 2015)

(retaliation under Title VII and Section 1981); *Rios v. Dep't of Educ.*, 351 F. App'x 503, 505 (2d

Cir. 2009) (retaliation under the ADA). Thus, to establish a *prima facie* case of retaliation under

these statutes, a plaintiff must show that "(1) [she] was engaged in protected activity; (2) the

employer was aware of that activity; (3) the [plaintiff] suffered a materially adverse action[17]; and

(4) there was a causal connection between the protected activity and that adverse action." *Lore v.

City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012).

Notably, under all three statutes, once the defendant puts forth a legitimate, non-retaliatory

reason for the materially adverse employment action, the plaintiff must then demonstrate by a

preponderance of the evidence that retaliatory animus was the "but-for" cause of the adverse

action.  *See, e.g., See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 339 (2013) ("Title VII

---

[17] A "materially adverse" employment action is one that "could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010).

retaliation claims must be proved according to traditional principles of but-for causation"); *Toombs v. New York City Hous. Auth.*, 830 F. App'x 665, 668 (2d Cir. 2020) (A "plaintiff alleging retaliation in violation of Title VII must show that retaliation was a but-for cause of the adverse action, and not simply a substantial or motivating factor in the employer's decision.") (internal quotations and citation omitted); *Georges v. Peters*, 581 F. App'x 80, 81 (2d Cir. 2014) ("but for" causation standard applies also to Section 1981 retaliation claims); *Heiden v. New York City Health & Hosps. Corp.*, No. 20-CV-10288 (LJL), 2023 WL 171888, at *21 (S.D.N.Y. Jan. 11, 2023) (holding that but-for causation applies to ADA retaliation claims even though the Second Circuit has not settled the issue); *Sears-Barnett v. Syracuse Cmty. Health Ctr., Inc.*, No. 16 Civ. 426 (DNH), 2021 WL 1202206, at *14 (N.D.N.Y. Mar. 31, 2021) (same).

**B.** **Tieu's Retaliation Claims under Title VII, the ADA, and Section 1981 Fail because She Cannot Establish Retaliation Was the But-For Cause of Any of the Actions She Claims to be Retaliatory.**

Tieu contends that Defendants retaliated against her for filing an internal complaint of discrimination against Hoyt in July 2019. For the reasons set forth below, Defendants are entitled to summary judgment on Tieu's retaliation claims because Tieu cannot demonstrate by a preponderance of the evidence that retaliatory animus was the but-for cause of any of the actions she claims to be retaliatory.

**1.** **Tieu's Allegation that She Had No Associate to Supervise.**

First, Tieu cannot establish a *prima facie* retaliation case based on EDC's purported failure to assign her an employee for her to supervise upon her return from leave in May 2020 because Tieu never had a direct report during the entire period she worked on Hoyt's team, *i.e.*, since 2018.[18] *See Bacchus v. N.Y.C. Dep't of Educ.*, 137 F. Supp. 3d 214, 247 (E.D.N.Y. 2014) ("An

---

[18] (SOF ¶ 258; Ex. TTT, at DEF000451; Ex. F, Tieu Dep. at 115:24-117:4; 202:9-25; Ex. C, Hoyt

employer's continuation of a course of conduct that had begun before the employee complained does not constitute retaliation because, in that situation, there is no causal connection between the employee's protected activity and the employer's challenged conduct."). The lack of a retaliatory animus is underscored by the fact that two other VPs in Hoyt's group also did not have direct reports. (SOF ¶ 259; Ex. C, Hoyt Dep. at 189:7-190:14; Ex. FFF, at PL001215).   Moreover, Defendants have provided legitimate, non-retaliatory reasons for not assigning an associate to Tieu: Tieu was only working a 3-day workweek, and was serving in a support role herself for her larger projects (specifically, the Wheel and Lighthouse Point). (SOF ¶ 260; Ex. F, Tieu Dep. at 260:21-261:12; Ex. VVV, at DEF000183).

