**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------- X
LIA TIEU,                                              :
                                                       :
                          Plaintiff,                   :
                                                       :
          v.                                           :
                                                       :   Civil Action No.: 1:21-CV-05951-AT
NEW YORK CITY ECONOMIC                                 :
DEVELOPMENT CORPORATION,                               :
WINTHROP HOYT and RACHEL LOEB, in                      :
their individual and professional capacities,          :
                                                       :
                          Defendants.                  :
-------------------------------------------------------------- X


**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**<u>MOTION FOR SUMMARY JUDGMENT</u>**


**WIGDOR LLP**


Valdi Licul
Sagar Shah

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
vlicul@wigdorlaw.com
sshah@wigdorlaw.com

*Attorneys for Plaintiff*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF FACTS ................................................................................................... 2

I.      BACKGROUND ................................................................................................... 2

II.     TIEU'S LEAVE AND ACCOMMODATION .................................................... 2

III.    TIEU'S CONTINUED PROTECTED COMPLAINTS OF DISCRIMINATION ............. 5

IV.    TIEU'S REQUEST FOR DISABILITY LEAVE ............................................... 6

V.     EDC SUMMARILY DISMISSES TIEU'S COMPLAINTS AND CONTINUES HOSTILITY AGAINST HER ............................................................................. 8

VI.    TIEU RETURNS TO WORK AND FACE CONTINUED DISCRIMINATION AND RETALIATION ............................................................................................ 10

VII.   RACE AND SEX DISCRIMINATION DEMONSTRABLE BY CONDUCT TOWARDS OTHERS ...................................................................................... 11

ARGUMENT ...................................................................................................................... 13

I.      THE SUMMARY JUDGMENT STANDARD .................................................. 13

II.     FMLA VIOLATIONS ....................................................................................... 14

A.    Interference ...................................................................................................... 15

B.    Retaliation ........................................................................................................ 19

C.    Timing .............................................................................................................. 20

D.    Comments ........................................................................................................ 23

E.    Pretext ............................................................................................................. 24

F.    Investigation .................................................................................................... 24

III.    PREGNANCY DISCRIMINATION ................................................................. 25

i

IV.     RACE AND SEX DISCRIMINATION ............................................................................. 26

V.      RETALIATION.............................................................................................................. 28

CONCLUSION........................................................................................................................... 30

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>                                                                      <u>Page(s)</u>

<u>Anderson v. New Orleans Jazz & Heritage Festival & Found., Inc.</u>,
   464 F. Supp. 2d 562 (E.D. La. 2006) ................................................... 19

<u>Back v. Hastings On Hudson Union Free Sch. Dist.</u>,
   365 F.3d 107 (2d Cir. 2004)................................................................... 25

<u>Billue v. Praxair, Inc.</u>,
   No. 3:05 Civ. 00170 (JCH), 2007 WL 1231841 (D. Conn. Apr. 26, 2007)............................ 20

<u>Bostock v. Clayton Cty.</u>,
   140 S. Ct. 1731 (2020) ......................................................................... 26

<u>Briggs v. Women in Need, Inc.</u>,
   819 F. Supp. 2d 119 (E.D.N.Y. 2011)..................................................... 25

<u>Byrnie v. Town of Cromwell, Bd. Of Educ.</u>,
   243 F.3d 93 (2d Cir. 2001).................................................................... 13

<u>Carter v. Syracuse City School Dist.</u>,
   850 Fed. App'x 22 (2d Cir. 2021)........................................................... 14

<u>Collins v. Connecticut</u>,
   684 F. Supp. 2d 232 (D. Conn. 2010) .................................................... 22

<u>Comcast Corp. v. Nat'l Assoc. of African American-Owned Media</u>,
   140 S. Ct. 1009 (2020) ......................................................................... 26

<u>Danzer v. Norden Systems, Inc.</u>,
   151 F.3d 50 (2d Cir. 1998).................................................................... 14

<u>Di Diovanna v. Beth Israel Med. Ctr.</u>,
   651 F. Supp. 2d 193 (S.D.N.Y. 2009)..................................................... 15

<u>Dodd v. City University of New York</u>,
   489 F. Supp. 3d 219 (S.D.N.Y. 2020)..................................................... 28

<u>Doe v. Columbia Univ.</u>,
   831 F. 3d 46 (2d Cir. 2016)................................................................... 19

<u>Donnelly v. Greenburgh Cent. Sch. Dist., No. 7</u>,
   691 F.3d 134 (2d Cir. 2012).................................................................. 13

<u>Friedman v. Swiss Re America Holding Corp.</u>,
   643 F. App'x 69  (2d Cir. 2016)............................................................. 17

i

Gorzynski v. JetBlue Airways Corp.,
   596 F.3d 93 (2d Cir. 2010) ............................................................................. 13, 28

Graziadio v. Culinary Inst. Of Am.,
   817 F.3d 415 (2d Cir. 2016) ............................................................................. *passim*

Green v. Town of East Haven,
   952 F.3d 394 (2d Cir. 2020) ................................................................................. 13

Greenberg v. State Univ. Hosp. – Downstate Med.,
   Ct., 838 F. App'x 603 (2d Cir. 2020) .................................................................... 18

Gross v. FBL Financial Services, Inc.,
   557 U.S. 167 (2009) .............................................................................................. 23

Hicks v. Baines,
   593 F.3d 159 (2d Cir. 2010) ................................................................................. 28

Holcomb v. Iona Coll.,
   521 F.3d 130 (2d Cir. 2008) ................................................................................. 25

Holtz v. Rockefeller & Co.,
   258 F.3d 62 (2d Cir. 2001) ................................................................................... 19

In re Dana Corp.,
   574 F.3d 129 (2d Cir. 2009) ............................................................................. 14, 23

Kaytor v. Elec. Boat Corp.,
   609 F.3d 537 (2d Cir. 2010) ................................................................................. 13

Kessler v. Wetchester Cnty Dep't of Social Svcs.,
   461 F.3d 199 (2d Cir. 2006) ................................................................................. 13

Kwon v. Univ. of Vermont and State Agricultural College,
   912 F. Supp. 2d 135 (D. Vermont 2012) ............................................................. 27

Laudadio v. Johanns,
   677 F. Supp. 2d 590 (E.D.N.Y. 2010) .................................................................. 20

Limauro v. Consol. Edison Co. of New York, Inc.,
   No. 20 Civ. 03558 (CM), 2021 WL 466952 (S.D.N.Y. Feb. 9, 2021) ................. 28

Mack v. Otis Elevator Co.,
   326 F.3d 116 (2d Cir. 2003) ................................................................................. 19

Magilton v. Tocco,
    379 F. Supp. 2d 495 (S.D.N.Y. 2005) ............................................................... 21

Matias v. Montefiore Med. Ctr.,
    No. 20 Civ. 2849 (VEC), 2022 WL 4448585  (S.D.N.Y. Sept. 23, 2022) .............................. 19

McKenna v. Santander Investment Securities, Inc.,
    21 Civ. 941(DLC), 2022 WL 2986588 (S.D.N.Y. July 28, 2022) ........................................... 17

Menaker v. Hofstra Univ.,
    935 F.3d 20 (2d Cir. 2019) ............................................................................ 24

Mihalik v. Credit Agricole Cheuvreux North America, Inc.,
    715 F.3d 102 (2d Cir. 2013) .......................................................................... 28

Milea v. Metro-N. R. Co.,
    658 F.3d 154 (2d Cir. 2011) .......................................................................... 19

Nicastro v. N.Y.C. Dep't of Design and Constr.,
    125 F. App'x 357 (2d Cir. 2005) ...................................................................... 22

Patrick v. LeFevre,
    745 F.2d 153 (2d Cir. 1984) ...................................................................... 13, 14

Piligian v. Icahn School of Medicine at Mt. Sinai,
    490 F. Supp. 3d 707 (S.D.N.Y. 2020) ................................................................. 28

Rasmy v. Marriott Int'l., Inc.,
    952 F.3d 379 (2d Cir. 2020) .......................................................................... 13

Redd v. N.Y. Div. of Parole,
    678 F.3d 166 (2d Cir. 2012) .......................................................................... 13

Reeves v. Sanderson Plumbing Prods., Inc.,
    530 U.S. 133 (2000) .................................................................................. 10

Robertson v. Wells Fargo Bank, N.A.,
    No. 3:14 Civ. 01861 (VLB), 2017 WL 326317 ......................................................... 28

Rodriguez v. Vill. Green Realty, Inc.,
    788 F.3d 31 (2d Cir. 2015) ...................................................................... 13, 14

Rule v. Brine, Inc.,
    85 F.3d 1002 (2d Cir. 1996) .......................................................................... 14

Santiago v. Dep't of Transp.,
    50 F. Supp. 3d 136 (D. Conn. 2014) .............................................................. 15, 16

Saraf v. West Publishing Corp.,
  No. 16 Civ. 1425 (VSB), 2018 WL 7107266 (S.D.N.Y. Dec. 20, 2018) .................... 15, 20, 21

Slattery v. Swiss Reinsurance Am. Corp.,
  247 F.3d 87 (2d Cir. 2001) ..................................................................... 22

Sterling v. Bond, Inc.,
  997 F. Supp. 306 (N.D.N.Y. 1998) ......................................................... 25

Stratton v. Dep't for the Aging for the City of N.Y.,
  132 F.3d 869 (2d Cir. 1997) .................................................................. 24

