UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _2/13/2024____
```

LIA TIEU,

                           Plaintiff,

            -against-

NEW YORK CITY ECONOMIC
DEVELOPMENT CORPORATION,
WINTHROP HOYT and RACHEL LOEB, in
their individual and professional capacities,

                           Defendant.

21 Civ. 5951 (AT)

**<u>ORDER</u>**

ANALISA TORRES, United States District Judge:

In this employment discrimination case, Plaintiff, Lia Tieu, alleges that her employer, New York City Economic Development Corporation ("EDC"), and its employees, Winthrop Hoyt and Rachel Loeb, discriminated against her on the basis of her sex, race, and pregnancy in violation of the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2615(a)(2); Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"); the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* ("ADA"); the Civil Rights Act of 1866, 42 U.S.C. § 1981 *et seq.* ("Section 1981"); the New York State Human Rights Law, N.Y. Exec. Law § 296 (the "NYSHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107 (the "NYCHRL"); and retaliated against her for exercising her rights under these statutes. *See generally* Compl., ECF No. 1. Before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. ECF No. 78. For the reasons stated below, Defendants' motion is GRANTED.

BACKGROUND[1]

I.     Factual Background

A.  Tieu's Hiring and Initial Accommodation Requests

Tieu was hired as a vice president in asset management at EDC—a nonprofit organization that manages and develops City-owned real estate assets—in July 2018.  Def. 56.1 ¶¶ 1, 3, ECF No. 86.  In that role, Tieu was "responsible for supporting the oversight, development, and direct management" of real estate strategies and asset-management plans. Ex. M, ECF No. 79-13.[2]

Tieu initially reported to Darryl Connelly, a senior vice president in asset management revenue.  Def. 56.1 ¶ 15.  In October 2018, Connelly drafted a "performance improvement plan" for Tieu, noting concerns with her communication style.  Ex. N, ECF No. 79-14.  Connelly never delivered the plan to Tieu because she began reporting to Defendant Winthrop Hoyt in October or November 2018.  Def. 56.1 ¶¶ 21–22, 32.

In January 2019, Tieu informed Hoyt that she was pregnant.  Hoyt Dep. at 138:8–14, Ex. C, ECF No. 79-3; Pl. 56.1 ¶ 7, ECF No. 103.  Soon after, she asked to work from home for two days per week for two weeks due to pregnancy-related morning sickness.  Def. 56.1 ¶ 68. Tieu states that Rebecca Osborne, an HR assistant vice president, denied her request, explaining that EDC did not have a formal work-from-home policy.  Pl. 56.1 ¶ 8.  EDC claims that Tieu did not submit a doctor's note in connection with her request.  *Id.*  EDC granted Tieu's subsequent request to work in the office from 10 a.m. to 3 p.m. for three months.  Def. 56.1 ¶¶ 74–75.

---

[1] Citations to a paragraph in a Rule 56.1 statement also include the other party's response and any sur-replies.

[2] Citations to "Ex. #" refer to the exhibits to the declaration of Kuuku Minnah-Donkoh, ECF No. 79.

In February 2019, Tieu suddenly lost hearing in her left ear.  Pl. 56.1 ¶ 12.  Around March 1, 2019, she provided Osborne a letter from her doctor asking that EDC "excuse her from work" for two weeks.  *Id.* ¶ 13; *see* Ex. AA, ECF No. 79-28.  Tieu states that Osborne "immediately" called her "unfit for work," "threw" the letter back at her, and told Tieu to take sick and vacation days.  Tieu Dep. at 146:12–147:7, Ex. F, ECF No. 79-6.  According to Osborne, "unfit for work" is an outdated Australian term "relating to a doctor's clearance for duties."  Pl. 56.1 ¶ 15.  Tieu also notified Hoyt that she had requested the accommodation but could "be effective and continue to perform [her] job duties at home"; Hoyt replied that this was "of course fine with [him]."  Ex. BB, ECF No. 79-29.

Tieu submitted a second doctor's note stating that she could return to the office on March 18, 2019, but was "advised strongly to work from home" until then.  Def. 56.1 ¶ 99; Ex. EE, ECF No. 79-32.  Upon receiving the second doctor's note, EDC granted Tieu's request to work from home for that period.  Def. 56.1 ¶ 100; Ex. GG, ECF No. 79-34.  EDC also credited back two vacation/sick days that Tieu used.  Def. 56.1 ¶ 101.

In May 2019, Khary Hair, an HR employee, met with Tieu to discuss her upcoming parental leave.  Pl. 56.1 ¶ 22.  EDC requires that an employee seeking parental leave submit forms including a manager's signature.  *Id.* ¶ 23.  Tieu testified that when she asked Hoyt to sign her form on May 7, he declined, explaining that he believed she was only eligible for twelve weeks of leave instead of sixteen.  Tieu Dep. at 161:5–162:5.  After seeking clarification and learning that Tieu was, in fact, eligible for sixteen weeks, Hoyt signed the form on May 13.  Def. 56.1 ¶¶ 112–15; Hoyt Dep. at 152:22–155:10.

B. First Performance Review and Complaint

On June 5, 2019, an EDC paralegal informed Tieu that the company had been court-ordered to produce a witness for deposition in a lawsuit involving one of her real estate assets. Def. 56.1 ¶ 119.  Tieu replied that other employees with more knowledge of the property might be more suitable witnesses; the paralegal responded that the project manager (Tieu) "should be doing the deposition."  Ex. MM, ECF No. 79-40.  Tieu then stated that she was "8 months pregnant and [her] water could break at any moment," so she "may not be available" for the deposition, which was scheduled for July 12.  *Id.*  Hoyt agreed to "make [him]self available" for the deposition instead, although Tieu stated that if she was "around on July 12," she could be the witness.  *Id.*

Tieu testified that on July 9, 2019, Hoyt "yelled [at her]," "berated [her]," "told [her she] was shirking [her] responsibilities, he didn't want to go on the deposition," and that Tieu "had to do it" and "take ownership of [her] work."  Tieu Dep. at 186:12–24.  On July 11, Tieu emailed the legal department that she had not "gone into labor yet so [she would] be the witness for the deposition."  Ex. NN, ECF No. 79-41.  She testified that she "felt pressured to go."  Tieu Dep. at 189:19–24.

On July 23, 2019, Crystal Adams, an EDC risk manager, emailed Tieu a list of comments related to the insurance coverage of one of Tieu's real estate assets.  Def. 56.1 ¶ 173; *see* Ex. SS, ECF No. 79-46.  In response to Adams' email, Tieu sent an email to a group including Hoyt and Sabrina Lippman, another vice president in asset management.  The email read: "What is Crystal talking about? Sara [Zhu, EDC's insurance risk manager prior to Adams] never required us to do the things mentioned below.  Do you agree or disagree?  Please advise.  I will let Sabrina handle this."  Def. 56.1 ¶ 174; *see* Ex. SS.  According to Tieu, Hoyt "accused [her] of bossing

4

[Lippman] around and demanding that she do" Tieu's work, and told Tieu she "should be grateful that [Lippman was] doing [her] work, that she [was] doing [Tieu] a favor while [Tieu was] on maternity leave."[3]  Tieu Dep. 171:9–173:4; 215:7–16.  Hoyt denied that he accused Tieu of "bossing people around," but testified that he told Tieu "that if her colleagues were doing her job . . . while she was still at EDC, . . . it would be the equivalent of asking them a favor."  Hoyt Dep. at 157:8–25.  He explained that he found Tieu's email inappropriate because it was "her scope of work to perform and there was no reason for her to have [Lippman] do it."  *Id.* at 159:23–160:5, 161:9–17.