## 2.    Tieu's Allegation That Her Workload Was Diminished.

Regarding the second alleged retaliatory act, that 80% of her projects were not returned to her upon return from leave, Tieu's *prima facie* retaliation case fails at the third prong because even with fewer projects, she contends she was working beyond her 3-day schedule: "I was actually working more like five days a week, I was working on my days off." (SOF ¶ 262; Ex. F, Tieu Dep. at 259:12-16, 260:18-261:17). An employer's refusal to reassign all of an employee's projects back to her -- when that employee was already at full capacity with the projects that were assigned back to her -- would not dissuade a reasonable worker from making a discrimination complaint. Simply put, Tieu cannot have it both ways. Even if Tieu could establish a *prima facie* case of retaliation based on the decision not to give back all of her projects, Defendants have provided a legitimate, non-retaliatory reason for Tieu's reduced workload. Specifically, at Tieu's request, she was scheduled to work only 3 days per week, and Hoyt attempted to assign projects that fit within her 3-day schedule.[19]   Tieu cannot point to any evidence to refute this justification, let alone point to

---

Dep. at 187:4-14; Ex. FFF, at PL001215).
[19] (SOF ¶ 260; Ex. F, Tieu Dep. at 260:18-261:12; Ex. VVV, at DEF000183; Ex. UUU, at

evidence to satisfy the but-for causation standard required to establish her retaliation claims under Title VII, the ADA or Section 1981.

### 3.    Tieu's Allegation that HR Ignored Her Emails.

As for the third alleged retaliatory act – that in September 2020, Hair initially failed to respond to an email from Tieu until three (3) weeks later, after Tieu sent a follow-up email – Tieu cannot demonstrate a *prima facie* case of retaliation because a reasonable employee would not be dissuaded from making a discrimination complaint based upon an isolated occasion of not receiving a response to an email. Additionally, Tieu cannot establish a causal connection between her July 2019 internal complaint of discrimination against Hoyt and Hair's three-week delay in responding to Tieu's email in September 2020 – more than a year after Tieu's July 2019 internal complaint. *See Dodd v. City Univ. of New York*, 489 F. Supp. 3d 219, 247 (S.D.N.Y. 2020) ("Generally, to show causation through temporal proximity alone, courts in this Circuit require no more than two months to have passed between a protected activity and an adverse action."). Indeed, the undisputed evidence shows that after Tieu complained in July 2019, Hair and other HR staff often responded to her emails the same day or within 1-2 business days, and did not "ignore" those emails.[20] Moreover, Hair has provided a legitimate, non-retaliatory explanation for initially not responding to Tieu's September 2020 email: that occasionally, Hair accidentally misses an email from an employee, and he believed the September 2020 email to be a missed email. (SOF ¶¶ 265, 267; Ex. HH, Hair Dep. at 16:25-17:18, 93:17-18).

### 4.    Tieu's Allegation that EDC Refused to Transfer Her.

Regarding the fourth alleged retaliatory act – that EDC refused to transfer her to the RETS

---

DEF000155).
[20]   (SOF ¶ 264; Ex. GGG, at DEF00001623-1624; Ex. KKK, PL000079-89; Ex. HHHH, DEF 000142-143, PL000102, & DEF00002782-84).

department – again, Tieu has not put forth any evidence that any refusal to transfer her in May 2020 was causally connected to her July 2019 complaint.

Assuming, without conceding, that Tieu could establish a *prima facie* retaliation case, Defendants have articulated legitimate, non-retaliatory reasons for not transferring Tieu: *first*, in May 2020, EDC was in the midst of a hiring freeze and not filling positions across the organization due to the COVID-19 pandemic and related fiscal impact; and, *second*, even after EDC's hiring freeze was lifted, Tieu did not apply for an open position in RETS pursuant to EDC's internal transfer policy. (SOF ¶¶ 270-273; Ex. IIII, at DEF000235; Ex. KKK, PL000079-89, at PL00083). Because Tieu cannot point to any evidence, let alone demonstrate, that retaliatory animus was the but-for cause of Defendants' purported failure to transfer her to RETs, her retaliation claims based on such purported failure to transfer her fails as a matter of law and should be dismissed.