Summa v. Hofstra Univ.,
  708 F.3d 115 (2d Cir. 2013) .................................................................. 21

Tolbert v. Smith,
  790 F.3d 427 (2d Cir. 2015) .................................................................. 23

Tomassi v. Insignia Fin. Grp., Inc.,
  478 F.3d 111 (2d Cir. 2007) .................................................................. 23

Treglia v. Town of Manlius,
  313 F.3d 713 (2d Cir. 2002) .................................................................. 21

Vega v. Hempstead Union Free Sch. Dist.,
  801 F.3d 72 (2d Cir. 2015) ................................................................... 26

Walsh v. New York City Housing Auth.,
  828 F.3d 70 (2d Cir. 2016) ................................................................... 13

Woods v. START Treatment & Recovery Centers, Inc.,
  864 F.3d 158 (2d Cir. 2017) ....................................................... 14, 15, 19

Zann Kwan v. Andalez Grp. LLC,
  737 F.3d 834 (2d Cir. 2013) .................................................................. 28

Ziccarelli v. Dart,
  35 F.4th 1079 (7th Cir. 2022) .......................................................... 17, 18

Zubulake v. UBS Warburg LLC,
  382 F. Supp. 2d 536 (S.D.N.Y. 2005) .................................................... 27

Other Authorities

29 C.F.R. § 825.214 ............................................................................. 18

29 C.F.R. § 825.220(a) ......................................................................... 18

iv

29 C.F.R. § 825.220(b) ........................................................................................ 15

29 U. S.C. § 612(1)(A) and (C) ........................................................................... 14

29 U.S.C. § 2614 ........................................................................................... 15, 17

29 U.S.C. § 2615(a)(1) .................................................................................. 16, 17

29 U.S.C. § 2615(a)(2) .................................................................................... 1, 19

42 U.S.C. § 1981 ............................................................................................. 1, 26

42 U.S.C. §§ 2000e .......................................................................................... 1, 26

42 U.S.C. §§ 12101 ............................................................................................... 1

N.Y.C. Admin. Code § 8-101 ................................................................................ 1

N.Y. Exec. Law § 290 ............................................................................................ 1
*Asian Women*
*and Employment Discrimination: Using Intersectionality Theory to Address to Title VII Claims*
*Based on Combined Factors of Race, Gender and Natio*nal Origin,
37 B.C. L. Rev. 771 ............................................................................................. 28

## PRELMINARY STATEMENT

Plaintiff Lia Tieu ("Tieu") began working at the Economic Development Corporation ("EDC") in July 2018 as a Vice President of Asset Management.  In early 2019, Tieu announced her pregnancy and in May 2019, requested protected leave.  Her supervisor, Winthrop Hoyt ("Hoyt"), made angry comments accusing Tieu of "shirking" her responsibilities, not taking "ownership" of her work, and demanding that Tieu be "grateful" because her colleague was "doing [Tieu] a favor" by filling in while Tieu was away.  Tieu gave birth in August 2019 and thereafter, while on maternity leave and, after her maternity leave ended, went on medical leave to recover from a tumor on her pituitary gland, and from post-partum depression and anxiety. Throughout this ordeal, EDC made clear that it did not want to accommodate Tieu for her high-risk pregnancy and disability.  Indeed, Hoyt and his boss, Rachel Loeb ("Loeb"), griped in private chat messages that neither "wanted" nor "expected" Tieu to return from leave. Defendants also treated Tieu differently than white, non-pregnant and male co-workers, and, ultimately, retaliated against her for her protected complaints.  Defendants' conduct violated the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2615(a)(2); Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"); the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 *et seq.* ("ADA"); the Civil Rights Act of 1866, 42 U.S.C. § 1981, *et seq.* ("Section 1981"); the New York State Human Rights Law ("Executive Law"), N.Y. Exec. Law § 290 *et seq.*; and the New York City Human Rights Law ("City Law"), N.Y.C. Admin. Code § 8-101 *et seq.*

## STATEMENT OF FACTS

### I.   BACKGROUND

Tieu began working for EDC in July 2018 as a Vice President of Asset Management, initially reporting to Darryl Connelly.  Pl. 56.1 at ¶ 1; Def. Ex. F, Tieu 103:17-20.[1]  In October 2018, Tieu began reporting to Hoyt, but Tieu worked very closely with and was supervised by Lauren Wolf, a Senior Vice President in the RETS group.  Pl. 56.1 at ¶ 2; Def. Ex. F, Tieu 81:22-25; Def Ex. C, Hoyt 123:11-15; Tieu Decl. at ¶ 7; Supp. Tieu Decl. at ¶ 2.  Hoyt admitted that Tieu worked more closely with Wolf, and that Hoyt worked progressively less closely with Tieu over time.  Pl. 56.1 at ¶ 3; Def. Ex. C, Hoyt 135:14-21, 136:11-14.  Hoyt did not interact with Tieu daily, nor did he work closely with Tieu because, generally, Hoyt did not manage or supervise Tieu, nor was he directly involved in Tieu's projects.  Pl. 56.1 at ¶ 4; Def. Ex. F, Tieu 262:3-6; Tieu Decl. at ¶ 7.  Wolf had very positive things to say about Tieu's performance and said she was doing a very good job.  Pl. 56.1 at ¶ 5; Def. Ex. C, Hoyt 137:19-23, 138:5-7.

### II.   TIEU'S LEAVE AND ACCOMMODATION REQUESTS

In or around January 2019, Tieu notified Hoyt that she was pregnant.  Pl. 56.1 at ¶7; Def. Ex. C, Hoyt 138:8-10. Shortly thereafter, Tieu requested to work from home two days per week for two weeks to manage the complications and symptoms of her high-risk pregnancy, but the request was denied by Rebecca Osborne, who claimed that EDC did not have a formal work from home policy even though Tieu was aware of at least one other employee who was permitted to work from home.  Pl. 56.1 at ¶ 8; Def. Ex. F, Tieu 120:5-12, 122:16-18, 127:23-128:3; Supp. Tieu Decl. ¶ 3.  After Osborne denied the accommodation, Tieu requested a flexible work

---

[1]     All references to "Pl. 56.1" are referring to Plaintiff Lia Tieu's statement of disputed facts pursuant to Local Civil Rule 56.1(c) dated April 14, 2023.

arrangement to work from the office from 10 a.m. to 3 p.m. for the period of January 31, 2019, through March 1, 2019, which was granted.  Pl. 56.1 at ¶ 9; Def. Ex. F, Tieu 134:10-20.

In or around February 26, 2019, Tieu suffered a sudden sensorineural hearing loss in her left ear while approximately 12 weeks pregnant, and as a result, her doctors advised her to work from home for two weeks, where she could perform the essential functions of her job.  Pl. 56.1 at ¶ 12; Supp. Tieu Decl. ¶ 4.  Tieu provided Osborne with a note from her doctor, Pl. 56.1 at ¶ 13; Def. Ex. F, Tieu 143:16-23, and explained that her doctor recommended two weeks of remote work.  Pl. 56.1 at ¶ 14; Def. Ex. F, Tieu 146:12-15.  Osborne labeled Tieu "unfit for work" and sent her home.  Pl. 56.1 at ¶ 15; Def. Ex. F, Tieu 146:16-19.  Loeb, who admitted that Osborne's response was callous, Pl. 56.1 at ¶ 16; Tieu Decl. at ¶ 14, attempted to brush off Osborne's comment, claiming it was an outdated Australian term.  Pl. 56.1 at ¶ 17; Id.

In early May 2019, Tieu met with Khary Hair (EDC HR employee) to request parental leave.  Pl. 56.1 at ¶ 22; Def. Ex. HH, Hair 21:15-20, 22:16-22.  EDC's procedures required that Tieu's manager, Hoyt, sign a leave from.  Pl. 56.1 at ¶ 23; Def. Ex. HH, Hair 32:24-33:4.  Hoyt refused, stating, "I'm not signing this form," Pl. 56.1 at ¶ 24; Def. Ex. F, Tieu 161:14-15, and claimed (falsely) that Tieu was "not eligible" and that her form "was wrong."  Pl. 56.1 at ¶ 25; Def. Ex. F, Tieu 161:17-18.  Ultimately, Hoyt was forced to sign the form.  Pl. 56.1 at ¶ 28; Def. Ex. HH, Hair 27:4-28:3.

Hoyt also forced Tieu to perform tasks that could be detrimental to her health.  For example, Hoyt demanded that Tieu serve as deposition witness in July 2019.  Pl. 56.1 at ¶ 30; Def. Ex. F, Tieu 191:11-23.  As the deposition approached, Tieu's baby was diagnosed with IUGR, making her pregnancy even higher risk.  Pl. 56.1 at ¶ 31; Def. Ex. F, Tieu 188:2-3, 19-20.  Nearing her due date, Tieu notified EDC that her water could break at any moment, and that she

may not be available for the deposition.  Pl. 56.1 at ¶ 32; Def. Ex. F, Tieu 184:3-25.  Jill

Braverman (EDC Assistant General Counsel) advised Hoyt that he needed to make himself

available for the deposition.  Pl. 56.1 at ¶ 33; Def. Ex. MM (DEF000115-120).  Hoyt became

angry and berated Tieu, accusing her of "shirking" her responsibilities and telling her that she

needed to take "ownership" of her work, Pl. 56.1 at ¶ 34; Def. Ex. F, Tieu 186:15-23, 192:14-19,

215:7-15; Supp. Tieu Decl. ¶ 5, and demanded that Tieu appear for the deposition.  Pl. 56.1 at ¶

35; Def. Ex. F, Tieu 186:15-23.  Ultimately, because of Hoyt's refusal, the deposition had to be

moved so that Tieu could attend.  Pl. 56.1 at ¶ 36; Def. Ex. F, Tieu 191:11-17.