On July 25, 2019, Hoyt met with Tieu to deliver her performance review.  Tieu's overall review rating was a "3" out of "5," or "Consistently Meets Expectations."  Def. 56.1 ¶ 182; Ex. QQ at 4, ECF No. 79-44.  Hoyt rated Tieu a "3" for "Teamwork" and a "4" for "Results," but a "2" for "Communication."  Ex. QQ at 2–3.  In the "Communication" section, Hoyt explained that "[t]here have been occasions in this period where [Tieu] has become frustrated in communications with tenants and other parties which have resulted in some communication challenges."  *Id.* at 2. Hoyt noted that Tieu had "asked to be removed from challenging projects," including the "Audubon Ballroom and Columbia" projects.  *Id.* at 3.  On the Columbia project, Hoyt testified that during a meeting in December 2018, Tieu "took a very aggressive tone" toward representatives of Columbia University and suggested that EDC would hold Columbia in default.  Hoyt Dep. at 139:4–140:6.  On the Audubon Ballroom project, in March 2019, a project contractor had complained to Matt Kwatinetz, then-executive vice president of Tieu's department, that Tieu had become "increasingly dismissive" and needed to "check her tone."

---

[3] In a text message sent that day, Tieu recounted that Hoyt told her: "[Lippman] doesn't work for you.  She's doing you a favor.  You should continue to work while you're here."  Ex. TT, ECF No. 79-47.

Ex. T, ECF No. 78-21.  Kwatinetz asked Tieu to "tone down the language please"; Tieu replied that she was "merely following EDC protocol."  Ex. U, ECF No. 79-22.

After the performance evaluation, Tieu received a pay raise from $115,000 to $118,450, a smaller increase than she expected.  Def. 56.1 ¶ 193; *see* ECF No. 84-9 at 3.   Tieu then raised complaints to various EDC employees, including Hair; Rosa Vasquez, then-vice president of human resources; and Defendant Rachel Loeb, then EDC's chief operating officer.  Pl. 56.1 ¶ 54; Def. 56.1 ¶¶ 183–84; Tieu Dep. at 205:14–209:4.  To Vasquez, Tieu complained that she believed Hoyt was treating her differently because of her pregnancy and indicated that she wanted to file a formal complaint against him and Kwatinetz.  Def. 56.1 ¶ 185.

On August 1, 2019, Tieu emailed Hair to discuss "taking medical leave before [her] maternity leave starts."  Ex. XX, ECF No. 79-51.  She attached a letter from her doctor noting that she "requires twice weekly visits and ultrasounds" and recommending that she start her leave on August 5.  *Id.*  Tieu later testified that she had initially planned to work until her water broke because she "didn't want to use up [her] maternity leave," but that Hair, Vasquez, and Loeb had "forced" her to get the doctor's note advising an earlier leave date.  Tieu Dep. at 244:3–19, 249:15–17.  Defendants claim that Hair only told Tieu that salary continuation— allowing her to continue receiving pay before her parental leave began—was available to her. Pl. 56.1 ¶ 188; *see* Ex. WW, ECF No. 79-50.  EDC approved Tieu's request to go on leave beginning on August 5, 2019.  Def. 56.1 ¶ 192.

Shortly before Tieu went on leave, Vasquez and Erica Edwards-O'Neal, who was then EDC's Equal Employment Opportunity ("EEO") officer, met with Tieu regarding her complaint against Hoyt and Kwatinetz.  *Id.* ¶¶ 194–98.  During the interview, Tieu stated that she believed Hoyt discriminated against her by giving her a poor review because of her pregnancy, request for

leave, and race. *Id.* ¶ 199.  Tieu alleged that women were not promoted under Kwatinetz, and

that he had pushed out other Asian women on the team. *Id.*  Edwards-O'Neal and Vasquez also

interviewed Hoyt and Kwatinetz. *Id.* ¶ 202.  Edwards-O'Neal and Vasquez finished their

investigation on October 29, 2019, concluding that they were "unable to substantiate any claim

of discrimination based on race, gender or pregnancy." Ex. AAA, ECF No. 79-54.  On

November 6, 2019, Edwards-O'Neal mailed Tieu a copy of a "Complaint Outcome Memo,"

although she did not send the full investigation report.  Ex. BBB, ECF No. 79-55.

### C.  Leave

Tieu gave birth in August 2019 and was diagnosed with a tumor, which required surgery

and led her to experience postpartum depression and anxiety.  Pl. 56.1 ¶ 72.  Tieu underwent

brain surgery and was unable to return to work on the planned date. *Id.* ¶¶ 72–74.  She emailed

Hair and James Patchett (EDC's then-president) to request medical leave and submitted a note

from her therapist recommending twenty-four weeks of leave.  Def. 56.1 ¶ 216.  Hair responded

that because Tieu had requested "a new disability claim based on a new medical condition," her

doctors would need to fill out a new set of forms.  Ex. GGG, ECF No. 79-60.  Tieu's neurologist

and brain surgeon submitted the forms to Aetna on December 17, 2019.  Def. 56.1 ¶ 227.

By email dated December 18, 2019, Hair notified Tieu that he had "not received official

word from Aetna" that he could push back her return date.  ECF No. 84-10.  Hair advised Tieu

that her FMLA job protection had ended on October 25 and her EDC-provided parental leave

would end on December 20, and asked her to provide "some documentation" to "continue

holding [her] position on our books." *Id.*

On December 19, Tieu submitted a doctor's note from her neurosurgeon and requested a

provisional extension of her return date until March 4, 2020.  Def. 56.1. ¶¶ 234–35; Ex. HHH,

ECF No. 79-61.  EDC approved the extension.  Def. 56.1. ¶¶ 236.  On March 2, 2020, she

requested another leave extension for additional psychiatric care; EDC again approved the

extension until April 30, 2020.  *Id.* ¶¶ 237–38.

On April 28, 2020, Tieu submitted a return-to-work form.  *Id.* ¶ 239.  EDC granted Tieu's

request to work three days per week until May 29, 2020, and asked Tieu to sign another

"Flexible Work Arrangement" agreement for the reduced schedule.  *Id.* ¶¶ 240–41; *see*

Ex. KKK, ECF No. 79-64.

### D.  Return to Work, Second Performance Review, and Second Complaint

Tieu went back to work—remotely and on a reduced schedule—around May 4, 2020.

Def. 56.1 ¶ 239.  After she returned, Tieu asked Osborne about transferring departments, a move

that Tieu had previously discussed with Patchett.  Tieu Dep. at 283:23–285:23. According to

Tieu, Osborne informed her that a COVID-19 hiring freeze prohibited the transfer.  *Id.* at

285:11–286:17; Def 56.1 ¶ 273.[4]  Tieu did not formally apply for a transfer, and the parties

dispute whether HR told her that she needed to.  *Id.* ¶¶ 270–73.