        **5.**     **Tieu's Allegation that She Reported to Stein and Hoyt, Was Subjected to "Excessive Scrutiny", and Had Two-On-One Weekly Check-In Meetings.**

As to the fifth alleged retaliatory act – that Tieu had to report to both Stein and Hoyt, who subjected her to "excessive scrutiny" and held 2-on-1 (as opposed to 1-on-1) check-in meetings, Tieu once again fails to establish a *prima facie* case of retaliation.  As an initial matter, Tieu cannot point to any evidence that she was subjected to "excessive scrutiny" other than her own conclusory statements. Further, reporting to Stein for limited scopes of work within Stein's portfolios, and attending check-ins with both SVPs to whom she reported would not dissuade a reasonable worker from making a complaint of discrimination. Indeed, it did not dissuade Tieu from filing another internal complaint in February 2021. *See Levitant v. City of N.Y. Hum. Res. Admin.*, 558 F. App'x 26, 29 n.2 (2d Cir. 2014) (holding "it is relevant that [Plaintiff] himself was not dissuaded from making several more complaints after suffering these allegedly materially adverse actions.").

Even if Tieu could demonstrate a *prima facie* retaliation case, which she cannot,  she cannot overcome Defendants' legitimate non-retaliatory reasons for having Tieu report both to Hoyt and Stein – business efficiency, and also so that Stein could act as an additional objective observer.[21]

### 6.     Tieu's 2020 Performance Review and Bonus

Finally, Tieu's claim that Hoyt gave her a negative performance review in February 2021 to retaliate against her for filing an internal complaint in July 2019 likewise fails. Where, as here, an employee received a similar performance review prior to the employee making a complaint of discrimination, "the Court infers little causal connection between [plaintiff's] protected activity. . . and [the employer's] continued course of challenged conduct." *E.E.O.C. v. Bloomberg L.P.*, 967 F. Supp. 2d 816, 896–97 (S.D.N.Y. 2013) (granting summary judgment where after filing a discrimination complaint, plaintiff "continued to receive negative performance reviews," because plaintiff's allegations were "that Bloomberg continued the same course of conduct that prompted her to file a discrimination [complaint] in the first place."). Accordingly, Tieu cannot establish a *prima facie* retaliation case based on the February 2021 performance review.

Moreover, and in any event, Defendants have legitimate, non-retaliatory reasons for giving Tieu a "2" for Communications in the 2020 performance review – Hoyt, Stein, and DeVito all observed communication issues, and Tieu's subjective disagreement with their observations is insufficient to demonstrate that retaliatory animus was the but-for cause of the "2" rating she received. (SOF ¶ 284-288; Ex. ZZZ, at DEF 000151–152). *See Fitzgerald*, 2022 WL 952963, at *10 (plaintiff's "subjective disagreement with [her supervisors'] assessment of her skills and expertise –even if that assessment was wrong– does not, without more, establish pretext.").

## VII.    THE COURT SHOULD DECLINE TO EXCERCISE SUPPLEMENTAL JURISDICTION OVER TIEU'S CLAIMS UNDER THE NYSHRL AND

---

[21]  (SOF ¶¶ 275, 278; Ex. EEE, Stein Dep. at 72:4-74:9, 171:5-24; Ex. C, Hoyt Dep. at 215:6-19).

NYCHRL.

Because summary judgment in favor of Defendants is warranted on each of Tieu's federal claims (First, Second, Third, Fourth, Fifth, Tenth, and Eleventh Causes of Action), the Court should decline to exercise supplemental jurisdiction over Tieu's remaining claims under the NYCHRL.  Where "federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the remaining state-law claims." *Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 727 (2d Cir. 2013) (citation and quotation marks omitted); *Onibokun v. Chandler*, 749 F. App'x 65, 67 (2d Cir. 2019) (same).  Accordingly, the Court should decline to exercise jurisdiction over Tieu's remaining claims under the NYSHRL and NYCHRL, and should dismiss those claims.

## CONCLUSION

For the foregoing reasons, this Court should grant Defendants' Motion for Summary Judgment in its entirety with prejudice, and grant such other and further relief as the Court deems just and proper.

Dated: New York, New York
      March 13, 2023

          GORDON & REES, LLP

          By: /s/_____
          Kuuku Minnah-Donkoh
          Lindsey Blackwell
          One Battery Park Plaza, 28th Floor
          New York, New York 10004
          (212) 269-5500
          kminnahdonkoh@grsm.com
          lblackwell@grsm.com
          *Attorneys for Defendants*