Tieu understood that a colleague, Sabrina Lippman, would be working on her projects

while Tieu went on maternity leave, and thus, Tieu assisted in the transition.  Pl. 56.1 at ¶ 38;

Def. Ex. F, Tieu 171:15-19.  Hoyt, however, falsely accused Tieu of "bossing" Lippman around

and claimed that Tieu should be "grateful" that Lippman was doing Tieu's work and that she was

doing Tieu a "favor." Pl. 56.1 at ¶ 39; Def. Ex. F, Tieu 194:18-23.

On July 24, 2019, Tieu protested to Hoyt that she had the right to take maternity leave

without feeling guilty, and that no one was doing her a favor while she is on maternity leave.  Pl.

56.1 at ¶ 40; Def. Ex. F, Tieu 192:14-195:21.  On July 25, 2019, the next day, Hoyt gave Tieu a

negative performance review.  Pl. 56.1 at ¶ 41; Def. Ex. F, Tieu 192:14-195:21.  Tieu expected a

higher rating because she had been a strong performer and no one previously mentioned any

deficiencies in her performance.  Pl. 56.1 at ¶ 42; Def. Ex. F, Tieu 295:10-15.  A higher rating

would result in a higher increase in pay.  Pl. 56.1 at ¶ 43; Def. Ex. F, Tieu 295:15-16.  Hoyt told

Tieu that he debated whether he was going to criticize her because she was nine months pregnant

and about to go on leave.  Pl. 56.1 at ¶ 45; Def. Ex. F, Tieu 204:15-18.  However, Hoyt

ultimately decided that Tieu "needed to hear it" and that it could have been worse.  Pl. 56.1 at ¶

4

46; Def. Ex. F, Tieu 203:18-20.  To further punish Tieu, Hoyt told her that he planned to "keep a list of all [her] wrongdoings."  Pl. 56.1 at ¶ 47; Def. Ex. F, Tieu 195:10-11.

## III.   TIEU'S CONTINUED PROTECTED COMPLAINTS OF DISCRIMINATION

Tieu reported Hoyt's July 2019 performance review to James Patchett (then President of EDC), explaining that Hoyt was creating a hostile work environment, that she felt he was discriminating and retaliating against her because he was resentful of her impending maternity leave and that he gave her an unfair and inappropriate annual review that she felt was retaliatory. Pl. 56.1 at ¶ 48; Def. Ex. F, Tieu 212:5-11.  Tieu felt that Hoyt was resentful that he had to do more work.  Pl. 56.1 at ¶ 49; Def. Ex. F, Tieu 194:16-17.  Patchett told Tieu that he could transfer her to another department when she came back from leave, but neither he nor anyone in HR advised Tieu that she needed to apply for an open position.  Pl. 56.1 at ¶ 50; Def. Ex. F, Tieu 284:3-15; Supp. Tieu Decl. ¶ 12.  Tieu also complained to Julie Gresack, Lauren Wolf, Steve Lazarus, Richard Palumbo, Rosa Vasquez and Rachel Loeb.  Pl. 56.1 at ¶ 51; Def. Ex. F, Tieu 205:18-22.

Tieu later reported Hoyt's discriminatory animus towards her maternity leave to Hair, Pl. 56.1 at ¶ 52; Ex. J, at DEF 35-36, and to Loeb in July 2019.  Pl. 56.1 at ¶ 54; Def. Ex. F, Tieu 205:18-22.  Rather than investigating Tieu's complaints, Loeb summarily dismissed them and interrogated Tieu about whether she knew when Hoyt wrote the review.  Pl. 56.1 at ¶ 55; Supp. Tieu Decl. ¶ 7.  Loeb also attacked Tieu for her disability and asked whether Tieu had heard Hoyt correctly because she had previously lost hearing earlier in her pregnancy.  Pl. 56.1 at ¶ 56; Supp. Tieu Decl. ¶ 7.

On July 31, 2019, Tieu met with Patchett to report Loeb's hostility.  Tieu told Patchett that she planned to file a formal complaint, Pl. 56.1 at ¶ 57; Supp. Tieu Decl. ¶ 8, which she did

on August 1, 2019, with Rosa Vasquez and Erica Edwards-O'Neal (EDC's former Equal

Employment Opportunity Officer and SVP of Diversity, Equity and Inclusion).  Pl. 56.1 at ¶ 58;

Supp. Tieu Decl. ¶ 9.  Vasquez questioned whether Tieu was overreacting to Hoyt's criticism,

saying "a three [that she received from Hoyt] is good" and that there was "a difference between

poor management and discrimination."  Pl. 56.1 at ¶ 59; Supp. Tieu Decl. ¶ 10.  Tieu responded

by showing Vasquez various emails and documents substantiating her complaint.  Pl. 56.1 at ¶

60; Supp. Tieu Decl. ¶ 10.  Vasquez claimed that EDC would conduct a thorough investigation,

provide Tieu with a detailed report containing witness interviews and would contact Tieu (while

she was on maternity leave) if she had any questions.  Pl. 56.1 at ¶ 61; Supp. Tieu Decl.  ¶ 10.

On August 2, 2019, Tieu responded in writing to the negative performance review and

once again protested Hoyt's discrimination, stating that Hoyt had exhibited "discriminatory

animus" toward her over the past four months because of her impending pregnancy leave.  Pl.

56.1 at ¶ 62; Supp. Tieu Decl. ¶ 11; Ex. H, PL256-258.

## IV.   TIEU'S REQUEST FOR DISABILITY LEAVE

In August 2019, Tieu gave birth by cesarean section, and in or around October 2019, was

diagnosed with a pituitary tumor, which required surgery, and led her to experience postpartum

depression and anxiety.  Pl. 56.1 at ¶ 72; Ex. J, DEF 30-37; Supp. Tieu Decl. ¶ 13.  As such, Tieu

was unable to return to work in late December and she requested an extension of her leave.  Pl.

56.1 at ¶ 74; Tieu 254:5-16.

On November 4, 2019, Tieu wrote to Patchett and Hair asking for assistance coordinating

her medical leave.  Pl. 56.1 at ¶ 75; Ex. J, at DEF 35-36.  Tieu explained that "I was recently

diagnosed with a pituitary tumor that [was] impinging on my optic nerve and that requires

surgery in order to preserve my vision [and that] [t]his latest development complicates my

6

existing postpartum depression and recovery." Pl. 56.1 at ¶ 76; Ex. J, at DEF 35-36. Tieu

further attached a note from her treating psychotherapist, explaining her health conditions as well

as her psychotherapist's recommendation that Tieu take "an extended leave of 24 weeks [until

June 2020] from the pressure of work for post-operative healing and recovery." Pl. 56.1 at ¶ 77;

Ex. J, at DEF 35-37.

On November 23, 2019, Tieu submitted her disability leave forms to Aetna, the outside

insurance company responsible for managing disability leave at EDC. Pl. 56.1 at ¶ 79; Supp.

Tieu Decl. ¶ 14. On December 12, 2019, Tieu's therapist submitted forms substantiating her

need for medical and disability leave. Pl. 56.1 at ¶ 80; Supp. Tieu Decl. ¶ 14. On December 4,

2019, Tieu underwent brain surgery and was discharged from the hospital on December 6, 2019.

Pl. 56.1 at ¶ 81; Supp. Tieu Decl. ¶ 15.

On December 17, 2019, Tieu had still not heard any confirmation from EDC regarding

her disability leave, and with her original return to work date of December 23, 2019,

approaching, Tieu emailed Hair to ask about the status of her disability leave request. Pl. 56.1 at

¶ 82; Ex. J, at DEF 31-32. Once again, EDC attempted to block Tieu from exercising her rights

when Hair stated that Tieu could not change her return-to-work date "until [she] receive[d]

formal word from Aetna as to [her] status." Pl. 56.1 at ¶ 83; Ex. J, at DEF 31. Hair then

suggested that her job was at risk, saying, "[a]ccording to the [FMLA] your job protection ended

on [October 25, 2019]. Your company provided Parental Leave is ending as of [December 20,

2019]. In order for us to continue holding your position on our books we must have some

documentation to support the action." Pl. 56.1 at ¶ 84; Ex. J, at DEF 31. Tieu responded to Hair

on December 18, 2019, copying Patchett, explaining that she had already submitted the

documentation required for an "ADA accommodation." Pl. 56.1 at ¶ 85; Ex. J, at DEF 30-31.

Fearful of losing her job, Tieu also explained that she would return to work on her scheduled return date of December 23, 2019, "against [her] medical provider's orders and despite [her] ongoing physical, mental and emotional recovery from [her] recent brain surgery and postpartum depression and anxiety." Pl. 56.1 at ¶ 87; Ex. J, at DEF 30-31.