Tieu also testified that several aspects of her job had changed upon her return.  First, she

testified, "80 percent of [her] projects were taken away"; Defendants state that the reduced

workload was due to her reduced schedule.  Tieu Dep. at 259:12–16; Def. 56.1 ¶ 262.  Second,

she did not have any direct reports assigned to her (although Defendants contend that she did not

have any direct reports prior to going on leave, either).  Def. 56.1 ¶ 258.  Third, she was now

required to attend two-on-one weekly check-ins with Hoyt and Julie Stein, who had been

promoted to co-heads of the portfolio management department.  Def. 56.1 ¶ 214; Pl. 56.1 ¶ 113.

Tieu claims (and Defendants dispute) that other employees had one-on-one meetings with their

---

[4] Per EDC policy, transfers can only be made to vacant positions.  Def. 56.1 ¶ 270.

supervisors and that she otherwise had limited interaction with Stein.  Pl. 56.1 ¶ 114.  Tieu felt

that she was under "intense scrutiny" from Hoyt and Stein.  Tieu Dep. at 259:21–25.

On June 4, 2020, Tieu requested an extension of her part-time schedule while she was

undergoing IVF treatment.  Def. 56.1 ¶ 246.  EDC granted the extension.  *Id.* ¶ 247.  In August

2020, EDC emailed employees instructions for communicating their plans to return to work in

the office.  *Id.* ¶ 248.  On August 13, Tieu advised Osborne that she was pregnant and requested

an exemption from EDC's return-to-work requirement because of her health conditions, her

husband's health conditions, and her infant child.  *Id.* ¶ 249.  EDC granted the exemption

through December 20, 2020, and later extended it through March 30, 2021.  *Id.* ¶¶ 250–55.

On February 1, 2021, Tieu received another performance review.  Def. 56.1 ¶ 289;

Ex. VVV, ECF No. 79-75.  Hoyt had solicited feedback on Tieu's performance from a variety of

individuals, including Stein and Loeb.  Def. 56.1 ¶ 290.  Hoyt gave Tieu an overall rating of

2.67, including a "2" for "Communication," which signifies "Sometimes meets expectations or

improvement needed."  *Id.* ¶ 296; Ex. VVV.  The review noted that "[f]eedback from key

stakeholders outside of the team also identified some areas for development in communication,"

including "asking questions before making assumptions about situations and being mindful of

not being 'short' with people."  Ex. VVV at 4.

Employees who received a score of "3" or higher on their performance review were eligible

for a one-time bonus between $1,200 and $1,500.  Def. 56.1 ¶¶ 322–23.  Because Tieu's overall

score was lower than "3," she was ineligible to receive the bonus.  *Id.* ¶ 324.

On February 18, 2021, Tieu emailed Vasquez, complaining that she had received a

retaliatory review and submitting a doctor's note recommending that she begin her leave that day

due to the high-risk nature of her pregnancy, anxiety, and emotional stress.  *Id.* ¶ 325.  Vasquez

forwarded Tieu's email to the new EEO officer, Mirna Santiago, for investigation.  *Id.* ¶ 330.
Santiago reviewed Tieu's performance evaluation, other evaluations Hoyt had prepared, and
Tieu's "rebuttal" to her evaluation; she also interviewed three of the individuals who had
provided feedback.  *Id.* ¶ 331.  Tieu declined to be interviewed.  *Id.*  Santiago ultimately
determined that Tieu's complaint could not be substantiated.  *Id.* ¶ 333; *see* Ex. EEEE, ECF No.
79-84.

Tieu admits that she has never heard Hoyt or Loeb make any derogatory comments about
Asians, women, or pregnant women.  *Id.* ¶ 337.  She states, however, that she "observed a culture
at EDC that repeatedly treated her and other Asian women less well and criticized them for being
'too aggressive.'"  *Id.*; *see* Tieu Supp. Decl. ¶¶ 17–20, ECF No. 88 (detailing how "[o]ther Asian
women at EDC have felt mistreated and harassed by Hoyt").

II.    <u>Procedural History</u>

On June 3, 2020, Tieu filed a charge of discrimination with the EEOC; the EEOC issued
a notice of right to sue on January 13, 2021.[5]  Compl. ¶ 13.  She commenced this action on July
12, 2021, alleging unlawful discrimination and retaliation on the basis of her sex, race, and
pregnancy in violation of the FMLA, Title VII, the ADA, Section 1981, the NYSHRL, and
NYCHRL.  *See id.*

Defendants move for summary judgment on all counts.  ECF No. 78; *see* ECF Nos. 79–
81.

---

[5] On April 12, 2021, the parties entered into an agreement tolling all applicable statutes of limitations until July 12,
2021.  Compl. ¶ 13 n.1.

## DISCUSSION

I.    Standard of Review

Summary judgment is appropriate when the record shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–26 (1986).  A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.

The moving party initially bears the burden of informing the Court of the absence of a genuine dispute of material fact by citing particular evidence in the record.  Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 323–24; *Koch v. Town of Brattleboro*, 287 F.3d 162, 165 (2d Cir. 2002).  If the nonmoving party has the ultimate burden of proof at trial, the movant may also satisfy its own summary judgment burden by demonstrating that the nonmovant cannot produce admissible evidence that supports the existence of a dispute of material fact.  *Celotex*, 477 U.S. at 322–23; *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam).  If the moving party meets its initial burden, the burden then shifts to the opposing party to establish a genuine dispute of material fact.  *Beard v. Banks*, 548 U.S. 521, 529 (2006); *PepsiCo*, 315 F.3d at 105.  "Although a party opposing summary judgment need not prove its evidence in a form admissible at trial or under the evidentiary standard which will be required, it must show facts sufficient to enable a reasonable mind to conclude that a material dispute of fact exists."  *Healy v. Chelsea Res. Ltd.*, 736 F. Supp. 488, 491–92 (S.D.N.Y. 1990) (citation omitted).  In deciding the motion, the Court views the record in the light most favorable to the nonmoving party.  *Koch*, 287 F.3d at 165.

The Court must be "cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question," and must "carefully scrutinize[]" the non-movant's affidavits and depositions for "circumstantial proof which, if believed, would show discrimination." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (internal quotation marks and citation omitted). That said, summary judgment is warranted if the opposing party "relies on conclusory allegations of discrimination and the employer provides a legitimate rationale for its conduct." *Figueroa v. N.Y. Health and Hosps. Corp.*, 500 F. Supp. 2d 224, 228 (S.D.N.Y. 2007) (internal quotation marks and citation omitted). To defeat summary judgment, the opposing party must set forth "concrete evidence from which a reasonable juror could return a verdict in [her] favor." *Anderson*, 477 U.S. at 256.

## II.    Discrimination

Claims Two, Four, and Ten of the complaint allege that Defendants discriminated against Tieu in violation of Title VII, the ADA, and § 1981, respectively. *See* Compl. ¶¶ 119–23, 129–33, 159–62.

### A.  Title VII

Title VII prohibits employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin."[6] 42 U.S.C. § 2000e–2(a)(1). Courts analyze employment discrimination claims brought under Title VII using "the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973)." *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012).

Under *McDonnell Douglas*, a plaintiff bears the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination; it is then the

---

[6] Under the Pregnancy Discrimination Act, "Title VII's prohibition against sex discrimination applies to discrimination based on pregnancy." *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 210 (2015).