The next day, December 19, 2019, Tieu sent Hair a letter from her physician recommending an extension of her leave to March 4, 2020, at which point her physician would conduct a follow up evaluation to determine whether Tieu could safely return to work.  Tieu wrote in the cover email to Hair and Patchett that she "hope[d] that this letter, along with the Nov. 4, 2019 letter from [her] therapist (who recommends an extension of [her] leave to June 15, 2020), underscores and helps EDC understand the gravity of [her] medical condition and the necessity of extending [her] leave."  Tieu explained that "[g]iven that [her] medical care professionals both recommend[ed] extending [her] leave but differ[ed] on the return date, a provisional extension of [her] leave to at least March 4, 2020 [was] warranted."  Pl. 56.1 at ¶ 88; Ex. K, at DEF 28-29.

On December 20, 2019, the Friday before Tieu was scheduled to return to work, Hair finally granted her accommodation request, writing that HR was "accepting [her] letter as a basis to provide [her] with an unpaid leave of absence" through March 4, 2020.  Pl. 56.1 at ¶ 89; Ex. L, at DEF 1679.

## V.   EDC SUMMARILY DISMISSES TIEU'S COMPLAINTS AND CONTINUES HOSTILITY AGAINST HER

As of November 4, 2019, Tieu had still not received an update on the status of her complaint so she sent a follow up email to Patchett.  Pl. 56.1 at ¶ 90; Ex. J, at DEF 36.  On November 7, 2019, Tieu received the results of EDC's purported investigation.  Pl. 56.1 at ¶ 91; Ex. M, at DEF 1562.  The superficial conclusion was less than half a page and stated that Tieu's

claims had been unsubstantiated.  Pl. 56.1 at ¶ 92; Ex. M, at DEF 1562.  Tieu provided Edwards-
O'Neal and Vasquez with a list of eight witnesses to interview but they failed to interview them.
Pl. 56.1 at ¶ 93; Ex. D, at PL 001029; Def. Ex. ZZ, Edwards-O'Neal 78:14-18.

Vasquez and O'Neal prepared a report based on their investigation, but the Report
misrepresented what Tieu stated in her interview with them.  Vasquez admitted that select
portions of the interview notes, including quotes from Tieu, were either misquoted or omitted.
Pl. 56.1 at ¶ 94; Def. Ex. D, Vasquez 168:16-169:13.  The Report quotes a question that was
never asked of Tieu and then misstates Tieu's answer to make it appear that she was only
accusing Hoyt of being lazy, rather than of discrimination based on pregnancy.  Pl. 56.1 at ¶ 95;
Id.  EDC withheld from Tieu the final Investigation Report that was sent to Patchett, which
falsified Tieu's statements during her interview.  Pl. 56.1 at ¶ 96; id.  EDC's Equal Employment
Opportunity Policy and Complaint Procedure does not authorize the creation of two separate
reports and does not permit EDC to withhold the final report from the complainant.  Pl. 56.1 at ¶
97; Ex. N, at DEF 000207; Ex. O, at DEF 000210-000216.  Rather than taking any corrective
action with regard to Hoyt's conduct, EDC promoted Hoyt to the role of Co-Head of Portfolio
Management.  Pl. 56.1 at ¶ 98; Def. Ex. C, Hoyt 53:23-54:2.

On November 18, 2019, Tieu emailed investigators and asked multiple questions about
the investigation process.  Tieu also repeated her request for a new and fair review from another
manager who truly knew her work and to be transferred to a new department to be removed from
the hostile work environment.  Pl. 56.1 at ¶ 99; Ex. P, DEF 146-147.  On November 20, 2019,
EDC responded stating that it would "have no further comment."  Pl. 56.1 at ¶ 100; Ex. P, at
DEF 146.

## VI.     TIEU RETURNS TO WORK AND FACES CONTINUED DISCRIMNATION AND RETALIATION

The EDC learned that Tieu would be returning to work in May 2020.  Pl 56.1 at ¶ 101; Def. Ex. F, Tieu 259:7-260:15.  Hoyt and Loeb, in a private text exchanged, griped that they neither "expected" nor "wanted" Tieu to return.  Pl. 56.1 at ¶ 111; Ex. F, at DEF 000504.

Upon her return, EDC subjected Tieu to further acts of discrimination and retaliation.  Pl. 56.1 at ¶ 101; Def. Ex. F, Tieu 259:7-260:15.  According to Tieu, "80 percent of my projects were taken away from me," "they called me a new hire, they treated me like a new hire, they made me go to a new hire orientation" and her supervisors, including Hoyt, "were constantly scrutinizing me."  Pl. 56.1 at ¶ 146; Def. Ex. F, Tieu 259:15-25.

On June 3, 2020, Plaintiff filed a Charge of Discrimination with the EEOC and provided the same to counsel for Defendants.  Pl. 56.1 at ¶ 118; Ex. Q, PL 479-502.  On February 1, 2021, the next review cycle, Hoyt gave Tieu an even worse (and again false) review.  Pl. 56.1 at ¶ 120; Def. Ex. F, Tieu 265:14-266:2.  As a result of the review, Tieu did not receive a bonus.  Pl. 56.1 at ¶ 124; Def. Ex. F, Tieu 270:16-21.

On March 3, 2021, Tieu complained that her February 2021 performance review was retaliatory because Hoyt did not manage her, was not familiar with her work, and never provided her contemporaneous feedback.  Pl. 56.1 at ¶ 125; Def. Ex. F, Tieu 262:3-6; Ex. R, DEF 2952-2956.  Tieu also stated that she worked primarily with Wolf, but she (Wolf) was not permitted to complete an evaluation of Tieu.  Pl. 56.1 at ¶ 126; Ex. R, DEF 2952-2956.  Tieu also complained that Hoyt criticized Tieu for events outside the review period.  Pl. 56.1 at ¶ 127; Ex. R, DEF 2952-2956.  Finally, Tieu complained that she was forced to have two-on-one meetings with Hoyt and Julie Stein.  Pl. 56.1 at ¶ 128; Ex. R, DEF 2952-2956.  In June 2021, EDC, once again, advised Tieu that her complaint could not be substantiated.  Pl. 56.1 at ¶ 129; Ex. S, at DEF 369.

In the summer of 2021, Tieu was subjected to a Summer Performance Review even though non-Asian male colleagues who were out on parental leave were not required to write such reviews.  Pl. 56.1 at ¶ 130; Ex. T, DEF 195-205; Ex. U, 374-377.  Tieu complained about the Summer Performance Review as discriminatory and retaliatory on September 10, 2021.  Pl. 56.1 at ¶ 131; Ex. U, DEF 374-377.  Tieu alleged that she was subjected to intense scrutiny by Hoyt even though she did not work with him on a regular or frequent basis and he was not involved in her projects.  Pl. 56.1 at ¶ 132; Ex. U, at DEF 374.  Tieu stated that the alleged issues raised in the review were never brought to her attention prior to being penalized for them in her review.  Pl. 56.1 at ¶ 133; Ex. U, at DEF 374.  Tieu also protested that Hoyt referred to examples which occurred outside the review period.  Pl. 56.1 at ¶ 134; Ex. U, at DEF 375.  Again, EDC claimed it could not substantiate that the Summer Performance Review was retaliatory.  Pl. 56.1 at ¶ 135; Ex. V, DEF 378-379.

## VII.   RACE AND SEX DISCRIMINATION DEMONSTRABLE BY CONDUCT TOWARDS OTHERS

In September 2018, Tieu complained to HR about being mistreated by Connelly, Tieu's then supervisor.  Pl. 56.1 at ¶ 136; Def. Ex. F, Tieu 105:15-17.  Tieu complained that Connelly was demoralizing, negative, uninvolved and that he badmouthed people, especially Tieu's subordinate, Jinquan Liang.  Pl. 56.1 at ¶ 137; Def. Ex. F, Tieu 106:14-21.  In October 2018, Tieu requested a transfer out of Connelly's group.  Pl. 56.1 at ¶ 138; Def. Ex. F, Tieu 113:20-114:14.  Other members on Connelly's team shared similar feelings about Connelly, including Liang and Stacy Yan who ultimately transferred out of Connelly's group.  Pl. 56.1 at ¶ 139; Def. Ex. F, Tieu 115:5-10.

Moreover, other Asian women at EDC felt mistreated and harassed by Hoyt.  Pl. 56.1 at ¶ 140; Supp. Tieu Decl. ¶ 17.  A Korean woman and a former Senior Associate at EDC was

generally regarded as very capable and was trusted with managing her own projects.  Pl. 56.1 at ¶ 141; Supp. Tieu Decl. ¶ 17.  As with Tieu, Hoyt was not involved with this employee's day-to-day work and seemed not to know much about her projects.  <u>Id</u>.  Nonetheless, Hoyt would regularly interfere and insist that this employee make changes to her work that made no sense.  <u>Id</u>.  When this employee resisted, Hoyt became enraged that she, an Asian woman, would disagree with him, labeling her "difficult" and "combative," Pl. 56.1 at ¶ 142; Supp. Tieu Decl. ¶ 18, wrote a negative performance review and placed her on a performance improvement plan ("PIP").  <u>Id</u>.  Believing that she was being targeted because of her race and gender, this employee refused to sign the PIP and ultimately resigned.  <u>Id</u>.