defendant's burden to proffer a legitimate non-discriminatory reason for its actions; the final and ultimate burden is on the plaintiff to establish that the defendant's reason is in fact pretext for unlawful discrimination.

*Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 251 (2d Cir. 2014) (citation omitted).

### 1. Prima Facie Case

A plaintiff establishes a prima facie case if she

introduces evidence that raises a reasonable inference that the action taken by the employer was based on an impermissible factor.  [The plaintiff] must show: (1) that [she] belonged to a protected class; (2) that [she] was qualified for the position [she] held; (3) that [she] suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent.

*Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008) (citations omitted).

For the purposes of summary judgment, Defendants do not dispute that Tieu belongs to several protected classes (based on her race, gender, and pregnancy), nor that she was qualified for her position.  Def. Mem. at 21, ECF No. 81.  The parties disagree, however, about the third and fourth elements of the prima facie case.

### i. Adverse Employment Action

Beginning with the third element, Tieu argues that she suffered "two negative reviews, a diminished raise, a lost bonus[,] and significantly diminished job responsibilities," contending that each constitutes an adverse employment action.  Pl. Opp. at 26, ECF No. 89.  Defendants argue that only the first performance review, for which she received an allegedly "minimal raise," constitutes an adverse employment action.  Def. Mem. at 22 & n.13.

"To qualify as an adverse employment action, the employer's action toward the plaintiff must be 'materially adverse' with respect to 'the terms and conditions of employment.'"  *Davis v. N.Y.C. Dep't of Educ.*, 804 F.3d 231, 235 (2d Cir. 2015) (per curiam) (quoting *Sanders v. N.Y.C. Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004)).  The action must be "more

13

disruptive than a mere inconvenience or an alteration of job responsibilities." *Davis*, 804 F.3d at

235 (quoting *Sanders*, 361 F.3d at 755) (internal quotation marks omitted); *see also Joseph v.*

*Leavitt*, 465 F.3d 87, 90 (2d Cir. 2006) (citation omitted).  Additionally, "a plaintiff must set

forth objective proof that the alleged action was materially adverse." *Potash v. Florida Union*

*Free Sch. Dist.*, 972 F. Supp. 2d 557, 584 (S.D.N.Y. 2013) (citing *Beyer v. Cnty. of Nassau*, 524

F.3d 160, 164 (2d Cir. 2008)) (emphasis omitted).

      "Negative evaluations can be adverse employment actions only if they give rise to

material adverse changes in work conditions." *Kpaka v. City Univ. of New York*, No. 14 Civ.

6021, 2016 WL 4154891, at *7 (S.D.N.Y. Aug. 2, 2016) (citation omitted); *see also Borzon v.*

*Green,* No. 16 Civ. 7385, 2018 WL 3212419, at *8 (S.D.N.Y. June 29, 2018), *aff'd*, 778 F.

App'x 16 (2d Cir. 2019) ("Put differently, a negative performance review is not itself an adverse

employment action.").  "Examples of materially adverse changes include termination of

employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a

material loss of benefits, significantly diminished material responsibilities, or other indices

unique to a particular situation." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d

Cir. 2015) (citation omitted).

      Here, Tieu has offered evidence that her first performance review resulted in a smaller

raise than expected, and that the second resulted in the denial of a one-time bonus.  Although

Tieu never suffered a pay decrease, her receipt of a smaller raise and the denial of a bonus

nonetheless constitute "materially adverse changes" for the purposes of her prima facie case.

*See, e.g.*, *Boutin v. Comcast Cable Commc'ns Mgmt., LLC*, No. 21 Civ. 1630, 2023 WL

4564375, at *7 (D. Conn. July 17, 2023) (holding that a "0.5% raise resulting from [plaintiff's]

negative performance evaluation," which was "substantially lower" than expected, was an

adverse action); *Burgos v. Sullivan & Cromwell*, No. 99 Civ. 11437, 2001 WL 709268, at \*7 (S.D.N.Y. June 25, 2001) (finding that receipt of a raise smaller than that given to another employee could constitute an adverse employment action).

Tieu has also stated that "80 percent of [her] projects were taken away" after she returned from leave, although the parties dispute the exact contours of her pre- and post-leave workloads. Tieu Dep. at 259:12–16.  The Circuit has held that "significantly diminished material responsibilities" may signify an adverse employment action. *Vega*, 801 F.3d at 85.  *But see Bennett v. Watson Wyatt & Co.*, 136 F. Supp. 2d 236, 248 (S.D.N.Y. 2001), *aff'd*, 51 F. App'x 55 (2d Cir. 2002) (a "decrease in workload, without any formal demotion or reduction in pay, does not constitute an actionable adverse employment action.").  Although Tieu does not allege that she was demoted or that her pay was reduced, the Court assumes that the reassignment of the majority of her projects also constitutes an adverse employment action.

## ii.  Inference of Discriminatory Intent

The fourth element of the prima facie case requires Tieu to present evidence that her performance reviews were made "under circumstances giving rise to an inference of discriminatory intent." *Holcomb*, 521 F.3d at 138 (citations omitted).  Such circumstances may include "the employer's criticism of the plaintiff's performance in ethnically degrading terms," "invidious comments about others in the employee's protected group," "the more favorable treatment of employees not in the protected group," or "the sequence of events leading to" the adverse action. *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994) (citation omitted).  At summary judgment, the Court must determine "whether the proffered admissible evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer

a discriminatory motive," not to "decide what inferences should be drawn." *Id.* at 38.  The plaintiff's burden at this step is "de minimis." *Id.*

Tieu's evidence on pregnancy discrimination passes this low bar, if barely.  First, she notes that the sequence of events could permit a rational factfinder to infer a discriminatory motive, as the reviews and work reduction came "after Tieu announced her pregnancy and requested leave."  Pl. Opp. at 25.  Tieu also testified that after she said she may not be available to sit for a deposition due to her advanced pregnancy, Hoyt accused her of "shirking" her responsibilities and not taking "ownership" of her work.  Tieu Dep. at 186:12–24.  Around two weeks later, Hoyt delivered Tieu's first negative performance review.  Drawing all inferences in Tieu's favor, a rational factfinder could interpret Hoyt's comments as suggesting that Tieu, a soon-to-be mother, was not "show[ing] the same level of commitment" she had previously shown because of her pregnancy. *Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 120 (2d Cir. 2004).

On race and non-pregnancy gender discrimination, however, Tieu offers no admissible evidence suggesting a discriminatory motive.  Tieu concedes that she has never heard Hoyt or Loeb make discriminatory comments about women or Asians.  Def. 56.1 ¶ 337.  Instead, Tieu points to a portion Hoyt's deposition in which he characterizes her tone as "aggressive", *see* Hoyt Dep. 139:5–9; and (2) her own supplemental declaration, which states that several Asian women had negative experiences with Hoyt at EDC, Tieu Supp. Decl. ¶¶ 17–20.  Although describing a woman as "aggressive" invokes invidious gender stereotypes, *cf. Price Waterhouse v. Hopkins*, 490 U.S. 228, 250 (1989), a single stray comment—especially one long removed from the relevant adverse actions—does not establish a prima facie case of discrimination. *Johnson v. City of New York*, No. 18 Civ. 9600, 2020 WL 2036708, at *4 (S.D.N.Y. Apr. 28,

2020) (citation omitted).  Nor can Tieu establish a prima facie case of race and gender

discrimination by pointing to the other experiences of Asian women who have worked at EDC.