Another Asian employee, a Korean woman who indirectly reported to Connelly, had similar experiences.  Pl. 56.1 at ¶ 143; Supp. Tieu Decl. ¶ 19.  She complained to HR about Connelly's mistreatment.  <u>Id</u>.  In 2019, she was verbally berated by Hoyt when she remarked on a business matter in the workplace.  <u>Id</u>.  She, too, eventually resigned.  <u>Id</u>.  Yet another Asian employee, a Chinese woman and Assistant Vice President has made similar complaints of mistreatment at EDC.  Pl. 56.1 at ¶ 144; Supp. Tieu Decl. ¶ 20.  This employee took the AVP role with the promise of being promoted to Vice President.  <u>Id</u>.  When she was passed up for a promotion, she made a complaint.  <u>Id</u>.  The following day, EDC posted a job position in order to replace her.  <u>Id</u>.  This employee then made a further complaint to the Head of Human Resources at the time, Patti Lukas, who attempted to intervene on her behalf.  <u>Id</u>.  Ultimately, she was unsuccessful, and this employee was not given a promotion.  <u>Id</u>.  The employee told Tieu that she believes she was also a victim of discrimination.  <u>Id</u>.  She resigned in June 2019.  <u>Id</u>.

12

# ARGUMENT

## I.      THE SUMMARY JUDGMENT STANDARD

"Summary judgment is inappropriate when the admissible materials in the record 'make it arguable' that the claim has merit." Redd v. N.Y. Div. of Parole, 678 F.3d 166, 174 (2d Cir. 2012) (citation omitted).  In deciding the motion, "the district court is required to resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." Green v. Town of East Haven, 952 F.3d 394, 406 (2d Cir. 2020) (quoting Kessler v. Wetchester Cnty Dep't of Social Svcs., 461 F.3d 199, 206 (2d Cir. 2006)). Moreover, "the district court may not properly consider the record in piecemeal fashion, trusting innocent explanations for individual strands of evidence; rather, it must review all of the evidence in the record." Rasmy v. Marriott Int'l., Inc., 952 F.3d 379, 386 (2d Cir. 2020) (quoting Kaytor v. Elec. Boat Corp., 609 F.3d 537, 545 (2d Cir. 2010) (emphasis omitted) (citation and internal quotation marks omitted)); see Friedman v. Swiss Re America Holding Corp., 643 F. App'x 69, 72  (2d Cir. 2016) (reversing grant of summary judgment in age discrimination case where "the district court failed to consider 'the record as a whole'") (quoting Byrnie v. Town of Cromwell, Bd. Of Educ., 243 F.3d 93, 102 (2d Cir. 2001)).

Importantly, the Second Circuit has "long recognized 'the need for caution about granting summary judgment to an employer in a discrimination case where, as here, the merits turn on a dispute as to the employer's intent.'" Walsh v. New York City Housing Auth., 828 F.3d 70, 784 (2d Cir. 2016) (quoting Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 101 (2d Cir. 2010)). Indeed, "'where subjective issues regarding a litigant's state of mind . . . are squarely implicated, summary judgment would appear to be inappropriate and a trial indispensable.'" Rodriguez v. Vill. Green Realty, Inc., 788 F.3d 31, 49 (2d Cir. 2015) (quoting Patrick v. LeFevre, 745 F.2d

153, 159 (2d Cir. 1984)); see id. ("'[A] sojourn into an adherent's mind set will inevitably trigger myriad factual inferences, as to which reasonable persons might differ in their resolution. Traditionally, this function has been entrusted to the jury.'") (quoting Patrick, 745 F.2d at 159)).

Finally, a court may not give credence to the moving party's evidence unless it comes from disinterested witnesses and is neither contradicted nor impeached.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 151 (2000); see In re Dana Corp., 574 F.3d 129, 152-53 (2d Cir. 2009) (reversible error to rely on testimony of interested witness for summary judgment). In short, "[a]ssessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."  Carter v. Syracuse City School Dist., 850 Fed. App'x 22, 26 (2d Cir. 2021) (quoting Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996)); see Danzer v. Norden Systems, Inc., 151 F.3d 50, 57 (2d Cir. 1998) ("Since the defendant will rarely admit to having said or done what is alleged, and since third-party witnesses are by no means always available, the issue frequently becomes one of assessing the credibility of the parties.").

## II.     FMLA VIOLATIONS

Congress enacted the FMLA "'to balance the demands of the workplace with the needs of families, promote the stability and economic security of families, and to promote national interests in preserving family integrity; [and] …to entitle employees to take reasonable leave for medical reasons, for the birth or adoption of a child, and for the care of a child, spouse, or parent who has a serious health condition." Woods v. START Treatment & Recovery Centers, Inc., 864 F.3d 158, 169 (2d Cir. 2017).  The FMLA requires employers to (1) provide an eligible employee "leave" for the birth of a child, or to attend to the health of the employee or her child, 29 U. S.C. § 612(1)(A) and (C); and (2) "restore" the employee to the same or "an equivalent position" upon

her return from leave.  29 U. S. C. § 2614(a)(l)(B).  The statute expressly prohibits an employer from interfering with or retaliating against an employee for exercising or attempting to exercise these rights.  Woods, 864 F.3d at 166.

### A.   Interference

An employer violates the FMLA's interference clause where it has "denied or otherwise interfered with a benefit to which [an eligible employee] was entitled under the FMLA." Graziadio v. Culinary Inst. Of Am., 817 F.3d 415, 424 (2d Cir. 2016).  "Denial of FMLA benefits is interpreted flexibly; '[i]nterfering with' the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave.'"  Id.  (quoting 29 C.F.R. § 825.220(b)).  Thus, an employer violates the interference clause where its "acts of discouragement would have dissuaded a similarly situated employee of ordinary resolve from attempting to exercise his or her FMLA rights."  Santiago v. Dep't of Transp., 50 F. Supp. 3d 136, 144 (D. Conn. 2014) (internal citations omitted).  In short, the plaintiff need only show "that an 'employer in some manner impeded the employee's exercise of his or her rights' protected by the FMLA."  Saraf v. West Publishing Corp., No. 16 Civ. 1425 (VSB), 2018 WL 7107266, at *16 (S.D.N.Y. Dec. 20, 2018) (quoting Di Diovanna v. Beth Israel Med. Ctr., 651 F. Supp. 2d 193, 199 (S.D.N.Y. 2009)).

Here, there is sufficient evidence for a jury to conclude that Defendants interfered with Tieu's FMLA rights.  Hoyt denied Tieu pregnancy leave, telling her that he was "not signing" her FMLA form because, according to Hoyt, Tieu was "not eligible."  Pl. 56.1 ¶ 24-25; Def. Ex. F, Tieu 161:14-18.  (In fact, Tieu was eligible for protected leave.)  Thereafter, Hoyt repeatedly made disparaging remarks about Tieu's leave, telling Tieu that she was "shirking" her responsibilities, "needed to take ownership of [her] work," "should be grateful" that a colleague

would be "doing [Tieu's] work" while she was "on maternity leave" and the colleague was doing Tieu a "favor."  Pl. 56.1 ¶¶ 29, 34, 39; Def. Ex. F, Tieu 186:15-23, 194:18-23, 215:7-15.  In making some of these statements, Hoyt lashed out at and "berated" Tieu , Pl. 56.1 ¶ 34; Def. Ex. F, Tieu 186:15-23, threatened to "keep a list of all [her] wrongdoings," Pl. 56.1 ¶ 47; Def. Ex. F, Tieu 195:10-11, and gave Tieu a diminished performance review.  Pl. 56.1 ¶¶ 41; Def. Ex. F, Tieu 192:14-193:4.  A jury could certainly find that Hoyt engaged in acts of "discouragement" that could have "dissuaded" a reasonable employee from exercising her FMLA rights.  Santiago, 50 F. Supp. 3d at 14.

Defendants now claim that Hoyt's refusal to sign Tieu's FMLA form was not an act of interference because the "EDC does not require a manager's signature as a precondition to granting an employee FMLA leave."  Def. Brf. At 17.[2]  But the plain language of EDC's FMLA form includes a space for the manager's signature.  56.1 ¶ 111; Def. Ex. JJ, DEF 7.[3]  Nothing on the form states – or even suggests – that a manger's signature is optional.  Id.  Moreover, EDC's HR representative admitted that an employee is required to obtain her manager's signature when submitting a request for parental leave.  Pl. 56.1 ¶ 23; Def. Ex. HH, Hair 32:24-33:4.  By refusing to sign the form (a necessary predicate to Tieu's parental leave), Hoyt clearly engaged in an act of interference with Tieu's leave rights.  That Hoyt may not have had the authority to deny Tieu leave, Def. Brf. 17, makes his conduct even worse.  His efforts amounted to unauthorized attempts to prevent Tieu from even submitting her leave request – unquestionably an act that "interfere[ed] with" Tieu's "attempt to exercise" her FMLA rights.  29 U.S.C. §

---

[2]    All references to "Def. Brf." are referring to Defendants' memorandum of law in support of their motion for summary judgement.  See Dkt. No. 81.
[3]    All references to "56.1" are referring to Defendants' statement of material facts pursuant to Local Rule 56.1.  See Dkt. No. 80.

2615(a)(1).