*See* Tieu Supp. Decl. ¶¶ 17–20.  Even if these secondhand stories were admissible, Tieu's

supplemental declaration does not establish that Defendants made any "invidious comments

about others in [her] protected group[s]," nor that employees not in her protected groups were

treated more favorably.[7]  *See Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015)

(quoting *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009)).

### 2.   Legitimate Nondiscriminatory Reason

Once the plaintiff establishes a prima facie case, "the burden then shifts to the defendant

to offer a legitimate, nondiscriminatory reason for" its actions.  *Ruiz v. Cnty. of Rockland*, 609

F.3d 486, 492 (2d Cir. 2010) (citation omitted).  "If the defendant proffers such a reason, the

presumption of discrimination drops out of the analysis, and the defendant will be entitled to

summary judgment unless the plaintiff can point to evidence that reasonably supports a finding

of prohibited discrimination."  *Spiegel v. Schulmann*, 604 F.3d 72, 80 (2d Cir. 2010) (cleaned

up).

Defendants argue that they have established legitimate, nondiscriminatory reasons for the

scores Tieu received in her two performance reviews: "EDC received complaints about Tieu's

communication style," and "Hoyt also observed communication issues with Tieu."  Def. Mem. at

19–20.  Although at this step Defendants "need not persuade the court that [they were] actually

motivated by the proffered reasons," *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 254

(1981), Defendants point to substantial evidence that concerns about Tieu's communication style

---

[7] In the complaint, Tieu alleges that her "less competent white and male co-workers"—including her former supervisor—have been "protected and even rewarded" at EDC.  Compl. ¶¶ 108–09.  Tieu offers no evidence, however, that she was similarly situated to a white or male employee who received allegedly preferential treatment. *See Colon v. Fashion Inst. of Tech. (State Univ. of New York)*, 983 F. Supp. 2d 277, 289 (S.D.N.Y. 2013).

were longstanding and grounded in specific incidents, including the December 2018 meeting with the Columbia representatives and the March 2019 complaints from the Audubon Ballroom contractor. *See* Ex. N (October 2018 draft performance improvement plan); Ex. R, ECF No. 79-19 (February 2019 ninety-day review); Ex. T (March 2019 complaint from contractor about Tieu); Hoyt Dep. at 139:4–141:3 (describing December 2018 Columbia meeting). In addition, Defendants have provided a legitimate, nondiscriminatory reason for the reduction in Tieu's workload upon her return from leave: she was working only three days a week, instead of her previous five. *See* Pl. 56.1 ¶ 102.

### 3. Pretext

Because Defendants have articulated legitimate, nondiscriminatory reasons for the adverse action, the burden shift back to Tieu to prove such reasons are pretextual. *Abrams*, 764 F.3d at 251 (citation omitted). On this record, Tieu has not carried her burden. She points, again, to Hoyt's alleged comment accusing her of "'shirking' her responsibilities." Pl. Opp. at 25. But to the extent that Tieu relies on the same "angry comments" that establish her prima facie case, *id.*, "it is well-settled that a plaintiffs' production of minimal evidence suggesting discriminatory intent, while sufficient to make a prima facie case, may not be enough in itself to satisfy the third prong of *McDonnell Douglas*." *Petrisch v. JP Morgan Chase*, 789 F. Supp. 2d 437, 448 (S.D.N.Y. 2011). Although the alleged comments could be interpreted to suggest bias on account of pregnancy, Tieu does not "demonstrate a sufficient nexus" to her subsequent performance reviews. *Id.* The performance reviews note issues with Tieu's communication skills, not her work ethic or productivity; indeed, the first review noted that Tieu's "Results" "consistently exceeded expectations" and that she was "excellent at executing work plans and keeping projects on track." Ex. QQ at 3.

At bottom, Tieu may "vehemently disagree[] with Defendants' assessment of [her] performance." *Pearson v. Lynch*, No. 10 Civ. 5119, 2012 WL 983546, at *10 (S.D.N.Y. Mar. 22, 2012)).  But "[t]he law is clear that a plaintiff's subjective disagreement with [her] reviews is not a viable basis for a discrimination claim." *Petrisch*, 789 F. Supp. 2d at 448 (cleaned up).

On the workload reduction, Tieu does not contest that she worked fewer days per week— at her own request—upon returning from leave.  Tieu testified that she was "still working almost a full-time schedule, since she was working on her days off and on the weekends."  Pl. 56.1 ¶ 103.  The fact that Tieu worked beyond her scheduled hours, however, does not establish that Defendants' justification for reducing her workload was pretextual.

Considering the record in its entirety and granting Tieu all the inferences to which she is entitled, the Court finds that Tieu has not produced evidence to support a finding that her performance reviews or workload reduction were influenced by discrimination on the basis of her race, gender, or pregnancy.  Accordingly, Defendants' motion for summary judgment as to Plaintiff's Title VII discrimination claims is GRANTED.

B.  Section 1981

Section 1981 provides that "all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens."  42 U.S.C. § 1981.  The Supreme Court has construed this provision to forbid racial discrimination in the making of public and private contracts.  *St. Francis Coll. v. Al–Khazraji*, 481 U.S. 604, 609 (1987).

The Second Circuit analyzes Section 1981 claims under the *McDonnell Douglas* framework.  *See, e.g.*, *Ruiz*, 609 F.3d at 491.  The Court, therefore, GRANTS Defendants'

motion for summary judgment on Tieu's Section 1981 for the reasons detailed in its analysis of Tieu's Title VII racial-discrimination claim.  *See supra* Part II.A.

C.  ADA

The ADA prohibits discrimination against any "qualified individual on the basis of disability," among other things, "employee compensation . . . and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  Claims alleging disability discrimination in violation of the ADA are also subject to the *McDonnell Douglas* burden-shifting analysis. *McMillan v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013).  To establish a prima facie case under this standard, the plaintiff must show by the preponderance of the evidence that "(1) [her] employer is subject to the ADA; (2) [s]he was disabled within the meaning of the ADA; (3) [s]he was otherwise qualified to perform the essential functions of [her] job, with or without reasonable accommodation; and (4) [s]he suffered adverse employment action because of [her] disability."  *Id.* (quoting *Sista v. CDC Ixis N. Am.*, Inc., 445 F.3d 161, 169 (2d Cir. 2006)). "Adverse employment action" has the same meaning under the ADA as it does under Title VII. *See Adams v. Festival Fun Parks, LLC*, 560 F. App'x 47, 49 (2d Cir. 2014).

Tieu's complaint alleges that Defendants "discriminated against Plaintiff on the basis of her disability and/or perceived disability in violation of ADA," Compl. ¶ 130, and her response brief suggests that this claim overlaps with her pregnancy-based gender discrimination claim under Title VII.  *See* Pl. Opp. at 28 n.11 ("Tieu's disability [and] pregnancy . . . claims are logically intertwined").  Even assuming that Tieu has established a prima facie case under the ADA, therefore, Defendants are entitled to summary judgment for the same reasons:  Tieu has not submitted evidence which undermines Defendants' legitimate, nondiscriminatory rationale for her disappointing performance reviews.  *See supra* Part II.A.