To be sure, Tieu was eventually able to get her leave, albeit after having to clear Hoyt's gratuitous hurdles.  But that does not mean that she was not denied "benefits to which she was entitled under the FMLA."  Graziadio, 817 F.3d at 424.  As explained above, Tieu was "entitled" both to take leave and "to be restored" to the same or "an equivalent position" upon her return from leave.  29 U.S.C. §§ 2614(a)(1)(A) and (B).[4]

Here, a jury could find that Defendants denied Tieu her restoration rights.  Tieu returned from leave to a different job.  She no longer supervised anyone, 56.1 ¶ 112; Def. Ex. F, Tieu 202:9-14 ,259:15-16; Ex. R, DEF 2956, 80% of her responsibilities were removed, she was only assigned short-term projects and treated as a new hire. 56.1 at ¶ 146; Def. Ex. F, Tieu 259:15-25.  Moreover, her pay was less because Hoyt gave her a diminished annual review after she requested leave, Pl. 56.1 at ¶ 6; Def. Ex. F, Tieu 192:14-193:4, 296:23-297:3, resulting in a lesser raise.  Pl. 56.1 at ¶ 147; Def. Ex. F, Tieu 295:6-296:1.

Even if (arguendo) these actions were not deemed a "denial" of benefits (which they were), they nevertheless resulted in "prejudice" to Tieu sufficient to make out an interference claim.  "[D]enial of benefits is not required to demonstrate an FMLA interference violation.  Interference or restraint alone is enough to establish a violation, and a remedy is available under [the FMLA] if the plaintiff can show prejudice from the violation."  Ziccarelli v. Dart, 35 F.4[th]

---

[4]     Some courts have suggested that the failure to restore an employee to the same position is an act of retaliation not interference.  See McKenna v. Santander Investment Securities, Inc., 21 Civ. 941(DLC), 2022 WL 2986588, at *13 (S.D.N.Y. July 28, 2022).  But this ignores the plain language of the statute.  The FMLA makes it unlawful for an employer to "interfere with . . . any right provided under" the statute.  29 U.S.C. § 2615(a)(1) (emphasis added).  Restoration is one of the statutory "benefits" to which an employee is "entitled."  29 U.S.C. § 2614.  Of course, an employer's decision to diminish the employee's position, whether by slashing her pay or responsibilities, could also be an act of retaliation where, as here, the employer acted with retaliatory intent.

1079, 1089 (7th Cir. 2022) (emphasis in original).  In <u>Ziccarelli</u>, the Seventh Circuit gave several

reasons for rejecting a requirement that the plaintiff show a denial of benefits in every instance.

First, requiring a plaintiff to show a denial of benefits is contrary to the plain language of the

statute, which "suggests that interfering, restraining, and denying are distinct ways of violating

the FMLA."  <u>Id.</u> At 1086.  Second, "[f]or the Act to protect the exercise of or the attempt to

exercise FMLA rights, it must be read so that interference or restraint without an actual denial is

still a violation."  <u>Id.</u>  Third, "to permit employers to interfere with or restrain the use of FMLA

rights as long as no unlawful denial occurs would conflict with and undermine the rights

granted."  <u>Id.</u> at 1086-87.  Finally, the FMLA's underlying regulations state that "[i]interfering

with the exercise of an employee's rights would include, for example, not only refusing to

authority FMLA leave, but <u>discouraging an employee from using such leave</u>."  <u>Id.</u> at 1087

(quoting 29 C.F.R. § 825.220(a)) (emphasis in original).[5]

　　　As explained above, Defendants, and Hoyt in particular, engaged in numerous acts of

interference.  And, even if Defendants did not ultimately deny Tieu her allotted leave, these acts

ultimately resulted in prejudice to Tieu in the form of lesser pay and a diminished job. <u>See</u> 29

C.F.R. § 825.214 (restoration requires "equivalent benefits, pay, and other terms and conditions

of employment").[6]

---

[5]　　　To be sure, in <u>Graziadio</u>, the Second Circuit stated that an FMLA plaintiff must establish
"that she was denied benefits to which she was entitled under the FMLA." 817 F.3d at 424.
However, the court was not asked to determine whether an act short of outright denial could
amount to interference.  Moreover, the court recognized that "discouraging" an employee from
attempting to exercise her leave rights – an act short of outright denial – would be sufficient to
violate the statute.  <u>Id.</u>

[6]　　　The cases cited by Defendants are inapposite.  These courts had no cause to address
whether an act short of outright denial of benefits violates the FMLA.  Indeed, these courts
dismissed FMLA claims because, in essence, the plaintiff could not show any prejudice.  <u>See</u>
<u>Greenberg v. State Univ. Hosp. – Downstate Med. Ct.</u>, 838 F. App'x 603, 606 (2d Cir. 2020);
(employee was "granted . . . the full amount of time he requested" and "was fully compensated"

**B.**   **Retaliation**

The FMLA has two separate anti-retaliation provisions.  First, the FMLA makes it unlawful for an employer to retaliate against an employee who seeks to exercise her FMLA rights.  Graziadio, 817 F.3d at 429.  Second, the statute prohibits retaliation against an employee "for opposing" FMLA violations.  29 U.S.C. § 2615(a)(2).  "For purposes of the FMLA's anti-retaliation provision, a materially adverse action is any action by the employer that is likely to dissuade a reasonably worker in plaintiff's position from exercising h[er] legal rights."  Milea v. Metro-N. R. Co., 658 F.3d 154, 164 (2d Cir. 2011).

FMLA retaliation claims are analyzed under the familiar McDonnell Douglas burden-shifting framework.  Graziadio, 817 F.3d at 429.  An employee proves retaliation where the evidence shows that the employee's exercise of FMLA rights or her protest of FMLA violations was a "motivating factor" in the adverse employment action.  Woods, 864 F.3d at 168.  That is, an employee prevails where she establishes "that the prohibited factor [in this case, retaliation] was at least one of the 'motivating' factors."  Holtz v. Rockefeller & Co., 258 F.3d 62, 78 (2d Cir. 2001).

Here, there are numerous indication that "a causal connection [exists] between the plaintiff's protected activity and the adverse action taken by the employer." Donnelly v. Greenburgh Cent. Sch. Dist., No. 7, 691 F.3d 134, 152 (2d Cir. 2012) (quoting Mack v. Otis Elevator Co., 326 F.3d 116, 119 (2d Cir. 2003).

---

for certain days); Matias v. Montefiore Med. Ctr., No. 20 Civ. 2849 (VEC), 2022 WL 4448585, at *15  (S.D.N.Y. Sept. 23, 2022) (alleged interference "had no impact on Plaintiff"); Anderson v. New Orleans Jazz & Heritage Festival & Found., Inc., 464 F. Supp. 2d 562, 569 (E.D. La. 2006) (employer's "insistence" on certain leave-related procedural requirements could amount to "interference" but, in this case, the requirements were "not burdensome").

**C.** <u>**Timing**</u>

Temporal proximity is a significant indicator of retaliation.  A jury can infer retaliation where the adverse actions follow the protected activity.  <u>Saraf</u>, 2018 WL 7107266, at *15. Retaliation can also be shown where the "pattern of [unlawful] conduct begins soon after" the protected activity and "only culminates later" in adverse action.  <u>Laudadio v. Johanns</u>, 677 F. Supp. 2d 590, 614 (E.D.N.Y. 2010) (quoting <u>Billue v. Praxair, Inc.</u>, No. 3:05 Civ. 00170 (JCH), 2007 WL 1231841, at *8 (D. Conn. Apr. 26, 2007), <u>aff'd</u>, No. 07-2359-CV, 2008 WL 4950991 (2d Cir. 2008)).

Tieu engaged in two types of FMLA-related protected activity.  First, she sought FMLA leave.  Second, she protested that Hoyt was violating her FMLA rights.  A jury could easily find from the tight timeline of events that Tieu suffered an increasing backlash as she engaged in protected activity by advocating for her FMLA rights.  On May 7, 2019, Tieu asked Hoyt to sign her FMLA form.  Pl. 56.1 ¶ 24; Def. Ex. F, Tieu 161:14-15; Def. Ex. JJ, DEF 7.  Hoyt immediately lashed out, telling Tieu (falsely) that she was "not eligible" and that he was "not signing" her form.  Pl. 56.1 ¶ 24-25; Def. Ex. F, Tieu 161:14-18.  Shortly, thereafter, in July 2019, Hoyt began accusing Tieu of "shirking" her responsibilities and demanding that she "take ownership" of her work.  Pl. 56.1 ¶ 29; Def. Ex. F, Tieu 215:7-15; Supp. Tieu Decl. ¶ 5.  On July 24, 2019, Hoyt continued to lash out, accusing Tieu (again, falsely) of "bossing around" her colleague and stating that Tieu "should be grateful" because her colleague was doing Tieu a favor by doing Tieu's work while she was on maternity leave.  <u>Id</u>.  The next day, July 25, 2019, Hoyt gave Tieu a negative performance review, criticizing her communications skills, Pl. 56.1 ¶ 41; Def. Ex. F, Tieu 192:14-193:4, 194:8-14, something that he had never done before.  Pl. 56.1 ¶ 44; Def. Ex. F, Tieu 193:8-12.  Tieu again protested.  Pl. 56.1 ¶ 47; Def. Ex. F, Tieu 195:10-11;

Supp. Tieu Decl. ¶ 6.  Hoyt threatened that he planned to "keep a list of all [her] wrongdoings."

Id.