"An employer may also violate the ADA by failing to provide a reasonable accommodation." *McMillan*, 711 F.3d at 125. To establish a prima facie case based on failure to accommodate, the plaintiff must demonstrate that

> (1) [she] is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of [her] disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations.

*Id.* at 125–26.

Tieu alleges throughout her complaint that Defendants denied her reasonable accommodations for her high-risk pregnancy and its associated symptoms and conditions. *See, e.g.*, Compl. ¶¶ 25, 30–32, 41–43, 78–80. On summary judgment, Defendants do not contest that Tieu can establish the first three elements of the prima facie case. Def Mem. at 25. They argue, however, that Tieu cannot establish the fourth element because "she was granted each and every reasonable accommodation she requested."[8]  *Id.*

The record establishes that EDC repeatedly made reasonable accommodations allowing Tieu to perform her job throughout and after her pregnancy. First, Tieu alleges that EDC denied her request to work from home for two days per week for two weeks in January 2019, while she experienced morning sickness. Compl. ¶¶ 24–25. She does not contest, however, that EDC approved an alternative accommodation allowing her to work reduced hours for three months. Def. 56.1 ¶¶ 74, 81. Under the ADA, "employers are not required to provide a perfect accommodation or the very accommodation most strongly preferred by the employee"—the accommodation need only be "effective." *Noll v. Int'l Bus. Machines Corp.*, 787 F.3d 89, 95 (2d Cir. 2015). Tieu alleges that the alternative accommodation was "lesser," Compl. ¶ 27, but she

---

[8] Tieu does not respond to this argument in her brief, so the Court may deem it abandoned. *See Jackson v. Fed. Exp.*, 766 F.3d 189, 195 (2d Cir. 2014) ("[A] partial response arguing that summary judgment should be denied as to some claims while not mentioning others may be deemed an abandonment of the unmentioned claims.").

does not allege that it was ineffective.  The Court finds that the hour-reduction accommodation was "plainly reasonable," "end[ing] the analysis."  *Noll*, 787 F.3d at 94.

Second, Tieu alleges that EDC failed to accommodate her hearing loss when Osborne "labeled Tieu 'unfit for work' and sent her home instead of permitting her to telecommute." Compl. ¶ 56.  But it is undisputed that upon receiving a note from Tieu's doctor a few days later, EDC granted Tieu's request to work from home and credited back the two vacation/sick days that she used.  Def. 56.1 ¶¶ 100, 101.  Osborne's comment and initial reaction do not negate the fact that Tieu was granted the accommodation she requested in relatively short order.  *See Logan v. Matveevskii*, 57 F. Supp. 3d 234, 257–58 (S.D.N.Y. 2014) ("A delay in implementing an accommodation does not violate the ADA . . . unless the delay was unreasonable or plaintiff has provided evidence of discriminatory intent" (citation omitted)).

Tieu also alleges that EDC denied her an accommodation when Hoyt "forced" her to sit for a deposition "eight months into her high-risk pregnancy."  Compl. ¶¶ 43, 45.  But the record tells a different story.  The record does not indicate that Tieu asked to be excused from the deposition: on the contrary, she said she would be "happy to do it" if she were not in labor. Ex. MM.  When the time came, Tieu confirmed: "I haven't gone into labor yet so I will be the witness for the deposition."  Ex. NN.  Although Tieu alleges that she "felt pressured to go," Tieu Dep. at 189:19–24, she does not allege that she asked for an accommodation or that EDC denied her request.  *See Brown v. The Pension Boards*, 488 F. Supp. 2d 395, 407 (S.D.N.Y. 2007) ("It is settled that an employee cannot hold an employer liable for failing to provide an accommodation that the employee has not requested in the first place." (citation omitted)).[9]

---

[9] Indeed, when EDC's legal department learned Tieu would be attending the deposition, they requested it be moved from Staten Island to lower Manhattan "so that Tieu would not need to take the ferry."  Compl. ¶ 43.

The Court finds that Defendants granted Tieu reasonable accommodations during and after her pregnancy, and she, therefore, cannot make out a prima facie case of disability discrimination.  Accordingly, Defendants' motion for summary judgment on Tieu's ADA claim is GRANTED.

III.    <u>FMLA Interference</u>

The FMLA allows eligible employees to take up to twelve work weeks of unpaid leave per year for the purposes specified in the statute, including "a serious health condition that makes the employee unable to perform the functions of the position of such employee."  29 U.S.C. § 2612(a)(1)(D).  "FMLA claims come in at least two varieties: interference and retaliation." *Woods v. START Treatment & Recovery Ctrs., Inc*., 864 F.3d 158, 166 (2d Cir. 2017).  "[A]n employee brings an 'interference' claim when her employer has prevented or otherwise impeded [her] ability to exercise [her] rights under the FMLA."  *Id*.  An employee brings a retaliation claim after "actually exercising her [FMLA] rights or opposing perceived unlawful conduct under the FMLA and then being subjected to some adverse employment action by the employer."  *Id*.  Plaintiff asserts both types of claims in her first cause of action.[10]  Compl. ¶¶ 115–18.

To establish a FMLA interference claim, a plaintiff must show

(1) that [s]he is an eligible employee under the FMLA; (2) that defendant is an employer as defined in the FMLA; (3) that [s]he was entitled to take leave under the FMLA; (4) that [s]he gave notice to the defendant of [her] intention to take leave; and (5) that [s]he was denied benefits to which [s]he was entitled under the FMLA.

*Achille v. Chestnut Ridge Transp., Inc.*, 584 F. App'x 20, 21 (2d Cir. 2014) (cleaned up).

---

[10] Plaintiff's FMLA retaliation claim is addressed *infra* in Part IV.

Tieu argues that Hoyt interfered with her FMLA rights when he initially refused to sign her leave form. Defendants contend that Tieu "was authorized to take FMLA leave, and did, in fact, take FMLA leave," and that Hoyt's alleged comments "were entirely unrelated to her leave." Def. Reply at 3–4, ECF No. 95.

It is undisputed that although Hoyt did not immediately sign the leave form, he did sign it less than a week later after confirming that Tieu was entitled to sixteen weeks of parental leave. Def. 56.1 ¶ 115. A mere administrative delay in approving a leave request does not amount to interference unless a plaintiff shows that she "was harmed as a result of the delay, and did not take FMLA days because [s]he lacked the approval." *Dudley v. New York City Hous. Auth.*, No. 14 Civ. 5116, 2017 WL 4315010, at *23 (S.D.N.Y. Sept. 25, 2017) (cleaned up); *see also Matias v. Montefiore Med. Ctr.,* No. 20 Civ. 2849, 2022 WL 4448585, at *15 (S.D.N.Y. Sept. 23, 2022). Tieu has presented no such evidence.