The retaliatory conduct continued after Tieu went on leave and when she returned.  On February 20, 2020, while on medical leave, Tieu hired counsel and sent a demand letter, protesting, among other things, that Defendants violated Tieu's leave rights.  Ex. W.  When Tieu ultimately returned to work on May 4, 2020, Pl. 56.1 at ¶¶ 109, 112, 146; Def. Ex. F, Tieu 202:9-14, 258:18-25, 259:15-25; Ex. R, DEF 2956, Defendants treated her as new employee id., removed her supervisory responsibilities id., stripped her of 80% of her responsibilities id. and left her with only short-term assignments.  Id.  On June 3, 2020, Tieu filed an administrative complaint with the EEOC.  Ex. Q.[7]  During the next annual review cycle, Hoyt gave Tieu an even worse review, causing Tieu to lose a bonus given to her peers.  Pl. 56.1 at ¶ 124; Def. Ex. F, Tieu 270:16-21.

Defendants cannot seriously claim that the timeline is too attenuated to permit an inference of retaliation.  In one instance, Defendants retaliated the day after Tieu engaged in protected activity.  See Saraf, 2018 WL 7107266, at *15 (adverse action "several days" after protected activity "is sufficient to establish an inference of retaliatory intent").  At other times, retaliatory action occurred within a month or two.  See Treglia v. Town of Manlius, 313 F.3d 713, 720 (2d Cir. 2002) (holding that a "few months" between complaint and adverse action supports inference of causation).  And in some instances, Defendants retaliated at the next available "opportunity," Summa v. Hofstra Univ., 708 F.3d 115 (2d Cir. 2013), such as the next annual review or pay cycle.  See Magilton v. Tocco, 379 F. Supp. 2d 495, 504 (S.D.N.Y. 2005)

---

[7]     The EEOC charge, which alleges sex, pregnancy and race discrimination, states that Defendants "also violated" the FMLA.  Ex. Q.

("While ordinarily the passage of nine months between the protected activity and the alleged retaliation is far too much to permit an inference… this was the first opportunity that [defendant] had to 'punish' plaintiff in his pocketbook").  Moreover, considering these events in their totality, a jury could certainly conclude that Defendants retaliated.

Defendants' attempt to provide innocent explanations for this sequence of events only create questions of fact.  For instance, Defendants argue that Hoyt's negative review could not be retaliatory because, seven months earlier, Tieu's prior manager (Connelly) drafted a PIP for Tieu.  Def. Brf. at 19.  However, to negate the inference of retaliation, "timing" must be the "only basis for a claim of retaliation."  Nicastro v. N.Y.C. Dep't of Design and Constr., 125 F. App'x 357, 358 (2d Cir. 2005).  Here, as explained below, Tieu has other proof of retaliation such as comments and pretext.  Second, Defendants must show that "gradual adverse job actions began well before the plaintiff had ever engaged in protected activity," id., or "an extensive period of progressive discipline."  Slattery v. Swiss Reinsurance Am. Corp., 247 F.3d 87, 95 (2d Cir. 2001).  But there is not such proof here.  Rather, Defendants can only show that a prior supervisor drafted – but never delivered – a PIP.  56.1 ¶ 22; Def. Ex. N, DC 001-003; Supp. Tieu Decl. at ¶ 6.  Nor was there any subsequent criticism of Tieu's performance.  Pl. 56.1 at ¶ 44; Def. Ex. F, Tieu 193:8-12. Certainly, there were no "gradual job actions," Nicastro, 125 F. App'x at 358, nor was the any period of "progressive discipline" let alone an "extensive" period. Slattery, 247 F.3d at 95; see Collins v. Connecticut, 684 F. Supp. 2d 232, 257 (D. Conn. 2010) (different treatment of plaintiff after he complained could lead a jury to "conclude that [the employer] responded by building a sizeable negative personnel file on him").

Defendants next attempt to negate the inference of retaliation by claiming that Hoyt "prepared [Tieu's] review before the July 24 conversation" where Tieu asserted her rights.  Def.

Brf. at 19.  But the only proof of this is Hoyt's own self-serving testimony.  See In re Dana

Corp., 574 F.3d at 152-53 (reversible error to rely on testimony of interested witness for

summary judgment).  Notably, Defendants have failed to produce the "draft" performance

review, or any document referencing the existence of such a draft.

    **D.**    **Comments**

Discriminatory statements are "powerful evidence of discrimination."  Tomassi v.

Insignia Fin. Grp., Inc., 478 F.3d 111, 116 (2d Cir. 2007) abrogated on other grounds Gross v.

FBL Financial Services, Inc., 557 U.S. 167, 167 (2009).  "The relevance of discrimination-

related remarks does not depend on their offensiveness, but rather on their tendency to show that

the decision-maker was motivated by assumptions or attitudes relating to the protected class."

Tomassi, 478 F.3d at 116.  "The more a remark evinces a discriminatory state of mind, and the

closer the remark's relation to the allegedly discriminatory behavior, the more probative the

remark will be."  Id. at 115.  Importantly, a plaintiff "need not show that the [decision-maker]

declared that [that adverse action] was tied" to the employee's protected status.  Tolbert v. Smith,

790 F.3d 427 at 438 (2d Cir. 2015).  "Statement's showing the employer's bias" are sufficient.

Id.

The record here contains numerous comments from a which a jury could find that Hoyt

resented Tieu for taking protected leave.  After Tieu requested leave, Hoyt accused Tieu of

"shirking" her responsibilities, directed her to "take ownership" of her work, claimed that she

"should be grateful" that a colleague would be "doing [Tieu's] work" while she was "on

maternity leave" and exclaimed that the colleague was doing Tieu a "favor."  Pl. 56.1 ¶¶ 29, 34,

39; Def. Ex. F, Tieu 186:15-23, 194:18-23, 215:7-15.  In making some of these statements, Hoyt

lashed out at and "berated" Tieu.  Pl. 56.1 ¶ 34; Def. Ex. F, Tieu 186:15-23.  Hoyt and Loeb

lamented that they neither "wanted" nor "expected" Tieu to return.  Pl. 56.1 at ¶ 111; Ex. F, at

DEF 000504.  A jury could consider this deluge of negative comments about Tieu and her leave

as proof of retaliation.

### E.    Pretext

Pretext can "constitute powerful evidence of discrimination."  <u>Stratton v. Dep't for the</u>

<u>Aging for the City of N.Y.</u>, 132 F.3d 869, 879 (2d Cir. 1997) (quotation marks omitted).  An

employee "may prove . . . retaliation . . . by demonstrating weaknesses, implausibilities,

inconsistencies, or contradictions in the employer's preferred legitimate, nonretaliatiory reasons

for its action.  From such discrepancies, a [factfinder] could conclude that the explanation were a

pretext for a prohibited reason."  <u>Graziadio</u>, 817 F.3d at 430.

Here, Hoyt and Loeb gave Tieu negative reviews even though, by their own admission,

they hardly worked with Tieu.  Pl. 56.1 at ¶ 3; Def. Ex. C, Hoyt 135:14-21, 136:11-14; Def. Ex.

A, Loeb 135:24-136:6.  Wolf, the employee who worked most closely with Tieu, provided

overwhelmingly positive feedback.  Pl. 56.1 at ¶ 5; Def. Ex. C, Hoyt 137:19-23, 138:5-7.

### F.    Investigation

An obviously flawed investigation can be proof of discrimination and retaliation.

<u>Menaker v. Hofstra Univ.</u>, 935 F.3d 20, 31-34 (2d Cir. 2019).  Here, Defendants' "investigation"

into Tieu's complaints was a transparent effort to exonerate Hoyt.  For instance, they tried to

convince Tieu that her diminished performance rating was not negative and suggested that she

had misheard some of the discriminatory comments because of her hearing issues.  Pl. 56.1 at ¶

56; Supp. Tieu Decl. ¶ 17.   Loeb exclaimed, before the start of the inquiry, that she "could not

believe" that Hoyt would discriminate.  Supp. Tieu Decl. ¶ 7.  Defendants' investigators also

"declined to seek out potential witnesses" Tieu identified as "favorable" to her claims.  Pl. 56.1

at ¶ 93; Ex. D, at PL 001029; Def. Ex. ZZ, Edwards-O'Neal 78:14-18.; see Doe v. Columbia

Univ., 831 F. 3d 46, 56-57 (2d Cir. 2016).  And, perhaps most critically, Defendants falsified the

final report of their internal investigation to make it appear as if Tieu was not complaining about

pregnancy discrimination or leave violations but only that her supervisor (Hoyt) was "lazy."  Pl.

56.1 at ¶¶ 94-95; Def. Ex. D, Vasquez 168:16-169:13.  In fact, one of the investigators admitted

at her deposition that they misquoted Tieu in the report.  Id.

## III.    PREGNANCY DISCRIMINATION

Title VII prohibits pregnancy discrimination, 42 U.S.C. § U.S.C. 2000e(k), and "protect[s]

against discrimination 'before, during, and after [a woman's] pregnancy.'"  Briggs v. Women in

Need, Inc., 819 F. Supp. 2d 119, 129 (E.D.N.Y. 2011) (quoting Sterling v. Bond, Inc., 997 F.

Supp. 306, 309 (N.D.N.Y. 1998)).  It also prohibits an employer from taking adverse actions

based on stereotypical notions that mothers with small children are less committed to their jobs.

Back v. Hastings On Hudson Union Free Sch. Dist., 365 F.3d 107, 120–22 (2d Cir. 2004).  An

employer is liable where the employee's pregnancy or related condition at least "partly . . .

motivated" an employment decision.  Holcomb v. Iona Coll., 521 F.3d 130, 142 (2d Cir. 2008).