Tieu further contends that Hoyt interfered with her FMLA rights by discouraging her from taking leave, alleging that he "made disparaging remarks about Tieu's leave, telling Tieu that she was 'shirking' her responsibilities" and "'should be grateful' that a colleague" would cover for her during her maternity leave. Pl. Opp. at 15–16. Courts in this Circuit require a plaintiff proceeding on a "discouragement theory" to offer evidence that she "attempted to assert [her] FMLA rights but was discouraged from doing so in such a way that would have 'dissuaded a similarly situated employee of ordinary resolve from attempting to exercise his or her FMLA rights." *Hockenjos v. Metro. Trans. Auth.*, No. 14 Civ. 1679, 2016 WL 2903269, at *8 (S.D.N.Y. May 18, 2016) (quoting *Reilly v. Revlon, Inc.*, 620 F. Supp. 2d 524, 535 (S.D.N.Y. 2009). Although a defendant cannot attempt to dissuade an employee from taking FMLA-protected leave, "[c]riticizing, even berating an employee's substantive job performance is not

enough to assert a claim for interference under a discouragement theory." *Hockenjos*, 2016 WL 2903269, at *9; *see also Hill v. New York City Hous. Auth.*, 220 F. Supp. 3d 499, 506 (S.D.N.Y. 2016) ("FMLA is not a shield to protect employees from legitimate disciplinary action by their employers if their performance is lacking in some manner unrelated to their FMLA leave." (citation omitted)).

Here, Hoyt's criticisms were directed toward Tieu's job performance and communications with Lippman, not toward her impending leave. Hoyt's alleged outburst occurred after Tieu delegated an assignment to Lippman, which Hoyt found "inappropriate" because the two held the same role. Hoyt Dep. at 159:23–160:5, 161:9–17. In a text message sent that day, Tieu recalled Hoyt telling her: "[Lippman] doesn't work for you. She's doing you a favor. You should continue to work while you're here." Ex. TT. No reasonable jury could find that Hoyt's comments were intended to discourage Tieu from taking leave; instead, they address a performance deficiency (improper delegation) "unrelated to [her] FMLA leave." *Hill*, 220 F. Supp. 3d at 506. And although Tieu also alleges that Hoyt told her she should be "grateful" Lippman would cover for her during her maternity leave, the Court cannot find that this statement would "dissuade a similarly situated employee of ordinary resolve" from taking leave. *Cf. Golden v. New York City Dep't of Env't Prot.*, No. 06 Civ. 1587, 2007 WL 4258241, at *2–*3 (S.D.N.Y. Dec. 3, 2007) (holding that plaintiff did not show that his supervisor's repeated mockery of his back injury "would have deterred an employee of ordinary firmness" from requesting or taking leave).

Tieu also argues that Defendants interfered with her FMLA rights by failing to restore her to the same or an equivalent position upon her return. Pl. Opp. at 16–17. "The FMLA provides that at the end of an employee's leave the employee has the right to return to the position [s]he

held before the leave or its equivalent." *Sista*, 445 F.3d at 174 (citing 29 U.S.C. § 2614).  This "restoration" right is not absolute: "If the employee is unable to perform an essential function of the position because of a physical or mental condition, including the continuation of a serious health condition, . . . the employee has no right to restoration to another position under the FMLA." *Id.* (quoting 29 C.F.R. § 825.216).

Tieu alleges that she "returned from leave to a different job," because she "no longer supervised anyone," "80% of her responsibilities were removed, she was only assigned short-term projects and treated as a new hire," and her second performance review "result[ed] in a lesser raise." Pl. Opp. at 17.  The Court need not decide whether these purported alterations to Tieu's job are actionable, however, because Tieu was undisputedly unable to return to her position after the end of her twelve-week FMLA leave. *See* Def. 56.1 ¶¶ 231, 234 (stating that Tieu's FMLA-covered leave ended on October 25, 2019, and Tieu requested a leave extension through March 4, 2020).  The FMLA, therefore, "did not entitle [Tieu] to be restored to [her] former position or to any other position." *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 161 (2d Cir. 1999).

Accordingly, Defendants' motion for summary judgment on Tieu's FMLA interference claim is GRANTED.

IV.    Retaliation

Claims One, Three, Five, and Eleven of the complaint allege that Defendants retaliated against Tieu for activities protected by the FMLA, Title VII, the ADA, and Section 1981, respectively.  *See* Compl. ¶¶ 115–18, 124–28, 134–38, 163–66.  These statutes all contain similar anti-retaliation provisions, which are likewise analyzed under the *McDonnell Douglas* burden-shifting framework.  *See Littlejohn*, 795 F.3d at 315 (Title VII and § 1981); *Treglia v. Town of*

*Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (ADA); *Millea v. Metro-N. R.R.*, 658 F.3d 154, 164

(2d Cir. 2011) (FMLA).  To establish a prima facie case of retaliation, plaintiff must show: "(1)

participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an

adverse employment action; and (4) a causal connection between the protected activity and the

adverse employment action."  *Littlejohn*, 795 F.3d at 316.  The burden then shifts to the

employer "to demonstrate that a legitimate, non-discriminatory reason existed for its action."

*Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013).  If the employer demonstrates such a

reason, the burden shifts back to the plaintiff "to establish, through either direct or circumstantial

evidence, that the employer's action was, in fact, motivated by discriminatory retaliation."  *Id.* at

129.  "[A] plaintiff alleging retaliation in violation of Title VII must show at the final step of the

analysis that retaliation was a 'but-for' cause of the adverse action, not simply a 'substantial' or

'motivating' factor in the employer's decision."  *Nieblas-Love v. N.Y.C. Hous. Auth.*, 165 F.

Supp. 3d 51, 70 (S.D.N.Y. 2016) (quoting *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338,

348 (2013)); *see also Georges v. Peters*, 581 F. App'x 80, 81 (2d Cir. 2014) (same for Section

1981); *Heiden v. N.Y.C. Health & Hosps. Corp.*, No. 20 Civ. 10288, 2023 WL 171888, at *21

(S.D.N.Y. Jan. 11, 2023) (same for the ADA).  Under the FMLA, the plaintiff must establish that

the exercise of FMLA rights was a "motivating factor" in the adverse employment action.  *See*

*Woods*, 864 F.3d at 166.

      A.  Prima Facie Case

      Defendants do not dispute that in seeking accommodations, taking FMLA leave, and

submitting various discrimination complaints to EDC, Tieu engaged in protected activity.  *See*

Pl. Opp. at 20, 29 (listing protected activities); *Weixel v. Bd. of Educ. of City of New York*, 287

F.3d 138, 149 (2d Cir. 2002) (seeking an accommodation is a protected activity under the ADA);

*Amin v. Akzo Nobel Chemicals, Inc.*, 282 F. App'x 958, 961 (2d Cir. 2008) ("Informal complaints to management as to discrimination on a basis prohibited by Title VII are protected activity.").  Nor do they contest that Defendants knew of her protected activity.  Tieu has, therefore, met the first two elements of the prima facie case.

On the third element, a plaintiff "must show that a reasonable employee would have found the challenged action materially adverse."  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

> The scope of actions that may be materially adverse for purposes of a Title VII retaliation claim is broader than those actions prohibited by Title VII's anti-discrimination provisions; the latter apply to the terms and conditions of employment, while the former anti-retaliation protection is broader and extends beyond workplace-related or employment-related retaliatory acts and harms.

*Alvarado v. United Hospice, Inc.*, 631 F. Supp. 3d 89, 118 (S.D.N.Y. 2022) (quotation marks and citation omitted).  Still, "even in the retaliation context, 'it is important to separate significant from trivial harms.'"  *Id.* (quoting *Burlington*, 548 U.S. at 68).