Here, for largely the same reasons stated above with respect to Tieu's FMLA claims, a

jury could find that Defendants discriminated against Tieu based on her pregnancy.  The adverse

actions began after Tieu announced her pregnancy and requested leave.  Pl. 56.1 at ¶ 6; Def. Ex.

F, Tieu 192:14-193:4, 296:23-297:3.  Hoyt's angry comments accusing Tieu of "shirking" her

responsibilities, not taking "ownership" of her work, and demanding that Tieu be "grateful"

because her colleague was "doing [Tieu] a favor" be filling in while Tieu was away, Pl. 56.1 at ¶

29; Def. Ex. F, Tieu 215:7-15, are quintessential comments revealing Hoyt's belief that Tieu, a

pregnant woman about to go on leave, is no longer as committed to her job.  Back, 365 F.3d at

120–22.  The private messages between Hoyt and Loeb stating that they neither "expected" nor "wanted" Tieu to return from leave are further proof of their hostility.  In combination with the timing of events, the pretextual nature of Defendants' criticisms of Tieu and the skewed investigation, a jury could find that the adverse job actions Tieu suffered – two negative reviews, a diminished raise, a lost bonus[8] and significantly diminished job responsibilities – were caused, at least in part, by Defendants' discriminatory animus.[9]

## IV.    RACE AND SEX DISCRIMINATION

Title VII and Section 1981 prohibit an employer from discriminating based on race.  42 U.S.C. § 2000e; 42 U.S.C. § 1981.  Title VII also makes it unlawful to discriminate based on sex. 42 U.S.C. § 2000e.  An employer violates Title VII where the employee's race or sex was "a motivating factor for any employment practice," Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 85 (2d Cir. 2015) (citation omitted), and Section 1981 where the employee's race was the but-for cause of her injury.  Comcast Corp. v. Nat'l Assoc. of African American-Owned Media, 140 S. Ct. 1009, 1015 (2020).  However, but-for causation does not require proof that discrimination was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the discriminatory motive.  Bostock v. Clayton Cty., 140 S. Ct. 1731, 1739 (2020).  There can be multiple "but-for" causes, each of which may be sufficient to support liability.  Id.

---

[8]     Defendants concede that negative performance reviews that result in lost compensation constitute adverse employment action.  Def. Brf. at 22, fn. 13.  Here, Tieu's first negative review resulted in a diminished raise 56.1 at ¶ 147; Def. Ex. F, Tieu 295:6-296:1, and her second negative review resulted in a lost bonus. Pl. 56.1 at ¶ 124; Def. Ex. F, Tieu 270:16-21.

[9]     Hoyt is free, of course, to argue to a jury that he did not act with a discriminatory purpose because he purportedly had a "history of helping and treating Tieu well."  Def. Brf. at 23.  The jury will have to weigh Hoyt's explanation against the competing evidence of his incriminating comments and the suspicious timing of his adverse actions, among other things.

Here, the combination of Tieu's race and sex caused Defendants to treat her differently. Defendants gave Tieu negative performance evaluations (ultimately resulting in a diminished raise and lost bonus) by criticizing her communications style.  Hoyt falsely accused Tieu of being "aggressive," Def. Ex. C, Hoyt 139:5-9, and "bossing" around another employee.[10]  But this was a common criticism of Asian women at the EDC who were not docile.  See Zubulake v. UBS Warburg LLC, 382 F. Supp. 2d 536, 544-45 (S.D.N.Y. 2005) (employer's mistreatment of "other employees" is "relevant to the issue of the employer's discriminatory intent).  For instance, Hoyt became enraged that another female Asian employee disagreed with him.  Pl. 56.1 at ¶ 142; Supp. Tieu Decl. ¶ 18.  He described her as "difficult" and "combative," and, as with Tieu, gave her a negative performance review, ultimately causing the woman to resign.  Id.  Hoyt berated another Asian woman because she commented on a business matter in the workplace. Pl. 56.1 at ¶ 143; Supp. Tieu Decl. ¶ 18.  Several other Asian women, including Tieu, asked to be transferred away from EDC supervisor Connelly because of his abusive behavior.  Pl. 56.1 at ¶¶ 136-39, 143; Def. Ex. F, Tieu 105:15-17, 106:14-21, 113:20-114:14, 115:5-10; Supp. Tieu Decl. ¶ 12.  This mistreatment of Asian women and the notion that they are "difficult," "combative" or "aggressive" when they speak up—contrary to the discriminatory stereotype that they should be docile—is classic proof of race and sex discrimination.  See Kwon v. Univ. of Vermont and State Agricultural College, 912 F. Supp. 2d 135, 144 (D. Vermont 2012) (denying summary judgment based, inter alia, on the use of a "racial stereotype" of Asians).

Defendants criticize Tieu for raising discrimination claims based on various protected characteristics.  Def. Brf. at 28.  But a discrimination plaintiff, like any other, is permitted to proceed on alternate theories of liability.  Moreover, in the discrimination context, courts have

---

[10]      In fact, that employee thanked Tieu for setting her up for success.  Ex. X.

recognized claims based on "combination" of protected grounds that "cannot neatly be reduced into distinct components." Robertson v. Wells Fargo Bank, N.A., No. 3:14 Civ. 01861 (VLB), 2017 WL 326317, at * (D. Conn. Jan. 23, 2017) (quoting Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 109 (2d Cir. 2010). Here, for example, Tieu's race and sex claims center on substantial proof of Defendants' stereotypical expectation that Tieu, and other Asian women at the EDC, were not docile. See Virginia W. Wei, Note, *Asian Women and Employment Discrimination: Using Intersectionality Theory to Address to Title VII Claims Based on Combined Factors of Race, Gender and National Origin*, 37 B.C. L. Rev. 771, 801 ("Asian women are commonly characterized as passive and repressive").[11]

## V.   **RETALIATION**

Federal laws also prohibit an employer from retaliating against an employee for protesting discrimination or seeking an accommodation. Mihalik v. Credit Agricole Cheuvreux North America, Inc., 715 F.3d 102, 112 (2d Cir. 2013); Limauro v. Consol. Edison Co. of New York, Inc., No. 20 Civ. 03558 (CM), 2021 WL 466952, at *10 (S.D.N.Y. Feb. 9, 2021).  The employer is liable where retaliation was the "but for" cause of the adverse employment action, Piligian v. Icahn School of Medicine at Mt. Sinai, 490 F. Supp. 3d 707, 718 (S.D.N.Y. 2020), but the plaintiff is not required to show that retaliation was the only cause. Zann Kwan v. Andalez Grp. LLC, 737 F.3d 834, 846 (2d Cir. 2013).  Once again, retaliation may be proven "indirectly, by showing that the protected activity was followed closely by discriminatory treatment." Dodd v. City University of New York, 489 F. Supp. 3d 219, 247 (S.D.N.Y. 2020) (quoting Hicks v. Baines, 593 F.3d 159, 170 (2d Cir. 2010)).

---

[11]   Likewise, Tieu's disability, pregnancy and FMLA claims are logically intertwined. That Tieu (a woman undergoing a high-risk pregnancy who sought leave and adjustments to her schedule) was treated differently because of the combination of these traits is hardly surprising.

Here, it is uncontested that Tieu engaged in repeated acts of protected activity.  First, she sought accommodations in January and March 2019 (work from home) 56.1 ¶ 68; Ex. F, Tieu Dep. at 120:5-12; 125:7-13; Pl. 56.1 at ¶ 14; Def. Ex. F, Tieu 146:12-15; June 2019 (to be excused from a deposition) Pl. 56.1 at ¶ 32; Def. Ex. F, Tieu 184:3-25; and November 2019 (leave extension because of tumor diagnosis).  Pl. 56.1 at ¶ 77; Ex. J, at DEF 35-37.  In each instance, the EDC placed obstacles in her path before finally relenting.  Tieu also protested discriminatory treatment in July 2019 (to HR and then EDC President James Patchett) (Pl. 56.1 at ¶ 52, 57; Ex. J, at DEF 35-36; Supp. Tieu Decl. ¶ 6.; on July 30, 2019 (to Loeb), Pl. 56.1 at ¶ 51; Def. Ex. F, Tieu 205:18-22; August 1, 2019 (formal HR complaint), Pl. 56.1 at ¶ 58; Supp. Tieu Decl. ¶ 9; August 2, 2019 (Tieu's response to her first negative review), Pl. 56.1 at ¶ 62; Supp. Tieu Decl. ¶ 11; Ex. H, PL256-258; February 2, 2020 (demand letter from Tieu's attorney), Pl. 56.1 at ¶ 62; Supp. Tieu Decl. ¶ 11; Ex. H, PL256-258; and June 3, 2020 (EEOC filing). Ex. Q.  This protected activity tracks Tieu's exercise of her FMLA rights, as explained above.  And, for the same reasons stated above (timing, comments, pretext and sham investigation), a jury could easily conclude that Defendants retaliated against Tieu for protesting discrimination and seeking an accommodation.

29

## <u>CONCLUSION</u>

For these reasons, Plaintiff respectfully requests that the Court deny Defendants' motion

in its entirety.

Dated: April 14, 2023
      New York, New York                 Respectfully submitted,

                                          **WIGDOR LLP**

By: _____
              Valdi Licul
              Sagar Shah

              85 Fifth Avenue
              New York, NY 10003
              Telephone: (212) 257-6800
              Facsimile: (212) 257-6845
              vlicul@wigdorlaw.com
              sshah@wigdorlaw.com
              *Counsel for Plaintiff*