For the reasons stated above, Tieu's two disappointing performance reviews and the "80 percent" reduction of her workload constitute adverse employment actions.  *See* Part II.A.1.i. However, the other allegedly retaliatory actions—including assigning her no direct reports, Compl. ¶ 91; "ignor[ing]" one of her emails regarding her benefits, *id.* ¶ 92; requiring her to attend "two-on-one weekly meeting[s]," *id.* ¶ 100; and requiring her to "go through trainings and orientations that she has already attended," *id.* ¶ 98—do not rise above the level of "trivial harm."  *Alvarado*, 631 F. Supp. 3d at 118.  Tieu also suggests that Defendants retaliated against her by failing to transfer her to another unit.  *See* Compl. ¶ 97.  But, Tieu concedes that she never formally applied for a transfer, as required by EDC's internal policy.  Def. 56.1 ¶¶ 270–73.

On the fourth element, Tieu must show a causal connection between the adverse employment actions and her protected activities.  Tieu argues that the timing of the events, Loeb and Hoyt's "negative comments" about her, "pretext," and the "obviously flawed investigation[s]" into her complaints establish the causal connection.  Pl. Opp. at 19–25.  As described above, Tieu has shown that the adverse actions at issue followed her requests for accommodations, a protected activity under the ADA.  And, the second performance review and reduction in workload occurred after Tieu requested additional accommodations and made several formal and informal complaints of discrimination.  *See, e.g.*, Pl. 56.1 ¶¶ 48, 51, 52, 58.  "Given that the burden for establishing a prima facie case of retaliation is de minimis," the Court assumes for the purposes of this motion that Tieu has established a sufficient causal connection.  *Hornig v. Trustees of Columbia Univ.*, No. 17 Civ. 3602, 2022 WL 976267, at *23 (S.D.N.Y. Mar. 31, 2022) (internal quotation marks and citation omitted).

### B.  Nonretaliatory Justifications and Pretext

As with Tieu's discrimination claims, Defendants have pointed to legitimate, nonretaliatory reasons for the performance reviews and reduced workload: Tieu's communication skills needed improvement, and her three-day-per-week schedule justified reassignment of some of her projects.  *See supra* Part II.A.2.  Accordingly, the "presumption of retaliation dissipates," and the burden shifts back to Tieu to establish "that the desire to retaliate was the but-for cause of the challenged employment action."  *Hornig*, 2022 WL 976267, at *23 (quoting *Ya-Chen Chen v. City Univ. of New York*, 805 F.3d 59, 70 (2d Cir. 2015)).  At this stage, "temporal proximity between a protected [activity] and an adverse employment action is insufficient to satisfy plaintiff's burden to bring forward some evidence of pretext."  *Ya-Chen Chen*, 805 F.3d at 72 (cleaned up).

First, Tieu points to two allegedly discriminatory comments.  The Court has already discussed why Hoyt's alleged comment about Tieu "shirking" her work does not suffice to show pretext.  *See supra* Part II.A.3.  Tieu also cites an April 30, 2020 text message from Loeb to Hoyt and Stein, which reads:

> I know you got the news about Lia.  We will discuss at our check in.  I am here to support you in every way possible.  I know this is not the outcome any of us wanted or expected.  And I made it clear I will not jeopardize the amazing work that you two have established with the team or Sabrina's relationship with key tenants.

ECF No. 84-6.  Tieu speculates that the text refers to the "news" that she would be returning from leave.  Pl. Opp. at 23–24.  Loeb testified, however, that she was referring to Tieu's decision to "fil[e] a federal complaint against EDC and individuals."  Loeb Dep. at 160:9–161:3, Ex. A, ECF No. 79-1.  Although the Court is required to draw reasonable inferences in favor of the plaintiff, a conflict between sworn testimony and conjecture is insufficient to create a genuine issue of fact.  *See Ghirardelli v. McAvey Sales & Serv., Inc.*, 287 F. Supp. 2d 379, 391 (S.D.N.Y. 2003).

Second, Tieu argues that that Defendants' reasons for the negative reviews are pretextual because Hoyt and Loeb "hardly worked with Tieu," and Lauren Wolf, "the employee who worked most closely with Tieu, provided overwhelmingly positive feedback."  Pl. Opp. at 24.  But Tieu does not contest that she reported to Hoyt, *see* Ex. TTT, ECF No. 79-73, or that Wolf's feedback was incorporated into her performance reviews.  *See, e.g.*, Ex. QQ (performance review noting that Hoyt "received positive feedback from internal colleagues about Lia's communications with them on projects, especially Lauren Wolf").  The fact that Wolf did not deliver Tieu's performance reviews does not establish that Defendants' reasons for their scores were pretextual.

Finally, Tieu argues that the "obviously flawed investigation" into her complaints were a "transparent effort to exonerate Hoyt." Pl. Opp. at 24–25. Tieu claims that EDC's EEO investigators "tried to convince Tieu that her diminished performance rating was not negative," "declined to seek out potential witnesses," and misquoted Tieu in the final report. *Id.* Even accepting all of Tieu's allegations as true, however, "a faulty investigation is not in and of itself evidence of pretext." *Sharpe v. Utica Mut. Ins. Co.*, 756 F. Supp. 2d 230, 250 (N.D.N.Y. 2010). Here, the record shows no evidence that "deficiencies in [EDC's] investigation and/or the incorrect conclusion reached . . . can be attributed to a discriminatory motive." *Rodriguez v. City of New York*, 644 F. Supp. 2d 168, 188 (E.D.N.Y. 2008). The 2019 investigation report indicates that Vasquez and Edwards-O'Neal interviewed both Tieu and respondents Hoyt and Kwatinetz, and reviewed relevant emails, text messages, and promotion records. *See* Ex. AAA. Moreover, the 2021 report notes that Santiago interviewed Hoyt, Stein, Wolf, and another employee about Tieu's communication skills in connection with her second performance review. Ex. EEEE. Although Tieu suggests that unspecified "witnesses" would have been able to support her claims, Pl. Opp. at 24, "[it] is not the Court's role to . . . question the manner in which [an employer] conducts its internal investigations, . . . or determine whether the employer's actions were justified." *Koppar v. Orange Reg. Med. Ctr.*, No. 19 Civ. 11288, 2022 WL 348172, at *18 (S.D.N.Y. Feb. 2, 2022) (citation omitted). Again, although Tieu may disagree with the results of the investigations, she offers no evidence to demonstrate that "the manner in which the investigation[s] [was] conducted . . . was discriminatorily motivated, which is fatal to [her] claim." *Id.* (citation omitted).

Accordingly, Defendants' summary judgment motion as to Tieu's FMLA, Title VII, Section 1981, and ADA retaliation claims is GRANTED.

31

V.     State Law

Finally, Tieu brings claims under the NYSHRL and the NYCHRL.  Compl. ¶¶ 139–58.
Having granted summary judgment to Defendants on all of the Tieu's federal claims, however,
the Court declines to exercise supplemental jurisdiction over these state-law claims.  *See* 28
U.S.C. § 1367(c)(3); *see also Marcus v. AT&T Corp.*, 138 F.3d 46, 57 (2d Cir. 1998) ("[W]here
the federal claims are dismissed before trial, the state claims should be dismissed as well.").
Accordingly, those claims are DISMISSED without prejudice to renewal in state court.

## CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is GRANTED.
The Clerk of Court is directed to terminate the motion at ECF No. 78, enter judgment consistent
with this order, and close the case.

SO ORDERED.

Dated: February 13, 2024
       New York, New York

_____
ANALISA TORRES
United States District Judge